**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In re: | ) |
| | ) |
| CENTRAL FALLS DETENTION | ) Chapter 11 |
| FACILITY CORPORATION, | ) |
| d/b/a Donald W. Wyatt Detention Facility | ) Case No. 26 -_____ |
| | ) |
| Debtor.[1] | ) |
| | ) |

**DECLARATION OF DANIEL S. POLSKY IN SUPPORT OF THE**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Daniel S. Polsky, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.      I am a Managing Director of Getzler Henrich & Associates LLC ("Getzler Henrich"), a limited liability company, which has served as the financial advisor to the Central Falls Detention Facility Corporation (the "Debtor") since July 2025.  I have over 40 years of financial restructuring and bankruptcy experience.  I have served as a Managing Director at Getzler Henrich since October 2014.  During my career, I have been engaged in hundreds of matters. A copy of my curriculum vitae is attached as **Exhibit A**, which provides more detail as well as a list of representative engagements in which I have been retained in a leadership role.

2.      As part of overseeing the Debtor's preparations for the above-captioned case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), I have been serving as the Debtor's principal restructuring advisor and have been involved in advising on, and assisting with, preparing and finalizing the Debtor's petition and first day motions and formulating the Debtor's plan of reorganization, including supporting financial analysis.  I have familiarized

---

[1]      The last four digits of the Debtor's federal employer identification number are 5439. The address of the Debtor is 950 High Street, Central Falls, RI 02863.

myself with the Debtor's day-to-day functions and financial and business affairs.  Except as otherwise stated in this First Day Declaration (this "Declaration"), the statements set forth herein are based on (a) my personal knowledge or my opinion based on my experience, including time spent in the Debtor's facility and working with the Debtor's management on numerous operating and restructuring activities, (b) information that I have received from the Debtor, my colleagues at Getzler Henrich working directly with me or under my supervision, direction, or control, or other advisors of the Debtor, including professionals at Troutman Pepper Locke LLP ("TPL"), and Partridge Snow & Hahn LLP ("PSH"), and/or (c) my review of relevant documents, including historical business and financial records.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, TPL and PSH.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I would testify to the facts set forth herein.

3.      On July 10, 2026 (the "Petition Date"), the debtor filed its petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Rhode Island (the "Court").  To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its operations, the Debtor is requesting various types of relief in certain "first day" pleadings (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other goals, (a) obtaining authorization to utilize cash collateral on a post-petition basis; (b) ensuring the continued payment of employee wage and benefits obligations; (c) ensuring the Debtor's ability to continue to use its prepetition cash management systems without interruption; (d) ensuring the continued payment under certain essential utility services and insurance agreements; (e) establishing certain

administrative procedures to facilitate a seamless transition into chapter 11; and (f) promoting the efficient and expedited global resolution of claims. The achievement of these goals will be critical to the success of this Chapter 11 Case and the Debtor's reorganization efforts.

4. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 Case and in support of the Debtor's chapter 11 petition and First Day Motions filed contemporaneously herewith. I am familiar with the contents of each First Day Motion and believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to its operations and minimal loss of value, while allowing the Debtor to best serve its estate and its creditors' interests, and also pursue its goals of restructuring its bond debt and resetting its relationship with the City of Central Falls (the "City").

5. Although the Debtor is on solid financial footing from a cashflow perspective as it relates to its current liabilities, its more than $167 million of bond debt (described below) is not sustainable, and the Debtor is unable to repay it according to its terms. Therefore, the Debtor's main financial goal in this proceeding is to restructure that bond debt by eliminating almost approximately $101.6 million, or 60.1% of the aggregate outstanding bond interest and principal, while also turning the page with the City and resetting their relationship.

6. In the course of my work on this project, I was pleased to learn that the three main stakeholders in this case—the Debtor, the Consenting Holders (as defined below), and the City— are all in agreement with, and support, this chapter 11 filing so that the Debtor can achieve and implement the abovementioned goals, as well as "right-size" its balance sheet on a go-forward basis.

7. This Declaration is organized into four sections:

- **Part I** provides a general overview of the Debtor's history and current operations;

- **Part II** summarizes the Debtor's prepetition corporate structure;

- **Part III** describes the circumstances leading to the commencement of this Chapter 11 Case; and

- **Part IV** provides a summary of the evidentiary support for the First Day Motions.

## I.    OVERVIEW

### A.  The Debtor's Formation

8.    The Debtor is a public corporation authorized by the State of Rhode Island under the Act Creating Municipal Detention Facility Corporations under the provisions of Chapter 421 of the 1991 Public Laws of Rhode Island (the "Act"), codified at R.I. Gen. Laws § 45-54-1 et seq. (1991).  A copy of the Act is attached hereto as **Exhibit B**.  The General Assembly of the State of Rhode Island passed the Act in July 1991 seeking to promote economic development in Rhode Island and address the detention facility needs of the United States.  Pursuant to the Act, a "municipal detention facility corporation" was authorized in each city and town in Rhode Island.  However, as a condition to the continued existence of the corporations created by the Act, any city or town wishing to construct a detention facility pursuant to the terms thereof was required, prior to December 31, 1991, to (a) pass appropriate resolutions, (b) enter into a contract for the operation of a detention facility with the United States Marshals Service ("USMS"), and (c) receive all necessary zoning approvals for the site of the detention facility.

9.    On May 29, 1991, the City Council of the City of Central Falls (the "City Council") passed its *Resolution in Support of Creating a Municipal Detention Facility Corporation* (the "May 1991 Resolution") supporting passage of the Act and declaring a need for the development of a detention facility as a catalyst for economic growth in the City.  On August 5,

4

1991, the City Council passed its *Resolution Regarding the Central Falls Detention Facility Corporation* (the "August 1991 Resolution," and together with the May 1991 Resolution, the "1991 Resolutions") declaring a need for the Debtor to function in the City.  On August 9, 1991, the Debtor entered into that certain *Inter-Governmental Agreement 70-91-0033* with the USMS, as required by R.I. Gen. Laws § 45-54-1(c).  In addition, the Debtor was awarded all necessary zoning relief for the site of the detention facility effective December 19, 1991. The Debtor thus was created for the purpose of acquiring land and constructing, managing, and operating a detention facility in the City pursuant to the Act.

### B.  The Donald W. Wyatt Detention Facility

10.     The Debtor owns and operates the Donald W. Wyatt Detention Facility (the "Facility").  The Facility is comprised of (a) a three-story building built in 1993 located at 950 High Street, Central Falls, Rhode Island owned in fee simple by the Debtor, and (b) the Wyatt Detention Facility Training Building at 935 High Street, Central Falls, Rhode Island (including adjacent employee and visitors parking lots) ("935 High Street"), which the Debtor acquired on December 23, 2019 following its exercise of a purchase option under a prior lease.[2]  Following an expansion of the Facility in December 2006 and other modifications, its maximum occupancy increased from 300 male detainees to its current capacity of 782 detainees, including a 40-bed unit for female detainees (the "2006 Expansion").

11.     The Facility began operations in December 1993 under the management of Cornell Corrections ("Cornell") as a private operator under contract with the Debtor.  In 2006, the Debtor ceased making full payments to Cornell, and in 2007, the Debtor terminated its management agreement with Cornell and transitioned the day-to-day management of the Facility in-house to an

---

[2]     The Debtor previously leased the 935 High Street property pursuant to that certain *Lease Agreement* between Sanford Fink and Francine Fink, as lessors, and Debtor, as lessee, dated as of May 1, 2005.

employee of the Facility, in a role first designated as its chief executive officer, and today, as the warden.

12.     Michael Nessinger (the "Warden") serves as the Facility's warden. The Warden manages the day-to-day operations at the Facility and is assisted by approximately 251 employees, including staff and correctional officers.  Approximately 204 employees at the Facility are union members and subject to collective bargaining with the Debtor.

13.     Consistent with the purpose of its formation, the Facility provides significant economic development in Rhode Island.  Upon information and belief, over the period of 2020–2024, the Facility made payments to Rhode Island-based employees and vendors totaling approximately $27 million annually, on average.  Over the same period, the Facility employed an average of over 200 Rhode Island residents annually, resulting in further economic benefit to the State.

### C.  Operations and Government Contracts

#### i.      USMS Intergovernmental Agreement

14.     The Debtor currently accepts detainees from the USMS pursuant to that certain *Office of Detention Services Intergovernmental Agreement*, dated June 1, 2022 (as modified, amended, or supplemented from time to time, the "2022 IGA", and together with appendices and exhibits thereto referred herein, the "USMS Contract").  Under the USMS Contract, the Debtor houses federal detainees awaiting trial or sentencing in Federal Court.  The Debtor also, on occasion, houses adult detainees from the Federal Bureau of Prisons.

#### ii.     ICE Addendum to USMS Intergovernmental Agreement

15.     On March 1, 2019, the Debtor's agreement with the USMS was modified to add Immigration and Customs Enforcement ("ICE") as an additional party and allow the housing of

ICE detainees at the Facility in addition to the USMS detainees (as modified, amended, or supplemented from time to time, the "ICE Addendum").

### iii.    Navy Contract

16.    The Facility also houses United States Navy personnel who have been placed in the custody of the General Court-Martial Convening Authority (the "GCMC").  In 2016, the Debtor entered into a contract (the "Navy Contract") with the United States Naval Submarine Base New London in Groton, Connecticut to provide detention services for military personnel who have been placed in the custody of the GCMC for the United States Navy Mid-Atlantic Region Commander. The Navy Contract was recently extended through March 2027.

### D. Operating Revenues

17.    The Debtor's overall financial health depends on the average daily population of detainees housed at the Facility ("ADP").  As noted above, the Facility has the capacity to house 782 detainees, though the Facility has historically operated well below its maximum capacity.  The fixed per-diem rate currently received by the Facility for each detainee is $180.97.

## II.    CORPORATE STRUCTURE

### A.    Debtor's Management

18.    Pursuant to the Act, the Debtor is managed by a board of directors (the "Board") appointed by the City's Mayor, with such appointments subject to the approval of the City Council. *See* R.I. Gen. Laws § 45-54-5(a).  The current Board of the Debtor is comprised of the following directors:

| Name | Position |
| --- | --- |
| Herman Yip | Director |
| Anthony Goes | Director |
| Anthony Manfredi | Director |
| Matthew Mulligan | Director |

19.     The City's involvement with the Debtor is limited to the appointments to the Board made by the Mayor and approved by the City Council.  Once appointed to the Board, each director's fiduciary duties run solely to the Debtor. *See* R.I. Gen. Laws § 45-54-2(d). The directors receive no compensation for the performance of their duties but are reimbursed for their reasonable expenses incurred in carrying out their duties.  The Board, in turn, appoints the Warden, who is responsible for overseeing the management and overall day-to-day operation of the Debtor and the Facility.

**B.     Bond Issuance and Indenture**

### i.      Existing Bond Indenture

20.     In order to fund the 2006 Expansion, on or about June 30, 2005, the Debtor issued the $106,380,000 Central Falls Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 2005A (the "Existing Bonds") pursuant to the Indenture of Trust dated June 1, 2005 (the "Existing Indenture") by and between UMB Bank, N.A., as successor trustee under Indenture of Trust dated June 1, 2005 (the "Bond Trustee") and the Debtor.  A copy of the Existing Indenture is attached hereto as **Exhibit C**.  Approximately 71.2% of the principal amount of the Existing Bonds are held by the Consenting Holders.  As of the Petition Date, the principal amount of Existing Bonds outstanding is approximately $97.3 million, and the outstanding interest on the bonds is approximately $71.8 million.

### ii.     Open End Mortgage and Security Agreement

21.     The Existing Bonds are secured by and payable solely from Revenues (as defined in the Existing Indenture) and other funds generated by the Facility as set forth in the Existing Indenture (the "Existing Indenture Collateral").  As further security for the Debtor's obligations under the Existing Indenture, the Debtor entered into that certain *Open-End Mortgage, Deed,*

*Leasehold Mortgage and Security Agreement*, dated as of June 30, 2005 (the "Mortgage", and together with the Existing Indenture and any and all documents relating to the Existing Bonds, the "Existing Bond Documents") with the Bond Trustee.  Pursuant to the Mortgage, the Debtor granted to the Bond Trustee a first priority security interest in, and lien on: (a) the real property titled in the name of the Debtor, (b) all revenues of the Debtor, (c) all personal property of the Debtor, and (d) all leases and rents associated with the Facility[3] (collectively, the "Mortgage Collateral," and together with the Existing Indenture Collateral, the "Collateral").  The Bond Trustee perfected its security interest in, and lien on, the Mortgage Collateral by recording the Mortgage on June 29, 2005, with the Office of the City Clerk.

## C.       Local Impact Fees Owed to the City

22.      Between 1994 and 2009, the Debtor paid the City approximately $5,386,130 in local impact fees.  Under the Existing Indenture, the Debtor was only authorized to make payment for local impact fees to the City after satisfying the required principal and interest payments on the Existing Bonds and making provisions for certain reserve funds.  In 2009, the Debtor ceased payment of local impact fees because the Debtor had insufficient funds to do so.  Since 2015, the Debtor has made payments to the City totaling approximately $516,166.50, including the 2015 Forbearance City Payments (defined below) the Debtor agreed to pay as part of forbearance and settlement discussions.  In connection with the RSA, on April 10, 2026, the Debtor also made a payment of $250,000 constituting annual local impact fees due to the City for the period of July 1, 2025 through June 30, 2026.

---

[3]        The Mortgage also includes as collateral subject to the Bond Trustee's lien "the Debtor's leasehold interest in the real property lease and installment purchase agreement, between Sanford Fink and Francine Fink and Debtor." The Fink lease related to the real property at 935 High Street, which as noted above the Debtor now owns in fee simple.

**D.     Other Obligations of the Debtor**

### i.     General Unsecured Claims

23.     As of the Petition Date, the Debtor owes a *de minimis* level of general unsecured claims.  In the ordinary course, the Debtor pays its invoices as presented and has no unpaid accounts payable.  The Debtor expects to receive additional invoices for prepetition goods and services during the early post-petition period.  Under the Plan (defined below), Allowed General Unsecured Claims will be Reinstated or paid in full on the Effective Date.

### ii.     No Equity Security Holders

24.     The Debtor has no "equity security holders" as that term is defined under the Bankruptcy Code.

**E.     Material Prepetition Litigation**

25.     Data Security Incident Class Action. On July 19, 2024, a putative class action complaint was filed in the United States District Court for the District of Rhode Island (the "District Court"). *See Hellested v. Central Falls Detention Facility Corp.*, Case No. 1:24-cv-00284 (D. R.I. July 19, 2024) (the "Data Security Incident Class Action"). The plaintiffs in the Data Security Incident Class Action sought, *inter alia*, actual, compensatory, and statutory damages in an amount to be determined at trial in connection with a ransomware attack on the Debtor's IT infrastructure.  As of the Petition Date, the Debtor has reached an agreement in principle with the proposed lead plaintiff and class representative as to the terms of a settlement of the Data Security Incident Class Action.  Since late 2025, the Data Security Incident Class Action has been stayed by the District Court pending final confirmation on certain terms and definitive documentation. The Debtor intends to file a motion seeking preliminary approval of the Data Security Incident Class Settlement, including to establish notice and opt-out procedures and

schedule a final approval hearing. Subject to Bankruptcy Court approval of the proposed Plan, Holders of Data Security Incident Claims who do not timely opt-out of the Data Security Incident Class Settlement will receive the settlement terms described in Section 5.05 of the Plan. Holders of Data Security Incident Claims who timely opt out of the Data Security Incident Class Settlement will have their Data Security Incident Claims treated as Class 5 Claims and Reinstated as of the Effective Date, all subject to the terms and conditions set forth in the Plan.

26.     <u>UMB Federal Court Litigation</u>. On or around April 10, 2019, the Bond Trustee filed a verified petition and complaint in the United States District Court for the District of Rhode Island, in a case captioned *UMB Bank N.A. v. City of Central Falls et al.*, Case No. 19-0182-WES-PAS, against the Debtor, the City, Mayor James A. Diossa, City Councilors Maria Rivera, Jonathan Acosta, Hugo Figueroa, Franklin Solano, and Jessica Vega, and the Debtor's Board of Directors, seeking appointment of a receiver and other causes of action against certain of the defendants for breach of the Existing Indenture, breach of fiduciary duty, and breach of the Act, among others (the "<u>Federal Court Litigation</u>").

27.     The Federal Court Litigation was precipitated by a series of alleged actions taken by the Debtor and by the City with respect to the Debtor, including the State of Rhode Island's alleged attempt to dissolve the Debtor and close the Facility. On April 3, 2019, the City's Mayor at the time called a special meeting of the City Council to consider resolutions to effectuate the dissolution of the Debtor. The City Council passed two such resolutions, the first *Rescinding Withdrawing, Denouncing, Invalidating and Terminating the August 5, 1991 "City Council Resolution of Approval" Regarding the Central Falls Detention Facility Corporation,"* and the second *Rescinding Withdrawing, Denouncing, Invalidating and Terminating the August 5, 1991 "Resolution Regarding the Central Falls Detention Facility Corporation*. The Bond Trustee

alleged that these actions constituted the City's tortious interference with the Mortgage, the Existing Indenture, and the USMS Contract by impairing the revenue stream of the Debtor and its ongoing viability. The Bond Trustee also alleged that the City took steps to impermissibly extract money from the Debtor ahead of the Bond Trustee, including by attempting to collect property taxes from the Debtor on account of the Fink Property.

28.     On April 5, 2019, the Board (a) voted to "suspend" the ICE Addendum for a period of ninety (90) days, and (b) directed the Warden to return all immigrant detainees to ICE custody within seven (7) days (the "ICE Suspension"). The Bond Trustee alleged that the ICE Suspension constituted a breach of the USMS Contract, which constitutes the Bond Trustee's collateral under the Existing Indenture. The Bond Trustee also brought claims of tortious interference with the Mortgage, the Existing Indenture, and the USMS Contract against the Board and breach of fiduciary duty claims against members of the Board.

29.     As part of the Federal Court Litigation, on April 23, 2019, the City also filed certain crossclaims against the Debtor, including for breach of the 2015 Forbearance Agreement (defined below) as a result of the Debtor's failure to make the 2015 Forbearance City Payments (defined below), and counterclaims against the Bond Trustee for breach of the 2015 Forbearance Agreement and anti-SLAPP claims.

30.     On or around April 26, 2019, the Rhode Island District Court entered an *Order Granting Preliminary Injunction and Appointment of Board Monitor Pursuant to Federal Rule of Civil Procedure 65,* Case No. 19-00182-WES-PAS, Docket No. 47 (the "Preliminary Injunction"). Pursuant to the Preliminary Injunction, the Board was ordered to rescind several votes related to the suspension of the ICE Addendum and the removal of ICE detainees from the Facility. The Board was further ordered to ratify a new addendum related to renewed detention of ICE detainees.

12

A Board Monitor was appointed effective April 24, 2019 to monitor all material communications to or from the Board to the extent they impacted the assets of the Debtor, the security of the bonds, and/or the revenue stream of the Debtor. On April 26, 2019, the Court also ordered the appointment of a Special Master.

31.     The Rhode Island District Court subsequently terminated the appointment of the Special Master and the Board Monitor on February 26, 2020 and February 28, 2023, respectively. Currently, the Federal Court Litigation is stayed until July 7, 2026 by the District Court's text order dated June 4, 2026.

### III.     EVENTS PRECEDING THIS CHAPTER 11 CASE

**A.     Operational Challenges**

32.     As noted above, the Debtor's financial health is directly tied to its ADP. The chart below shows the fluctuating nature of the Debtor's ADP for the years 2017 through 2025:



33.     In March 2020, as a result of the COVID-19 pandemic, the Governor of Rhode Island declared a state of emergency and ordered all non-essential business services to temporarily

13

cease, leading to increased costs associated with operating the Facility while at the same time resulting in a substantial drop in ADP due to releases of detainees.  In an effort to address this calamitous "perfect storm"—increased expenses and decreased revenue—management implemented steps to mitigate the negative effects on operations, including but not limited to, availing itself of available government assistance.  In April 2020, Debtor received a Paycheck Protection Program ("PPP") Loan under the Coronavirus Aid, Relief, and Economic Security Act in the amount of $2,903,400. Proceeds of the loan were used to cover eligible payroll, related benefits, worker expenses and utilities. The loan was forgiven by the Small Business Administration in July 2021.  In February 2021, the Corporation received an additional PPP loan in the amount of $2,000,000. Proceeds of the loan were used to cover eligible payroll, related benefits, worker expenses and utilities. The loan was forgiven by the Small Business Administration in October 2021.

34.     The Debtor suffered further financial difficulty due to the ransomware attack in November 2023. While the Facility's technological infrastructure was eventually reconstructed and brought back online, the Debtor later learned that as a result of the attack, certain information regarding approximately 18,500 former and current detainees, employees, and vendors had been released on the dark web.  The ransomware attack is the subject of the Class Action.

35.     Over the life of the Facility, it has been consistently unable to sustain a population rate to fund both its operations and its obligations under the Existing Indenture.  As noted above, the Facility has the capacity to house 782 detainees; however, due to practical limitations relating to the inflow and outflow of detainees from the Facility, it cannot practically house 782 detainees at one time.  Over the past five years, the Facility has continued to operate well below its maximum capacity, with ADP averaging approximately 675 detainees.

**B.** **Keepership and Forbearance Agreements under Existing Indenture**

36. In 2014, the Debtor filed a receivership petition in the Rhode Island Superior Court (the "2014 Keepership"), resulting in the appointment of a temporary receiver, Jonathan Savage, whose role was subsequently modified to a "keeper" (the "Keeper"). To resolve the 2014 Keepership, the Debtor, City, Bond Trustee, and Keeper negotiated a forbearance agreement, dated March 30, 2015, among the Debtor, City, and Bond Trustee (the "2015 Forbearance Agreement"), pursuant to which the Bond Trustee agreed to forbear from exercising its rights and remedies under the Existing Indenture over a four (4) year period. The parties also agreed that the Debtor was authorized to transfer to the City a one-time payment of $100,000, plus $16,666.67 monthly in an aggregate amount of up to $800,000 from its revenues, to the extent funds were available subsequent to payment of operation and maintenance expenses (the "2015 Forbearance City Payments"). From March 2015 to August 2017, when payments ceased, the Debtor made the 2015 Forbearance City Payments of $16,666.67 per month. Pursuant to the 2015 Forbearance Agreement, the Board resumed oversight of the Debtor in April 2015.

37. On May 3, 2017, the Debtor and the Bond Trustee (but not the City) executed that certain Amendment to Forbearance Agreement (the "First Amendment to 2015 Forbearance Agreement"), pursuant to which the Bond Trustee advanced approximately $900,000 to the Debtor to fund security-based capital expenses and budgeted operational shortfalls. This amendment also provided that if the Debtor experienced future operational expense shortfalls that required funding from the Bond Trustee to meet its most essential operating expenses, the Debtor would be prohibited from making any monthly 2015 Forbearance City Payments for a period of 60 days from such budget shortfall requests.

15

38.      On March 12, 2018, the Debtor and the Bond Trustee executed that certain Second Amendment to the Forbearance Agreement (the "Second Amendment to 2015 Forbearance Agreement"), in which the Bond Trustee agreed to advance up to $388,000 in additional funds from the Debt Service Reserve Fund to pay for half of the Debtor's financial needs to construct a portion of its perimeter fence requested by the USMS (the "Fence Project").  The balance of the cost of the Fence Project was to be reimbursed by the USMS.

39.      On January 16, 2019, the Debtor and the Bond Trustee executed that certain Third Amendment to Forbearance Agreement (the "Third Amendment to 2015 Forbearance Agreement"), pursuant to which the Bond Trustee advanced funds as a bridge loan to the Debtor to meet essential budgeted expenses, including payroll.  On February 19, 2019, the Debtor satisfied all of its obligations to the Bond Trustee under the bridge loan under the Third Amendment to Forbearance Agreement and the parties terminated that emergency loan.

40.      On April 10, 2019, the Bond Trustee provided written notice to the Debtor that the 2015 Forbearance Agreement terminated pursuant to Section 4.2(ii) of the 2015 Forbearance Agreement. Specifically, the Bond Trustee terminated the 2015 Forbearance Agreement due, in part, to the unsuccessful attempt to dissolve the Debtor.

41.      On October 30, 2019, following the filing of the Federal Court Litigation in April 2019, the Debtor and the Bond Trustee entered into a new Forbearance Agreement the (the "2019 Forbearance Agreement"), pursuant to which the Bond Trustee agreed to forbear from the exercise of remedies under the Existing Indenture and to stay the Federal Court Litigation.  Pursuant to the 2019 Forbearance Agreement, the Bond Trustee advanced additional funds to the Debtor to meet essential budgeted expenses, including payroll, and the Debtor agreed that the Bond Trustee was entitled to debt service payments for remaining amounts in excess of $400,000 following payment

of operating expenses by the Debtor.  The 2019 Forbearance Agreement ultimately expired by its terms on December 3, 2021.

42.    Throughout the course of the Federal Court Litigation, the Debtor, Bond Trustee, and the City have engaged in mediated confidential settlement discussions before Magistrate Judge Patricia A. Sullivan in an attempt to negotiate global resolution (the "Federal Court Mediation"). As part of the Federal Court Mediation, the parties have agreed to a series of stays of the Federal Court Litigation, most recently through July 7, 2026.  The Federal Court Mediation has proven fruitful, resulting in the agreement that the Debtor would file this Chapter 11 Case and implement the restructuring embodied in the Plan (defined below).

C.    **Restructuring Support Agreement and Plan**

43.    On June 19, 2026, following months of extensive, arm's-length negotiations, the Debtor entered into a Restructuring Support Agreement (as amended from time to time and including all exhibits thereto, the "RSA"), with (a) holders representing approximately (i) 71.2% of the aggregate outstanding principal amount of Class 3 Claims (Existing Bond Secured Claims) (collectively, the "Consenting Holders"), and (b) the City (and together with the Consenting Holders, the "Consenting Parties").  Under the RSA, the Consenting Parties have agreed to support the Restructuring as set forth in the *Chapter 11 Plan of Central Falls Detention Facility Corporation* (the "Plan").  The Plan will result in a reduction of the principal amount of the Debtor's outstanding secured debt obligations by approximately 60.1% and will provide total relief between principal and interest of over $101.6 million, leaving the Debtor better positioned to implement its long-term business plan and reset its relationship with the City.  Significantly, the Plan also provides that all allowed claims, other than the Existing Bond Secured Claims and the City Claims (the treatment of which is set forth in the Restructuring Support Agreement), will be

17

paid in full or reinstated on the Effective Date, thus preserving value for local suppliers, trade creditors, litigation claimants, and other stakeholders of the Debtor.

44.     Under the Plan, the Debtor intends and expects that its day-to-day operations post-petition will continue as normal, and that all post-petition debts (including wage payments) to its employees will be paid in the ordinary course.

45.     Further, the Plan provides that holders of Class 3 Claims (Existing Bond Secured Claims) will receive their *pro rata* share of Series 2026 Bonds in the face amount of $67.5 million, $27.5 million of which will amortize and the remainder of which will be payable solely from excess cash flow.  The Plan also implements the terms of a settlement between the Debtor and the City in full and final satisfaction of the City's claims in the Federal Court Litigation, whereby the Debtor shall, among other things, make (a) go-forward payments of local impact fees to the City in the annual amount of $250,000, (b) an annual charitable donation of $25,000 to agreed-upon non-profits providing services in the City for public safety, and (c) reimbursement to the City of $400,000 in the first 12 months following the Effective Date of the Plan for community amenities to be provided by the City.

## IV.     FIRST DAY MOTIONS[4]

46.     The Debtor has filed a number of First Day Motions, consisting of administrative motions and motions relating to the Debtor's business operations. The Debtor believes, and I agree, that approval of each First Day Motion is an important element of its reorganization efforts and is necessary to ensure a seamless transition into chapter 11 with minimal disruption to its operations, including continuing to ensure the safe and orderly operation of the Facility. I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and

---

[4]     Capitalized terms used but not defined in this Part IV shall have the meanings given such terms in the applicable First Day Motion.

believe that the Debtor would suffer immediate and irreparable harm absent the ability to continue its business operations as requested in First Day Motions.

<u>**Administrative Motions**</u>

A. <u>**Debtor's Motion for Emergency Determination for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion")**</u>

47.     Pursuant to the Case Management Motion, the Debtor has requested that the Court enter an order providing for certain notice, hearing, and other case management procedures in this Chapter 11 Case. Given the number of parties in interest, requiring that service be made upon each of these parties would waste the Debtor's limited resources. Thus, the Debtor believes that requiring paper service of certain pleadings only upon main parties in interest, as well as authorizing service on all parties by email, will be efficient and save the estate significant time and expense. As more fully set forth in the Case Management Motion, the Debtor proposes to establish a core group of entities to receive notice of all Documents filed with the Court in this Chapter 11 Case (the "Core Group").  The Core Group shall include: (a) the Debtor, its counsel, and its co-counsel; (b) counsel to the Bond Trustee, and its co-counsel; (c) the Office of the United States Trustee; (d) counsel to the City; (e) the Internal Revenue Service; and (f) counsel to any Committee appointed by the United States Trustee. Further, the Debtor proposes to serve all other parties in interest who file a notice of appearance and request for service pursuant to Bankruptcy Rule 2002 (the "2002 List"). As set forth more fully in the Case Management Motion, the Debtor requests that parties requesting service pursuant to Bankruptcy Rule 2002 be deemed to consent to e-mail service in this Chapter 11 Case to facilitate the cost-effective administration of its estate.

48.     Additionally, due to the likely volume of motions and other pleadings that will be filed in this case, the Debtor has proposed that special hearing procedures be created, including the

19

scheduling of regular omnibus hearings at which the Debtor and other main parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.

49.	I believe that the approval of the case management procedures will not only prevent the Debtor's estate from incurring unnecessary costs, it will also preserve judicial resources through the establishment of orderly procedures for the conduct of this Chapter 11 Case and keep creditors informed through the efficient service of critical information.

B.	**Debtor's Motion For Emergency Determination For Entry of an Order (I) Authorizing the Debtor to Redact Certain Personally Identifiable Information from the Creditors Matrix, Schedules and Statements, and Related Documents; (II) Approving the Form and Manner of Notice of Commencement; and (III) Granting Related Relief (the "Creditors Matrix Motion")**

50.	Pursuant to the Creditors Matrix Motion, the Debtor is seeking entry of an order (a) authorizing the Debtor to redact certain personally identifiable information in connection with the Debtor's Creditors Matrix, Schedules and Statements, and any other documents filed publicly on the docket, (b) approving the form and manner of notice of commencement of this Chapter 11 Case, and (c) granting related relief.

51.	The Debtor believes, and I agree, that it is appropriate for the Debtor to redact from any paper filed or to be filed with the Court in this Chapter 11 Case (a) the names, home addresses, email addresses, and any other personally identifiable information of the Debtor's current and former employees and directors (collectively, the "Protected Parties"), and (b) the home addresses, email addresses, and any other personally identifiable information of all the Debtor's individual creditors (solely to the extent they are natural persons) (collectively, the "Individual Creditors").

52.	The Debtor runs a detention facility that held and holds, among others, individuals who have been accused of, and some who have later been convicted of, violent crimes. Some of these individuals may want to cause harm to current or former correctional officers, other Facility

20

employees, and their families. As a result, the Debtor works to ensure that the Protected Parties, specifically correctional officers, are generally only identified to detainees at the Facility by their last names as much as possible. The Debtor believes, and I agree, the privacy of the Protected Parties' personally identifiable information is paramount, given the serious risks and safety concerns in the Debtor's industry.

53.    As noted above, there are approximately 18,500 current and former detainees, employees, and vendors whose information was released on the dark web following a ransomware attack in November 2023. The Debtor believes, and I agree, that there is minimal, if any, benefit to the public disclosure of the Individual Creditors' contact information in this Chapter 11 Case. The public disclosure each Individual Creditors' home and email addresses would create an undue risk of identity theft for the individual as well as other potential risks to their welfare. I believe that the circumstances of this Chapter 11 Case warrant the redaction requested in the Creditors Matrix Motion as to the Individual Creditors to ensure that the privacy of these individuals without the unnecessary public disclosure of their personal home and email addresses.

54.    I respectfully submit that the Court should approve the confidentiality procedures described in the Creditors Matrix Motion to protect the privacy of the Protected Parties and Individual Creditors from public disclosure. I submit that it is appropriate to authorize the Debtor to redact from any paper filed with the Court in this Chapter 11 Case, the home addresses, email addresses and names (where applicable), of the Protected Parties and Individual Creditors from any document filed or to be filed with the Court, including the Creditor Matrix, Schedules and Statements.

21

C. **Debtor's Motion For Emergency Determination For Entry of An Order Extending Deadline to File (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, and (C) Statement of Financial Affairs (the "Schedules Extension Motion")**

55.     Pursuant to the Schedules Extension Motion, the Debtor seeks entry of an order extending the deadline by which the Debtor must file its (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "Schedules and Statements") by 30 days, for a total of 44 days from the Petition Date, through and including August 10, 2026, without prejudice to the Debtor's ability to request additional extensions for cause shown.

56.     To prepare the Schedules and Statements, the Debtor must first close its books as of the Petition Date and then compile information from its books and records relating to creditor claims, as well as the Debtor's assets, liabilities, executory contracts, and unexpired leases. This information is voluminous. The Debtor anticipates that there may be approximately 20,000 parties in interest in this case, many of whom will necessitate effort by the Debtor to obtain proper notice addresses, where available.

57.     I am advised that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) generally require debtors to file Schedules and Statements within 14 days after their petition date. I am also advised that under Bankruptcy Rule 1007(c), the Court has the authority to extend the time required for filing the Schedules and Statements "for cause." I believe cause exists for granting the extensions requested in the Schedules Extension Motion because of the voluminous information the Debtor must compile to complete the Schedules and Statements. Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtor, its employees, and its professional advisors in the near term, when these resources would

22

be best used to address the immediate needs of the Debtor's business operations, which is essential to the Debtor's ability to make a smooth transition into chapter 11, ensure the continued safety and security of its detainees and staff, and maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest.

58.     For the foregoing reasons, I believe granting the relief sought in the Schedules and Statements Motion is in the best interests of the Debtor, its estate and creditors, and parties in interest.

**D. Debtor's Application for Emergency Determination for Entry of An Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective As of the Petition Date (the "Claims Agent Retention Application")**

59.     I understand that this Court is authorized to utilize agents and facilities other than the Clerk for the administration of bankruptcy cases. I believe that if Epiq Corporate Restructuring, LLC ("Epiq") is retained as the claims and noticing agent (the "Claims and Noticing Agent") in this Chapter 11 Case, the distribution of notices and the processing of claims will be expedited and the Court Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims and notices. The Debtor's counsel has informed me that, pursuant to noticing requirements, the Debtor will be required to provide notice to thousands of persons and entities during the pendency of this Chapter 11 Case. The appointment of Epiq as the Claims and Noticing Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtor of the administrative burden associated with these necessary tasks. In addition, by appointing Epiq as the Claims and Noticing Agent in this Chapter 11 Case, the distribution of notices will be expedited, and the Court Clerk will be relieved of the administrative burden of noticing.

60.     I have also reviewed the Claims and Noticing Agent's engagement letter and the description of services that the Claims and Noticing Agent has agreed to provide and the compensation and other terms of the engagement as provided in the application of the Claims and Noticing Agent. Based on that review, I believe that the Debtor's estate, creditors, parties in interest, and the Court will benefit from the Claims and Noticing Agent's experience and cost-effective methods. The Debtor asserts, and I agree, that the appointment of the Claims and Noticing Agent is the most effective and efficient manner by which to provide noticing and claims processing services in this Chapter 11 Case and is necessary and in the best interests of the Debtor and its estate, and accordingly, I believe the Claims Agent Application should be approved in all respects.

**Cash Collateral Motion**

E.  **Debtor's Motion For Emergency Determination For Entry of Interim and Final Orders (I) Authorizing the Debtor (A) To Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Party; (III) Modifying the Automatic Stay; (IV) Scheduling A Final Hearing; and (V) Granting Related Relief (the "Cash Collateral Motion")**

61.     As discussed in Section II.B above, the Debtor's obligations to the Bond Trustee are secured by liens on the Debtor's (a) real property titled in the name of the Debtor, (b) all revenues of the Debtor, (c) all personal property of the Debtor, and (d) all leases and rents associated with the Debtor. During this Chapter 11 Case, the Debtor must obtain consent of the Bond Trustee to use the Bond Trustee's cash collateral (as defined in Bankruptcy Code § 363(a)) (the "Cash Collateral"), without which the Debtor would be unable to continue to operate the Facility and preserve value for the benefit of its estate.

62.     I believe that the Debtor's continued use of Cash Collateral as requested in the Debtor's Cash Collateral Motion is essential to preserve and maintain the going-concern value of

24

the Debtor's estate. The Debtor's ability to continue its operations without interruption is essential for the Debtor to maximize the value of its estate for the benefit of all stakeholders and avail itself of the "breathing room" afforded by a chapter 11 restructuring. Accordingly, the Debtor urgently requires Cash Collateral to continue to operate its business and to fund the administration of this Chapter 11 Case.

63.     Absent the relief requested in the Cash Collateral Motion, the Debtor will not have sufficient funds necessary to maintain the Facility, pay employee compensation, payroll taxes, overhead, and satisfy other operational requirements during its restructuring. All of the foregoing expenditures are essential to preserve the value of the Debtor's estate as a going concern. The Debtor believes, and I agree, that any delay in the Debtor's ability to access Cash Collateral would irreparably harm the Debtor and its estate, as well as jeopardize the Debtor's ability to operate the Facility in a safe and orderly fashion.

64.     As a condition to its consent to the Debtor's use of Cash Collateral, the Bond Trustee seeks the following forms of adequate protection against the post-petition diminution in value of its interest in the Cash Collateral resulting from the Debtor's use of such property: (a) replacement liens on all of the Prepetition Collateral of the Debtor's estate to the extent of any actual post-petition diminution in value; (b) supplemental liens, and security interests in, all of the assets of the Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products and profits therefrom (the "Supplemental Collateral"); (c) allowed superpriority administrative expense claims against the Debtor as, I understand, is provided for in section 507(b) of the Bankruptcy Code, to the extent of any actual diminution in value of the Prepetition Collateral; (d) periodic financial reports, documents, and other materials; (e) the right to seek

25

additional or alternative forms of adequate protection; and (f) payments of the reasonable and documented professional fees, expenses and disbursements (including, but not limited to, the expenses and disbursements of counsel and other third-party consultants, including financial advisors) incurred by the Bond Trustee (the "Bond Trustee Fees") in the amounts and at the times set forth in the Budget (as defined in the Cash Collateral Motion), a copy of which is attached to this Declaration as **Exhibit D**.

65.    The Debtor believes, and I agree, that the adequate protection provided in the Cash Collateral Motion is the product of extensive arms'-length negotiations between the Debtor and the Bond Trustee, is fair and reasonable under the circumstances, and is in the best interests of the Debtor, its estate, and all parties in interest. I believe that access to existing Cash Collateral will provide the Debtor with the liquidity necessary to ensure that the Debtor can continue operating in the course of its reorganization process. Based on the foregoing, I believe that entry of the Cash Collateral Motion authorizing the use of Cash Collateral is necessary and appropriate.

### Operational Motions

F.  **Debtor's Motion For Emergency Determination For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Maintain Existing Bank Accounts and Business Forms, (B) Continue Using its Existing Cash Management System, and (C) Continue Employee Credit Card Program; (II) Waiving Requirements of Section 345(b) of the Bankruptcy Code; And (III) Granting Related Relief (the "Cash Management Motion")**

66.    Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders, (a) authorizing, but not directing, the Debtor to (i) maintain and use its existing cash management system, including existing bank accounts, checks, and business forms, and (ii) continue its employee credit card program; (b) granting the Debtor a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtor's practices under the existing Cash Management System or other

26

actions described therein; (c) authorizing, but not directing, the Debtor to continue to maintain and use the existing deposit practices notwithstanding the provisions section 345(b) of the Bankruptcy Code; and (d) authorizing the Debtor to pay ordinary course fees and service charges in connection with the maintenance of its existing cash management system. The Debtor also requests that the Court authorize and direct all banks with which the Debtor maintains bank accounts to continue to maintain, service, and administer such accounts on behalf of the Debtor.

67.     Debtor's Bank Accounts and Funds Flow. The Debtor maintains an integrated, centralized cash management system in the ordinary course of its operations to collect, transfer, and disburse funds generated by the Facility's operations (the "Cash Management System"). The Cash Management System facilitates cash monitoring, forecasting, and reporting, and enables the Debtor to maintain the administration of five (5) bank accounts (collectively, the "Bank Accounts"). The Debtor maintains three Bank Accounts with Beacon Bank & Trust[5] ("Beacon Bank")—namely, an Operations and Maintenance Fund Account, Payroll Account, and a Detainee Welfare Account (the "Beacon Bank Accounts"). In addition, there are ten (10) Bank Accounts at UMB Bank, N.A. (the "UMB Accounts"), two of which are Bank Accounts that are part of the Cash Management System. The remaining eight (8) UMB Accounts are separately held and maintained by UMB Bank, N.A., as Bond Trustee in accordance with the Bond Documents (the "Trustee-Held Accounts"). Except as expressly set forth in the Cash Management Motion with respect to the UMB Revenue Fund and the UMB Tax Credit Reserve Fund, the Debtor is not seeking authority to use the Trustee-Held Accounts pursuant to the Cash Management Motion.

---

[5]     Effective September 1, 2025, Berkshire Hills Bancorp, the parent company of Berkshire Bank, and Brookline Bancorp, the parent company of Brookline Bank, Bank Rhode Island ("BankRI"), and PCSB Bank merged into a new company, Beacon Financial Corporation and its subsidiary, Beacon Bank & Trust. Prior to the merger, the Debtor held accounts at BankRI, which now operates as a division of Beacon Bank & Trust.

68.     <u>Existing Business Forms</u>. I am informed that in the ordinary course of business, the Debtor uses a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, purchase orders, and other business forms (the "<u>Business Forms</u>") and maintains books and records to document its financial results and a wide array of necessary operating information (collectively, the "<u>Books and Records</u>"). To minimize expenses and disruption, the Debtor seeks authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date, without reference to the Debtor's status as a chapter 11 debtor in possession. The Debtor believes, and I agree, that requiring the Debtor to change existing Business Forms and Books and Records would unnecessarily distract the Debtor from its restructuring efforts and impose needless expenses on the estate. The Debtor proposes to communicate with its various vendors and counterparties to notify them of the commencement of these cases, which the Debtor believes will provide adequate notice of the Debtor's status as debtor in possession. Further, once the existing stocks are depleted, the Debtor will use checks that include the "Debtor in Possession" notation on all checks and will order new business forms with a "Debtor in Possession" designation. The Debtor submits, and I agree, that such efforts protect the interests of parties conducting business with the Debtor on a postpetition basis while also avoiding unnecessary expenses and administrative delays at this critical time.

69.     <u>Bank Fees</u>. I am also informed that in the ordinary course of business, the Debtor pays, honors, or allows the deduction of periodic service charges and other ordinary course fees (collectively, the "<u>Bank Fees</u>") from the appropriate Bank Account in connection with maintaining the Cash Management System. To maintain the integrity of its Cash Management System, the Debtor requests authority, but not direction, to pay all prepetition Bank Fees and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis and consistent with

historical practice. The Debtor believes, and I agree, that it is appropriate for the Court to authorize the Debtor to continue to pay the Bank Fees, including any prepetition Bank Fees, to prevent any disruption to the Cash Management System and ensure that the Debtor's receipt of and access to funds is not delayed. I believe that the material benefit of maintaining the Cash Management System to avoid disruption and costly delay is warranted in comparison to the relatively modest amount of the Bank Fees.

70.      Employee Credit Card Program. I am also informed that in the ordinary course of business, the Debtor provided certain employees with access to credit cards, issued by Bank of America and Wright Express/WEX, Inc. (the "Credit Cards"), to pay for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to transportation expenses, office supplies, expenses related to the transfer of detainees (such as fuel), and other qualifying expenses related to the operations of the Facility (the "Employee Credit Card Program"). The Debtor pays the balances accrued on the Credit Cards directly for charges made by the employees through the Beacon Bank Operations and Maintenance Fund.  The Facility receives monthly billing statements that reflect the payments made on its behalf. The Debtor submits, and I agree, that the Employees' continued use of the Credit Cards and the Debtor's ability to pay the balances accrued on the Credit Cards through the Employee Credit Card Program substantially eases the burden of paying certain vendors, including certain vendors who will only accept credit cards as payment for their goods or services. I believe it is appropriate for the Court to authorize the Debtor to continue the Employee Credit Card Program.

71.      U.S. Trustee Operating Guidelines. I understand that the U.S. Trustee Operating Guidelines for this district require debtors in possession to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-

29

in-possession account for all estate monies required for payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.

72.     I believe that the enforcement of these provisions of the U.S. Trustee Operating Guidelines during the Chapter 11 Case would be expensive and burdensome and would severely disrupt the Debtor's operations. By contrast, I believe that maintaining the current Cash Management System will facilitate the Debtor's smooth transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, I believe that maintaining the current Cash Management System will allow the Debtor's employees to focus on their daily responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System.

73.     Moreover, the Debtor believes, and I agree, that no parties in interest will be harmed by maintaining the Cash Management System. I understand that the Debtor has implemented appropriate measures to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations.

74.     Additionally, I believe that affording certain flexibility to the Banks, as requested in the Cash Management Motion, is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtor may pay a particular item in accordance with a Court order or otherwise. Considering the nature of its operations, the Debtor needs to conduct transactions by debit, electronic fund, ACH payments, and other similar methods.

I therefore believe that if the Debtor is denied the opportunity to conduct transactions by debit, electronic fund, ACH payments, or other methods used in the ordinary course, the Debtor's operations would be disrupted unnecessarily, burdening the Debtor and its creditors with additional costs.

75.     The Cash Management System provides the ability to: (a) track and control the Debtor's funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  The Debtor's continued use of its Cash Management System will greatly facilitate its smooth transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition debts and avoid the need to incur the significant administrative difficulties and expenses relating to opening new accounts. I believe that any disruption to the Cash Management System would have a severe and adverse impact upon the Debtor's reorganization efforts and would jeopardize the Debtor's ability to operate the Facility in a safe and orderly fashion. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate and all parties in interest, and should be granted.

**G. Debtor's Motion For Emergency Determination For Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, Reimbursable Employee Expenses and other Compensation; and (B) Maintain Employee Compensation and Benefits Programs; and (II) Granting Related Relief (the "Wages Motion")**

76.     Pursuant to the Wages Motion, the Debtor seeks to (a) pay certain prepetition wages, salaries, reimbursable employee expenses and other compensation obligations, including overtime (the "Employee Wages"), and (b) maintain employee benefit programs and related obligations, such as vacation, federal and state withholding taxes and other withheld amounts,

31

health and welfare benefits, workers' compensation and programs that the Debtor historically has provided in the ordinary course of business (the "Employee Obligations").

77.     As described more fully in the Wages Motion, the Debtor employs approximately 251 employees, including approximately 240 Employees who are employed on a full-time basis (the "Full-Time Employees"), and 11 Employees who are employed on a part-time basis (the "Part-Time Employees") or a per diem basis (the "Per-Diem Employees," and together with the Full-Time Employees and the Part-Time Employees, collectively, the "Employees"). Approximately 204 of the Debtor's Employees (the "Union Employees") are represented by two local unions with whom the Debtor has collective bargaining agreements: (a) Fraternal Order of Police (FOP) Wyatt Lodge 50 (the "FOP"), as the bargaining representation for all correctional officers, including those correctional officers holding the ranks of Sergeant, and (b) Rhode Island Council 94 AFSCME, AFL-CIO ("Council 94," and together with FOP, the "Unions"), as the bargaining representative for certain medical, maintenance, and administrative support staff.

78.     The Debtor's ability to operate the Facility is entirely dependent on its dedicated workforce which performs a wide variety of functions critical to providing service and support to the Debtor's operations. The Debtor's workforce is comprised of skilled professionals, including correctional officers, sergeants, physicians, nurses, other specialized medical personnel, maintenance and administrative and other support staff. The Employees' skills, knowledge, and understanding of the Debtor's operations are essential to preserving operational safety, stability, and efficiency. Without the continued, uninterrupted services of its Employees, the Debtor's administration of this Chapter 11 Case would be materially impaired, and the safety and security of the Facility would be jeopardized.

79.     I believe that any delay in paying, or failure to pay, the Employee Wages and Employee Obligations would irreparably impair the morale of the Debtor's Employees at a time when their dedication, confidence, retention, and cooperation are most crucial. The Debtor asserts, and I agree, that the Employees would suffer hardship without the relief requested in the Wages Motion and, in many instances, financial difficulties, since the monies associated with the relief sought in the Wages Motion are needed to enable the Employees to meet their personal obligations and daily living expenses. The Debtor cannot risk such a substantial disruption to its business operations. In addition, without the requested relief, in my opinion the Debtor's stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

80.     The Debtor is not seeking relief to pay prepetition Employee Wages to any individual Employee in excess of the $17,150 cap imposed by section 507(a)(4) of the Bankruptcy Code.  I believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtor's overall business. Furthermore, the Debtor has sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtor and cash generated through operations. Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm, and is in the best interests of the Debtor, its estate, and all parties in interest.

H. **Debtor's Motion For Emergency Determination For Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures to Resolve Requests for Additional Adequate Assurance, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services and (IV) Granting Related Relief (the "Utilities Motion")**

81.     As more fully described in the Utilities Motion, in the ordinary course of the Debtor's operations, the Debtor obtains electricity, natural gas, water and sewage,

telecommunications, internet, waste, and other similar services (collectively, the "Utility Services") from approximately nine (9) utility providers (collectively, the "Utility Providers").

82.     Based on their monthly average for the twelve (12) months before the Petition Date, the Debtor pays approximately $150,000 each month for Utility Services, calculated as a historical average payment over the previous twelve-month period, or based on the highest month's bill during the same period when the full twelve-month period is unavailable.

83.     I understand that, to provide additional assurance of payment to the Utility Providers, the Debtor proposes to deposit $75,000 (the "Adequate Assurance Deposit") into a newly created, segregated, interest-bearing account maintained at UMB Bank, N.A. (the "Utility Deposit Account"). I am informed that the Adequate Assurance Deposit is equal to approximately one half of the cost of the Debtor's average monthly Utility Services, calculated as a historical average payment for the previous twelve-month period. Such Adequate Assurance Deposit will further assure the Utility Providers of payment for postpetition services.

84.     Furthermore, I believe the Adequate Assurance Procedures described in the Utilities Motion are necessary for the Debtor to effectuate its chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services. Any interruption in Utility Services, even for a brief period of time, would severely disrupt the Debtor's operations, jeopardize the Debtor's reorganization efforts, and create a substantial safety and security risk at the Facility. If the relief requested in the Utility Motion is not approved, the Debtor likely will be confronted with and forced to address numerous requests by its Utility Providers at a critical time for its business. I understand that the Debtor's Utility Providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtor altogether. Such an outcome could

34

jeopardize the Debtor's operations and their ability to maximize the value of its estate.

85.     Accordingly, I believe that it is critical that the Utility Services continue without interruption during this Chapter 11 Case, and the proposed Adequate Assurance Deposit into the Adequate Assurance Account is sufficient to provide the Utility Providers with adequate assurance, as required by the Bankruptcy Code.

**I.   Debtor's Motion For Emergency Determination For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Policies and Agreements Related Thereto, (B) Honor Certain Prepetition Obligations in Respect Thereof, (C) Renew, Revise, Extend, Supplement or Enter Into New Insurance Coverage, and (II) Granting Related Relief (the "Insurance Motion")**

86.     Pursuant to the Insurance Motion, the Debtor seeks entry of an order (a) authorizing, but not directing, the Debtor to (i) maintain existing insurance policies and pay on an uninterrupted basis all premiums, obligations, brokerage fees, deductibles, and administration fees arising thereunder or in connection therewith, including any obligations for prepetition periods, (ii) renew, revise, extend, supplement, or enter into new insurance policies, (b) modifying the automatic stay to the limited extent necessary to permit the Debtor's employees to proceed with any claims they may have under the Workers' Compensation Program (as defined in the Insurance Motion), and (c) granting related relief. I am informed that in the ordinary course of business, the Debtor maintains approximately thirteen (13) insurance policies (collectively, the "Insurance Policies") that are administered by ten (10) third-party insurance carriers (collectively, the "Insurance Carriers"). These policies provide coverage for both general and commercial business risks, including, but not limited to, coverage for the Debtor's real and personal property, general liability, professional liability (including medical malpractice liability), crime liability, cyber and privacy liability, directors' and officers' liability, commercial automobile liability, commercial umbrella liability, flood liability, and workers' compensation liability.

87.     The continuation of the Insurance Policies on an uninterrupted basis is integral to the functioning of the Debtor's business. I believe that if any of the Insurance Policies are permitted to lapse, the Debtor could face significant liability for personal or property damage, which, in turn, could harm all parties in interest. The Debtor could also be forced to obtain replacement insurance coverage on an emergency basis and at significant cost, or one or more of the insurance carriers could decline to renew its insurance policies or refuse to enter into new insurance agreements with the Debtor in the future. Accordingly, the Debtor believes, and I agree, that it must timely and fully make all payments with respect to the Insurance Policies, including, without limitation, any and all obligations in connection therewith.

88.     Moreover, failure by the Debtor to pay the premiums and deductibles associated with the Debtor's Workers' Compensation Program would jeopardize coverage and expose the Debtor to substantial liability in fines by various state workers' compensation boards.

89.     Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest in this case.

*[signature page follows]*

36

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 10, 2026

Name: Daniel S. Polsky

State of __New York__ )

)ss.:

County of __westchester__ )

On the __9th__ day of __July__ in the year __2026__, before me, the undersigned notary public, personally appeared __Daniel Polsky__, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____ Notary Public

Keyla Fernandez
Notary Public - State of New York
No. 01FE0041898
Qualified in Westchester County
My Commission Expires September 22, 2029

**<u>Exhibit A</u>**

## Daniel S. Polsky

Managing Director
Getzler Henrich & Associates LLC
1500 Broadway; 27th Floor
New York, NY 10036
Phone: 212-697-2400 ext. 215
Mobile: 914-393-6098
dpolsky@getzlerhenrich.com

### Profile

Daniel Polsky is a Managing Director in Getzler Henrich & Associates LLC, a boutique restructuring advisory firm. Mr. Polsky has 41 years of diverse restructuring experience.  He has led many engagements in formal bankruptcy proceedings and out-of-court restructurings and has advised unsecured creditors' committees, senior management and BOD's of distressed businesses, bank lenders, private equity investors and other parties-in-interest. Mr. Polsky has assisted clients in a wide variety of industries including healthcare, retail, telecommunications/media, steel, transportation, professional services, manufacturing and distribution, among others.  He has advised investors on business/asset acquisitions and distressed businesses on disposition alternatives. Mr. Polsky has served in advisory, expert and crisis/turnaround management roles and has served in numerous capacities during his restructuring career including:

- Decades of practice experience across a wide spectrum of industries and capital structure constituents

- Significant experience in bankruptcy and related litigation, including expert witness testimony

- Longtime creditor rights practitioner and a former leader of Creditor Rights practice in a large international consulting firm

- Company-side restructuring, CRO/Crisis management and turnaround roles

- Professional practice protection, risk management, concurring reviewer and service line policy development

Mr. Polsky has provided a full range of consulting services for numerous clients.  His extensive experience includes devising case recovery and litigation strategies, developing Plans of Reorganization and capital structures, designing operational and strategic plans, and creating and implementing cost reduction strategies. He has conducted various fraud, fraudulent transfer, preference and financial investigations, performed insolvency and liquidation analyses, prepared expert reports, and provided expert testimony in connection with various bankruptcy litigation and restructuring matters.  During his 41-year restructuring career, Mr. Polsky has also provided quality and risk management oversight, with consultation responsibility including conflict resolution and risk mitigation, engagement acceptance and documentation, service line policy development and complex client and technical matters.

## Prior Experience

- November 1999 to July 2014: Deloitte Financial Advisory Services LLP (CRG/RSG)

- September 1992 to October 1999: KPMG LLP (Corporate Recovery Services)

- January 1987 to September 1992: Price Waterhouse (Reorganization and Litigation Services)

- April 1985 to January 1987: Cook United Inc. (Cleveland, OH - discount retail department stores).  Mr. Polsky served as a member of the crisis/turnaround management team.  In this engagement, he assisted in cash management during lengthy period of insufficient capitalization, effectuating cost reduction and profitability improvement programs including evaluation and reorientation of the chain's advertising programs, distribution and promotional approach in its major urban markets.  Mr. Polsky served as a member of the Operating Committee of this New York Stock Exchange-traded company, while reporting to the president, chairman and executive vice president of merchandising.

- January 1984 to March 1985: Served as a commodity trader, performing hedging, arbitrage and related functions, concentrating in high-grade copper futures, forward contracts, physical metal purchases and sales and contract pricing.

## Clients Served

Mr. Polsky has had significant involvement in the following representative matters:

| Company | Client | Industry |
|---|---|---|
| Tricolor Holdings, LLC | Bank Lender Group | Subprime Autos: Dealerships/Lender |
| Multi-Specialty Physician Practice | Company – Financial Advisor | Southeastern states; 20+Medical Specialties; 200+Doctors; 200,000 Patients |
| Advantage Rent-a-Car | Liquidating Trustee | Car Rental Agency |
| Northwest Senior Housing | Landlord | Cont. Care Retirement Community |
| PNW Cornerstone Healthcare | Company – Financial Advisor | Skilled Nursing/Assisted Living |
| Clare Oaks | Company – Financial Advisor | Cont. Care Retirement Community |
| Barnett Paper & Pulp | Bank Lender Group | Paper, Linerboard |
| Specialty Physician Practice | Medical Practice - Financial Advisor | Anesthesiology |
| BWGS, LLC | Company – CRO/CFO | Distribution-Agricultural/Hydroponics |
| Lighthouse Guild/ GuildNet | Company – Financial Advisor | Managed LT Care Plan (MLTCP) |
| Hebrew Hospital Home Organization | Companies/Debtors – Financial Advisor | Continuing Care Retirement Community; Home Health Agency; Skilled Nursing Facility; Adult Day Care; MLTCP |
| Community Intervention Services | Company – Financial Advisor | Behavioral Healthcare Platform: Autism; Mental Health; Early Intervention; Community-based |
| Multi-Specialty Physician Practice | Company – Financial Advisor | Northeastern states; 50+Medical Specialties; 900+Doctors; 675,000 Patients |
| Long Beach Medical Center | Unsecured Creditors' Committee | Acute Care Hospital; Skilled Nursing |
| Sound Shore Med Ctr of Westchester | Unsecured Creditors' Committee | Acute Care Hospital System; SNF |
| Hipcricket Inc. | Unsecured Creditors' Committee | Mobile Advertising and Marketing |
| Dewey & LeBoeuf | Unsecured Creditors' Committee | Law Firm – dissolution |
| Pemco World Air Services | Unsecured Creditors' Committee | Commercial Aircraft MRO |
| Lower Bucks Hospital | Unsecured Creditors' Committee | Acute Care Hospital |
| Philadelphia Orchestra Association | Unsecured Creditors' Committee | Symphony Orchestra |
| Sumner Regional Health System | Unsecured Creditors' Committee | Acute Care Hospital |

| | | |
|---|---|---|
| Centaur Corp. | Unsecured Creditors' Committee | Racing and Gaming |
| Cabrini Medical Center | Secured Creditor | Acute Care Hospital |
| Cynergy Data, Inc | Unsecured Creditors' Committee | Credit/Debit Card Processing |
| The Rugged Bear | Unsecured Creditors' Committee | Retail-Children's Apparel |
| Ritz Camera Centers | Unsecured Creditors' Committee | Retail-Photography |
| Sportsman's Warehouse | Unsecured Creditors' Committee | Retail-Hunting/Fishing |
| S&K Famous Brands, Inc. | Unsecured Creditors' Committee | Retail-Men's Apparel |
| National Heritage Foundation | Unsecured Creditors' Committee | Not-for-Profit Public Charity |
| Hawaii Medical Center | Unsecured Creditors' Committee | Acute Care Hospitals (2) |
| Goody's Family Clothing | Unsecured Creditors' Committee | Retail-Apparel |
| Haven Eldercare | Unsecured Creditors' Committee | Assisted Living/Nursing Homes |
| Strategic Supplier | Fortune 50 - Consumer Goods | PET/Plastic Bottles/Containers |
| InPhonic, Inc | Unsecured Creditors' Committee | Retail On-line: Cell Phones/Cell Plans |
| NY Westchester Square Med. Center | Unsecured Creditors' Committee | Acute Care Hospital |
| Auburn Memorial Hospital | Unsecured Creditors' Committee | Acute Care Hospital |
| Rowe Furniture, Inc. | Unsecured Creditors' Committee | Furniture Manufacturer |
| Photocircuits Corp. | Unsecured Creditors' Committee | Printed Circuit Board Mfgr. |
| Coudert Brothers LLP | Financial Advisor to Law Firm | Dissolution of Law Firm |
| Global Crossing LTD | Unsecured Creditors' Committee | Telecommunications |
| Rouge Industries, Inc. | Unsecured Creditors' Committee | Steel Manufacturer |
| Slater Steel, Inc. | Unsecured Creditors' Committee | Specialty Steel Manufacturer |
| J.A. Jones, Inc. | Unsecured Creditors' Committee | Construction Contractor |
| Communications Dynamics, Inc. | Unsecured Creditors' Committee | Cable/Broadband Distributor |
| Budget Car Rental | Avis/Cendant (Acquiror) | Rental Cars |
| Safety-Kleen Corporation | Unsecured Creditors' Committee | Industrial and Hazardous Waste |
| RSL Communications/USA | Debtor-in-Possession | Telecommunications |
| Washington Group Int'l, Inc. | Debtor-in-Possession | Construction & Engineering |
| Outsource International, Inc. | Debtor-in-Possession | Temporary Staffing |
| Nobody Beats The Wiz | Acquiror | Retail-Consumer Electronics |
| Lomas Financial Corporation | Debtor-in-Possession | Mortgage Servicing |
| Smith Corona Corporation | Unsecured Creditors' Committee | Office Equipment |
| Elizabeth Webbing, Inc. | Unsecured Creditors' Committee | Textile Manufacturing |
| Avian Farms USA | Company-Restructure/Refinance | Poultry Breeding |
| Global Associates | Acquiror | Defense Contractor |
| Apex One, Inc. | Unsecured Creditors' Committee | Sports Apparel Licensing/Marketing |
| Plattco, Inc. | Unsecured Creditors' Committee | Manufacturing/ Specialty Valves |
| Direct Travel, Inc. | Company-Restructure/Sale | Travel Agency |
| Pudgie's Famous Chicken | Debtor-in-Possession | Restaurants/ Franchisor |
| Cresvale International, Inc. | Official Receiver (Luxembourg) | Broker/Dealer |
| Golden-Lee Book Dist, Inc. | Debtor-in-Possession | Book Distributors |
| Marisa del Re Gallery | Bank Lender-Forensic Investigation | Art Galleries/Dealer |
| Hempstead General Hospital | Debtor-in-Possession | Acute Care Hospital |
| Anorad Corporation | Debtor-in-Possession | Linear Motors/ Positioning Devices |
| Rose's Stores, Inc. | Debtor-in-Possession | Retail - Discount Department Stores |
| Northwest Airlines | Bank Lenders | Airline |
| Kiwi Airlines | Unsecured Creditors' Committee | Airline |
| The Faxon Company | Company - Restruct. /Strategic Plan | Library Subscription Agency |
| Four Winds, Inc. | Company - Restructuring/Refinancing | Psychiatric Hospitals |

| R. H. Macy & Co., Inc. | Bondholders' Committee | Retail – Department Stores |
|---|---|---|
| Harvard Industries, Inc. | Bondholders' Committee | Automobile Parts Manufacturing |
| 47th Street Photo, Inc. | Unsecured Creditors' Committee | Retail - Cameras/Electronics |
| Simmons Company | Company - Restructuring | Bedding Manufacturer |
| Morse Shoe, Inc. | Bank Lenders' Committee | Retail - Fayva Shoes/Leased Depts. |
| Duckwall-ALCO Stores, Inc. | Unsecured Creditors' Committee | Retail - Discount Department Stores |
| Heck's, Inc. | Unsecured Creditors' Committee | Retail - Discount Department Stores |
| Miller & Rhoads, Inc. | Debtor-in-Possession | Retail – Department Stores |
| Virginia Specialty Stores, Inc. | Debtor-in-Possession | Retail - Women's Apparel Stores |
| Maxway-Danners, Inc. | Unsecured Creditors' Committee | Retail - Discount/Variety Stores |
| OTASCO, Inc. | Unsecured Creditors' Committee/Restructuring | Retail - Discount Stores/Auto Service Centers |
| S.E. Nichols | Debtor-in-Possession | Retail - Discount Dept./ Drug Stores |
| Cook United, Inc. | Debtor-in-Possession | Retail - Discount Department Stores |
| Kaufman & Roberts, Inc. | Debtor-in-Possession/Restructuring | Retail - Appliances/Electronics |
| Adam Metal Supply, Inc. | Debtor-in-Possession | Aluminum Service Center |
| La Prairie, Inc. | Company - Restructuring | Cosmetics Production/Distribution |
| Vestron, Inc. | Unsecured Creditors' Committee | Entertainment/Video Distribution |
| Tracor, Inc. | Bank Lenders' Committee | Defense/Aerospace Contractor |
| Ross Bicycles | Secured Lender | Bicycle Manufacturer/Distributor |
| Houlihans Restaurants | Lender - Restructuring | Restaurants/Real Estate |
| Bucknell Press | Secured Lender | Printing |
| Athenia Audio Disc | Secured Lender | Cassette/CD Box  Manufacturer |
| Cuyahoga Wrecking Company | Unsecured Creditors' Committee | Demolition Contractor |
| Cambridge Drywall | Secured Lender | Construction Contractor |
| Revco, D. S., Inc. | Debtor - Special Vote Tabulator | Retail - Discount Drugs |
| Thomson McKinnon Securities | Secured Lender | Securities |
| Best Products/Tandy Corp. | Reclaiming Creditor-Litigation | Retail - Catalog Showrooms |

## Education and Professional Affiliations

- New York University, Graduate School of Business Administration: MBA (Finance) 1983

- University of Pennsylvania: BA 1980

- Member:  American Bankruptcy Institute (ABI)

**<u>Exhibit B</u>**

# Title 45
# Towns and Cities

## Chapter 54
## Municipal Detention Facility Corporations

### R.I. Gen. Laws § 45-54-1

**§ 45-54-1. Corporations created.**

**(a)** For the purposes stated in this chapter there is incorporated in each city and town a body corporate and politic which shall be known as the municipal detention facility corporation of the municipality. The corporation is a public corporation, which is an instrumentality and agency of the municipality, but has a distinct legal existence from the municipality, and which has purposes that are consistent with the declaration of purpose set out in this chapter, and which has powers that are necessary and incidental to the effectuation of the stated purposes.

**(b)** The corporation of any city or town shall not have the authority to transact any business or exercise any powers under this chapter until the city or town council shall by resolution declare that there is a need for the corporation to function in the city or town.

**(c)** The corporation of each city or town shall cease to exist unless the city or town council passes the resolution specified in subsection (b) prior to December 31, 1991, the corporation of the municipality has entered into a contract for the operation of a detention facility with the United States Marshals' Service prior to December 31, 1991, and the site of the detention facility has received all necessary zoning approvals by December 31, 1991.

History of Section.
P.L. 1991, ch. 421, § 1.

**Exhibit C**

**INDENTURE OF TRUST**

THIS INDENTURE OF TRUST, dated as of June 1, 2005, by and between the Central Falls Detention Facility Corporation, a public corporation and an instrumentality and agency of the City of Central Falls, Rhode Island (the "City") organized and existing under and by virtue of the laws of the State of Rhode Island (the "Corporation"); and U.S. Bank National Association, a national banking association, duly authorized to accept and execute trusts of the character herein set forth, as trustee (the "Trustee").

*RECITALS:*

WHEREAS, the Central Falls Detention Facility Corporation (the "Corporation") presently operates a detention facility (the "Project") in the City; and

WHEREAS, under Title 45, Chapter 54, Sections 1 et seq. of the General Laws of Rhode Island (the "Act") the Corporation is authorized to issue bonds for the purpose of carrying out any of its purposes; and

WHEREAS, the Corporation previously issued its $38,810,000 Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 1998A (the "Prior Bonds") for the purpose of refinancing certain prior obligations of the Corporation used to finance the acquisition, design, development, construction and equipping of the Project; and

WHEREAS, the Corporation previously issued its $3,520,000 Detention Facility Subordinate Revenue Bonds (The Donald W. Wyatt Detention Facility) Series 2005 (the "Subordinate Bonds") for the purpose of financing additional capital improvements to the Project; and

WHEREAS, the Corporation desires to issue, sell and deliver its Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 2005A in the principal amount of $106,380,000 (the "Bonds"), in the form hereinafter set forth, to (i) refund the Prior Bonds and the Subordinate Bonds, (ii) finance an expansion project, (iii) finance additional capital improvements to the Project, (iv) fund capitalized interest on a portion of the Series 2005A Bonds through July 15, 2007, (v) fund a Debt Service Reserve Fund securing the Bonds, and (vi) pay the costs of issuing the Series 2005A Bonds, all under and in accordance with the Constitution and laws of the State of Rhode Island; and

WHEREAS, the execution and delivery of this Indenture and the issuance and sale of the Bonds have been in all respects duly and validly authorized by a written resolution duly adopted by the Corporation; and

WHEREAS, the Bonds, the Trustee's certificate of authentication to be endorsed thereon and the form of assignment to be endorsed on such Bonds are to be in substantially the form attached hereto as Exhibit A, with necessary and appropriate variations, omissions and insertions as permitted or required by this Indenture; and

WHEREAS, the Corporation has determined that the execution and delivery of the Bonds and of this Indenture have been duly authorized and all things necessary to make the Bonds, when executed by the Corporation and authenticated by the Trustee, valid and binding legal obligations of the Corporation and to make this Indenture a valid and binding legal instrument for the security of the Bonds, have been done.

45545798.12

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That the Corporation, in consideration of the premises, the acceptance by the Trustee of the trusts hereby created, the purchase and acceptance of the Bonds by the purchasers thereof, and of other good and valuable consideration, the receipt of which is hereby acknowledged, and in order to secure the payment of the principal of, premium, if any, and interest on all Bonds Outstanding hereunder from time to time, according to their tenor and effect, and to secure the observance and performance by the Corporation of all the covenants expressed or implied herein and in the Bonds, does hereby convey, pledge and assign unto the Trustee, and unto its successors and assigns forever and does hereby grant to it and them a security interest, together with all right, title and interest of the Corporation, in:

## GRANTING CLAUSE FIRST

All the right, title, and interest of the Corporation in and to all cash proceeds and receipts arising out of or in connection with the sale of the Bonds (as defined herein) and all money held by the Trustee in the funds created under this Indenture, including the Revenue Fund, the Debt Service Fund, the Reserve Fund, the Contingency Reserve Fund, the Operational Reserve Fund, the Redemption Fund and the Capital Improvement Fund created hereunder, or held by the Trustee as special trust funds derived from insurance proceeds, condemnation awards, payments on contractors' performance or payment bonds or other surety bonds, or any other source, together with any and all awards or payments, including interest thereon.

## GRANTING CLAUSE SECOND

All the right, title, and interest of the Corporation in and to all money and securities and interest earnings thereon from time to time delivered to and held by the Trustee under the terms of this Indenture and all other rights of every name and nature and any and all other property from time to time hereafter by delivery or by writing of any kind conveyed, pledged, assigned, or transferred as and for additional security hereunder by the Corporation or by anyone on its behalf or with its written consent to the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

## GRANTING CLAUSE THIRD

All the right, title, and interest of the Corporation in the Operator's Agreement.

## GRANTING CLAUSE FOURTH

Any and all other property of each name and nature from time to time hereafter by delivery or by writing of any kind pledged or assigned as and for additional security for the Bonds, hereunder, by anyone, to the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

TO HAVE AND TO HOLD all and singular the Trust Estate, whether now owned or hereafter acquired, unto the Trustee and its respective successors in said trusts and assigns forever.

IN TRUST NEVERTHELESS, upon the terms and trusts herein set forth for the equal and proportionate benefit, security and protection of all present and future Owners of the Bonds, as to the Trust Estate, from time to time issued under and secured by this Indenture without privilege, priority or distinction as to the lien or otherwise of any of the Bonds over any of the other Bonds.

45545798.12

PROVIDED, HOWEVER, that if the Corporation, its successors or assigns, shall well and truly pay, or cause to be paid, the principal of the Bonds and the interest and premium, if any, due or to become due thereon, at the times and in the manner provided in the Bonds, according to the true intent and meaning thereof, and shall cause the payments to be made into the Funds and Accounts as required hereunder or shall provide, as permitted by Article 13 hereof, for the payment thereof, and shall well and truly keep, perform and observe all the covenants and conditions pursuant to the terms of this Indenture to be kept, performed and observed by it, and shall pay or cause to be paid to the Trustee and the Paying Agent all sums of money due or to become due to them in accordance with the terms and provisions hereof, then this Indenture and the rights hereby granted shall cease, determine and be void, otherwise this Indenture is to be and remain in full force and effect.

THIS INDENTURE OF TRUST FURTHER WITNESSETH, and it is expressly declared, that all Bonds issued and secured hereunder are to be issued, authenticated and delivered and the Revenues hereby assigned and pledged are to be dealt with and disposed of under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as hereinafter expressed, and the Corporation has agreed and covenanted, and does hereby agree and covenant, with the Trustee and with the respective Owners from time to time of the Bonds, as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1 **Definitions**. The following terms shall, for all purposes of the Indenture, have the following meanings.

"Account" shall mean an Account created and established by Article 5 of the Indenture.

"Accountant's Certificate" shall mean a certificate or opinion signed by an independent certified public accountant of recognized national standing or a firm of accountants of recognized national standing, selected by the Corporation, who may be the accountant or firm of accountants who regularly audit the books of the Corporation.

"Act" shall mean Title 45, Chapter 54, Sections 1 et seq. of the General Laws of Rhode Island.

"Additional Improvements" shall mean any structures, site improvements, facilities and fixtures acquired or constructed on the Property after the Closing Date.

"Authorized Denominations" mean $5,000 or any integral multiple thereof with respect to the Bonds.

"Authorized Officer" shall mean the Chairperson, the Vice Chairperson or any other officer or employee of the Corporation, or their respective designees, authorized to perform specific acts or duties.

"Bond" or "Bonds" shall mean the Series 2005A Bonds and any additional bonds.

"Bond Counsel" shall mean a nationally recognized law firm specializing in the area of tax-exempt municipal finance.

"Bond Documents" means the Bonds, the Indenture, the Mortgage, and any other agreement now or hereafter delivered as security for or with respect to the Bonds or the Corporation's obligations under any Bond Document.

"Bondowner" or "Owner" or "Owner of Bonds" or any similar term (when used with respect to Bonds) shall mean the registered owner of any Outstanding Bond or Bonds, subject to the provisions of Section 3.3 herein.

"Bond Register" shall mean the registration books of the Trustee with respect to the Bonds.

"Bond Year" shall mean a twelve-month period ending on July 15, except that the first Bond Year shall begin on the date on which the Bonds are initially delivered and end on the next succeeding July 15.

"Business Day" means a day, other than a Saturday, Sunday, legal holiday or day on which the New York Stock Exchange is closed, on which banking institutions are not closed in the State of Rhode Island, or in any state in which the designated office of the Trustee is located.

"Capitalized Interest" shall mean interest to be paid from the original proceeds of Bonds (including proceeds constituting accrued interest on the Bonds) and from income derived from the investment of such proceeds.

"City" shall mean City of Central Falls, Rhode Island.

"Closing Date" means the date when the Bonds, duly authenticated by the Trustee, are delivered to the Original Purchaser.

"Code" shall mean the Internal Revenue Code of 1986 and the regulations in effect thereunder.

"Construction Contract" shall mean the revised versions of AIA document form A191, Parts 1 and 2 (1996 Ed.) and AIA document form A201 (1997 Ed.) and any other related documents constituting the construction contract providing for the design/build services in connection with the expansion project to be financed with a portion of the proceeds of the Bonds.

"Construction Monitor" shall mean Levien-Rich Associates, Inc. or such other construction monitor selected by the Corporation acceptable to the Majority Owner.

"Contingency Reserve Fund" shall mean the Contingency Reserve Fund created and established by Section 5.2.

"Contingency Reserve Fund Requirement" shall mean $2,000,000.

"Continuing Disclosure Agreement" shall mean that certain Continuing Disclosure Agreement between the Corporation and the Dissemination Agent dated the Closing Date as originally executed and as it may be amended from time to time in accordance with the terms thereof.

"Contract Administrator" shall mean AVCORR Consultants or such other consultant or in-house employee as shall be identified by the Corporation to act as the Corporation's consultant to oversee the Operator's Agreement as well as the Construction Contract.

"Corporation" shall mean the Central Falls Detention Facility Corporation, a public corporation and an instrumentality and agency of the City of Central Falls, Rhode Island, organized and existing under and by virtue of the laws of the State of Rhode Island, and any other entity which may by law succeed to the powers, duties and functions of the Corporation.

"Corporation Budget" shall mean the budget adopted by the Corporation for each Fiscal Year, as such budget may be amended from time to time by the Corporation.

"Cost of Issuance" shall mean items of expense payable or reimbursable directly or indirectly by the Corporation and related to the authorization, issuance and sale of Bonds, which expenses shall include, but not be limited to, printing costs, costs of reproducing documents, filing and recording fees, initial fees and charges of the Trustee and other Fiduciaries, legal fees and disbursements, financial advisory fees, Public Finance Management Board fees, professional consultants, fees and disbursements, reimbursements to the Corporation and its agents for administrative, travel and overhead expenses, bond discount, rating agency fees, credit facility costs, title insurance premium, Corporation's legal fees and costs, underwriting fees and other financing costs (if not otherwise provided for), fees and charges for execution, transportation and safekeeping of Bonds, and all other costs, charges, fees and expenses in connection with the foregoing.

"Cost of Issuance Fund" shall mean the Cost of Issuance Fund established pursuant to Section 5.2.

"Coverage Ratio Requirement" means the Net Operating Revenues, plus any earnings on moneys on deposit in the Reserve Fund, in each case for any twelve (12) month period, is equal to not less than 120% of principal (including Sinking Fund Installments) and interest payable on the Bonds during such twelve (12) month period.

"Counsel's Opinion" shall mean an opinion signed by a nationally recognized attorney or firm of attorneys who may be selected by the Corporation. Any such attorney may be in the regular employment of the Corporation.

"Debt Service Fund" shall mean the Debt Service Fund created and established by Section 5.2.

"Depository" shall mean (a) initially, DTC, and (b) any other Securities Depository acting as Depository under this Indenture.

"Depository System Participant" means any participant in the Depository's book-entry system.

"Dissemination Agent" shall have the meaning ascribed thereto in the Continuing Disclosure Agreement.

"DTC" shall mean The Depository Trust Company, New York, New York, and its successors and assigns.

"Environmental Laws" shall mean collectively, all Legal Requirements applicable to (i) environmental conditions on, under or emanating from the Mortgaged Property including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Federal Water Pollution Control Act and the Federal Clean Air Act and (ii) the generation, storage, transportation, utilization, disposal, management or release (whether or not on, under or from the Mortgaged Property) of Hazardous Materials by the Corporation.

"Event of Default" shall mean an Event of Default, as set forth in Section 11.1.

"Fiduciary" shall mean the Trustee and each Paying Agent.

"Fiscal Year" or "fiscal year" shall mean each twelve-month period ending December 31 or such other fiscal year of the Corporation which may be adopted.

"Fund" shall mean a fund created and established by Article 5 hereof.

"Generally Accepted Accounting Principal" or "GAAP" means the uniform accounting and reporting procedures set forth in publications of the American Institute of Certified Public Accountants or its successor and the Governmental Accounting Standards Board or its successor, or by any other generally accepted authority on such procedures, and includes, as applicable, the standards set forth by the Financial Accounting Standards Board or its successor.

"Government Obligations" shall mean bonds or other obligations which as to principal and interest constitute direct obligations of the United States of America and which are not subject to redemption prior to their maturity at the option of any person other than the holder thereof.

"Governmental Authority" shall mean all agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures and offices of any nature whatsoever for any government unit or political subdivision, whether federal, state, county, district, municipal, city or otherwise, and whether now or hereafter in existence.

"Hazardous Substances" shall mean collectively, (i) any "hazardous material," "hazardous substance," "hazardous waste," "oil," "regulated substance," "toxic substance," "restricted hazardous waste", "special waste" or words of similar import as defined under any of the Environmental Laws; (ii) asbestos in any form; (iii) urea formaldehyde foam insulation; (iv) polychlorinated biphenyls; (v) radon gas; (vi) flammable explosives; (vii) radioactive materials; (viii) any chemical, contaminant, solvent, material, pollutant or substance that may be dangerous or detrimental to the Project, the environment, or the health and safety of the patients and other occupants of the Project or of the owners or occupants of any other real property nearby the Project and (ix) any substance, the generation, storage, transportation, utilization, disposal, management, release or location of which, on, under or from the Project is prohibited or otherwise regulated pursuant to any of the Environmental Laws. Notwithstanding the foregoing, the term Hazardous Substances as defined herein shall not include pharmaceuticals and cleaning agents of the types and in the quantities and concentrations normally stocked by health care providers engaged in operations similar to Corporation's use of the Project that are used, stored, transported and disposed of in accordance with all Legal Requirements.

"Hedging Contract" means an interest rate swap, exchange, cap or other agreement between the Corporation and any other party for the purpose of hedging payment, interest rate, spread or similar exposure.

"Improvements" shall mean, as of the Closing Date or at any time thereafter, any structures, site improvements, facilities and fixtures located on the Property.

"Indebtedness" means, collectively, but without duplication, (1) indebtedness or liability for borrowed money or the deferred purchase price of property or services; (2) obligations as lessee under leases which are, should be or should have been, reported as capital leases in accordance with Generally Accepted Accounting Principles; (3) any guaranty and any contingent obligation to purchase, to provide funds for payment, to supply funds to invest in any Person or otherwise to assure a creditor against loss; and (4) all other items or obligations which would be included in determining total liabilities on the balance sheet of any Person.

"Indenture" shall mean this Indenture of Trust as from time to time amended or supplemented by Supplemental Indentures in accordance with the terms and provisions hereof.

"Independent" shall mean, when used with respect to any given person or entity, that such person or entity is acceptable to the Trustee and (i) is in fact independent and, not under domination of the Corporation, (ii) does not have any substantial interest, direct or indirect, with the Corporation, and (iii) is not connected with the Corporation as a member, an officer or employee of the corporation, but who may be regularly retained to provide services to the Corporation.

"Independent Consultant" shall mean any Independent certified public accountant, Independent engineer or other Independent consultant acceptable to the Majority Owner, who is in any case nationally recognized as being experienced in the evaluation of the management and pricing of detention facility operations services.

"Information Services" means Financial Information, Inc.'s "Daily Called Bond Service," 30 Montgomery Street, 10th Floor, Jersey City, New Jersey 07302, Attention: Fitch "Called Bond Department," 5250 Center Drive, Suite 150, Charlotte, NC 28217; S&P "Called Bond Record," 65 Broadway, 16th Floor, New York, New York 10004; and, in accordance with then current guidelines of the Securities and Exchange Commission, such other addresses and/or such other services providing information with respect to called bonds as the Corporation may designate in a written request delivered to the Trustee.

"Interest Payment Date" shall mean January 15 and July 15 of each year, commencing January 15, 2006, on which interest on any Bonds is due and payable.

"Legal Requirements" shall mean all federal, state, county, municipal and other governmental statutes, ordinances, by-laws, codes, restrictions, orders, judgments, decrees and injunctions (including, without limitation, all applicable building, health code, zoning, subdivision, and other land use and health-care licensing statutes, ordinances, by-laws and codes) or, to the best of the Corporation's knowledge, any rule or regulation to which any of the Corporation is subject, whether now or hereafter enacted, affecting the Mortgaged Property and/or the construction, development, maintenance, management, repair, use and/or operation thereof.

"Local Impact Fees" shall mean any payments to be made by the Corporation to the City, which shall be subordinate to the payment of debt service on the Bonds.

"Majority Owner" shall mean an Owner or Owners of at least a majority in aggregate Principal Amount of the Bonds Outstanding.

"Maximum Annual Debt Service" shall mean at any point in time, with respect to the Bonds then Outstanding, the maximum amount of principal (including sinking fund payments) and interest becoming due in the then current or any future Bond Year provided, however, that for purposes of the final Bond Year, the principal (including Sinking Fund Installments) and interest becoming due may be reduced by the amount then on deposit in the Reserve Fund.

"Moody's" shall mean Moody's Investors Service Inc., New York, New York, and its successors.

"Mortgage" shall mean the Open-End Mortgage Deed, Leasehold Mortgage and Security Agreement, dated as of June 1, 2005, made by the Corporation in favor of the Trustee.

"Mortgaged Property" shall mean the Mortgaged Property as defined in the Mortgage.

"Net Proceeds" shall mean any insurance or condemnation proceeds paid with respect to the Project which are available after payment therefrom of all expenses incurred in the collection thereof.

"Net Operating Revenues" means for any Fiscal Year or other period, the excess of revenues over expenses for such period, before depreciation, amortization and interest, and as determined in accordance with generally accepted accounting principles consistently applied; provided, however, that without limiting the foregoing, no determination thereof shall take into account (i) any gain or loss resulting from either the extinguishment of Indebtedness or the sale, exchange or other disposition of capital assets not in the ordinary course of business, (ii) the net proceeds of insurance (other than business interruption insurance) and condemnation awards; (iii) Local Impact Fees and the Project Operator Per Diem Fee (so long as the payment thereof is subordinated in writing to the payment of principal of and interest on the Bonds, and the City and the Project Operator have no lien for their respective payment thereof), (iv) any extraordinary gain or loss as defined and allowed under generally accepted accounting principles; (v) the cumulative effect of changes in accounting principles; (vi) all gains and losses resulting from changes in the fair value of investments or Hedging Contracts; and (vii) unrealized investment gains and losses.

"Officer's Certificate" shall mean a certificate executed by an Authorized Officer.

"Operating Revenues" means, for any Fiscal Year or other period, all operating revenues and interest income (including interest earnings on all funds held under this Indenture) arising from the operation of the Project, determined in accordance with Generally Accepted Accounting Principles.

"Operational Reserve Fund" shall mean the Operational Reserve Fund created and established by Section 5.2.

"Operation and Maintenance Costs" means, for any Fiscal Year or other period, the reasonable and necessary costs and expenses incurred for operation, maintenance and repairs of the Project including, without limiting the generality of the foregoing, Local Impact Fees, administrative costs of the Corporation, Project Operator Monthly Fee, Project Operator Per Diem and other Project Operator payments, including incentive payments, administrative expenses, financial and auditing expenses, insurance premiums, payments on insurance claims, taxes, legal and engineering expenses relating to operation and maintenance, payments and reserves for pension, retirement, health, hospitalization and sick leave benefits, all to the extent properly and directly attributable to the Project.

"Operator's Agreement" shall mean the Professional Management Agreement between the Corporation and the Project Operator dated as of January 1, 2004, or any subsequent agreement between the Corporation and the Project Operator.

"Original Purchaser" shall mean Piper Jaffray and Co.

"Outstanding" shall mean, as of any date, Bonds theretofore or then being delivered under the provisions of this Indenture, except: (i) any Bonds canceled by the Trustee or any Paying Agent at or prior to such date, (ii) Bonds for the payment or redemption of which moneys equal to the Principal Amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee or the Paying Agent in trust (whether at or prior to the date of maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as in Article 4 provided or provision satisfactory to the Trustee shall have been made for the giving of such notice, (iii) Bonds in lieu of or in substitution for which other Bonds shall have been delivered pursuant to Article 3 or Section 4.7, and (iv) Bonds deemed to have been paid as provided in Section 13.1.

45545798.12

8

"Participants" shall mean those broker-dealers, banks and other financial institutions from time to time for which DTC holds Bonds as securities depository.

"Participating Underwriter" shall have the meaning ascribed thereto in the Continuing Disclosure Agreement.

"Paying Agent" shall mean the Trustee, acting as paying agent, or any other bank, trust company or national banking association designated or appointed pursuant to Section 8.2 to act as a paying agent for the Bonds, and each successor or successors and any other bank, trust company or national banking association at any time substituted in its place pursuant to this Indenture.

"Person" means an individual, corporation, firm, association, partnership, trust, or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

"Principal Amount" shall mean, with respect to any Bond and at any date of computation, the stated principal amount thereof.

"Principal Installment" shall mean, as of any date of computation, the amount payable in any Bond Year on account of the amount of any Sinking Fund Installments due in such Bond Year with respect to Bonds.

"Principal Payment Date" shall mean each January 15 and July 15 in each year, commencing January 15, 2006.

"Prior Bonds" shall mean the $38,810,000 Central Falls Detention Facility Corporation Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 1998A.

"Prior Bonds Indenture" shall mean the Indenture of Trust, dated as of September 1, 1998, pursuant to which the Prior Bonds were issued.

"Project" shall consist of the Property and the Improvements commonly known as the Donald W. Wyatt Detention Facility.

"Project Operator" shall mean Cornell Corrections of Rhode Island, Inc. or such other person or entity appointed by the Corporation to run the day-to-day operation of the Project pursuant to the Operator's Agreement. In the event Corporation itself becomes the operator of the Project pursuant to Section 7.29 herein, all references to the Project Operator shall mean the Corporation.

"Project Operator Monthly Fee" means the monthly fixed fee payable to the Project Operator pursuant to Section 2.4(a) of the Operator's Agreement in connection with the operation of the Project.

"Project Operator Per Diem" means the per unit fee payable to the Project Operator pursuant to Section 2.4(b) of the Operator's Agreement, which shall be subordinate to the payment of debt service on the Bonds unless otherwise approved by the Majority Owner.

"Property" shall mean the real property on which the Improvements or Additional Improvements are located.

"Qualified Investments" means, to the extent permitted by applicable law:

A.  Direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury, and CATS and TIGRS) or obligations the principal of and interest on which are unconditionally guaranteed by the United States of America.

B.  Bonds, debentures, notes or other evidence of indebtedness issued or guaranteed by any of the following federal agencies and provided such obligations are backed by the full faith and credit of the United States of America (stripped securities are only permitted if they have been stripped by the agency itself):

    1.  U.S. Export-Import Bank (Eximbank)
       Direct obligations or fully guaranteed certificates of beneficial ownership

    2.  Farmers Home Administration (FmHA)
       Certificates of beneficial ownership

    3.  Federal Financing Bank

    4.  Federal Housing Administration Debentures (FHA)

    5.  General Services Administration
       Participation certificates

    6.  Government National Mortgage Association (GNMA or "Ginnie Mae")
       GNMA - guaranteed mortgage-backed bonds
       GNMA - guaranteed pass-through obligations

    7.  U.S. Maritime Administration
       Guaranteed Title XI financing

    8.  U.S. Department of Housing and Urban Development (HUD)
       Project Notes
       Local Authority Bonds
       New Communities Debentures - U.S. government guaranteed debentures
       U.S. Public Housing Notes and Bonds - U.S. government guaranteed public housing notes and bonds

C.  Bonds, debentures, notes or other evidence of indebtedness issued or guaranteed by any of the following non-full faith and credit U.S. government agencies (stripped securities are only permitted if they have been stripped by the agency itself):

    1.  Federal Home Loan Bank System
       Senior debt obligations

    2.  Federal Home Loan Mortgage Corporation (FHLMC or "Freddie Mac")
       Participation Certificates
       Senior debt obligations

    3.  Federal National Mortgage Association (FNMA or "Fannie Mae")
       Mortgage-backed securities and senior debt obligations

45545798.12

4. <u>Student Loan Marketing Association</u> (SLMA or "Sallie Mae")
Senior debt obligations

5. <u>Resolution Funding Corp.</u> (REFCORP) obligations

6. <u>Farm Credit System</u>
Consolidated systemwide bonds and notes

D. Money market funds registered under the Federal Investment Company Act of 1940, whose shares are registered under the Federal Securities Act of 1933, and having a rating by S&P of AAAm-G; AAA-m; or AA-m and if rated by Moody's rated Aaa, Aa1 or Aa2, including funds for which the Trustee, its parent holding company, if any, or any affiliates or subsidiaries of the Trustee or such holding company provides investment advisory or other management services.

E. Certificates of deposit secured at all times by collateral described in (A) and/or (B) above. Such certificates must be issued by commercial banks, savings and loan associations or mutual savings banks including the Trustee, its parent holding company and their affiliates. The bondholders must have a perfected first security interest in the collateral.

F. Certificates of deposit, savings accounts, deposit accounts or money market deposits which are fully insured by FDIC, including BIF and SAIF, which may be from or with the Trustee, its parent holding company and their affiliates.

G. Investment Agreements, including GICs, Forward Purchase Agreements and Reserve Fund Put Agreements. The provider of the Investment Agreement must be a domestic or foreign bank or corporation the long-term debt of which, or, in the case of a guaranteed corporation, the long term debt, or, in the case of monoline financial guaranty insurance company, claims paying ability, of the guarantor is rated at least "AA" by Standard & Poor's and "Aa2" by Moody's Investors Service; provided that any such agreement shall provide that (A) it may be drawn upon for any purpose permitted under the Indenture and (B) if rating of the provider's (or if applicable, the guarantor's) unsecured long-term indebtedness or claims-paying ability is reduced below "A+" by S&P or "A1" by Moody's, then within ten (10) days of such suspension, the Investment Agreement must be terminated and the principal amount of all invested funds plus accrued but unpaid interest must be paid to the Trustee without penalty. (In lieu thereof, the provider may assign its obligations under the Investment Agreement to, or obtain a guaranty of its obligations from, an entity meeting the foregoing rating requirements; provided that any such assignment or guarantee must be absolute and unconditional, in writing in form and substance satisfactory to the Trustee, and accompanied by enforceability opinions in form and substance satisfactory to the Trustee.)

H. Commercial paper rated, at the time of purchase, "Prime - 1" by Moody's and "A-1" or better by S&P.

I. Bonds or notes issued by any state or municipality which are rated by Moody's and S&P in one of the two highest rating categories assigned by such agencies at the time of purchase.

45545798.12                                                11

J.    Federal funds or bankers acceptances with a maximum term of one year of any bank which has an unsecured, uninsured and unguaranteed obligation rating of "Prime - 1" or "A3" or better by Moody's and "A-1" or "A" or better by S&P including the Trustee, its parent holding company and their affiliates.

K.    Repurchase Agreements with the following criteria:

Repurchase Agreements provide for the transfer of securities from a dealer bank or securities firm (seller/borrower) to a municipal entity (buyer/lender), and the transfer of cash from a municipal entity to the dealer bank or securities firm with an agreement that the dealer bank or securities firm will repay the cash plus a yield to the municipal entity in exchange for the securities at a specified date.

1.    <u>Repos must be between the municipal entity and a dealer bank or securities firm</u>

    a.    <u>Primary dealers</u> on the Federal Reserve reporting dealer list which are rated A or better by Standard & Poor's Corporation and Moody's Investor Services, or

    b.    <u>Banks</u> rated "A" or above by Standard & Poor's Corporation and Moody's Investor Services.

2.    <u>The written repo contract must include the following:</u>

    a.    <u>Securities which are acceptable for transfer are:</u>

        (1)    Direct U.S. governments, or

        (2)    Federal agencies backed by the full faith and credit of the U.S. government (and FNMA & FHLMC)

    b.    <u>The term of the repo may be up to 30 days</u>

    c.    The collateral must be delivered to the municipal entity, trustee (if trustee is not supplying the collateral) or third party acting as agent for the trustee (if the trustee is supplying the collateral) before/simultaneous with payment (perfection by possession of certificated securities).

    d.    <u>Valuation of Collateral</u>

        (1)    <u>The securities must be valued weekly, marked-to-market</u> at current market price <u>plus</u> accrued interest

            (a)    The value of collateral must be equal to 104% of the amount of cash transferred by the municipal entity to the dealer bank or security firm under the repo plus accrued interest. If the value of securities held as collateral slips below 104% of the value of the cash transferred by municipality, then additional cash and/or acceptable securities must be transferred. If, however, the securities

45545798.12            12

used as collateral are FNMA or FHLMC, then the value of collateral must equal 105%.

    e.    A perfected first security interest under the Uniform Commercial Code, or book entry procedures prescribed at 31 C.F.R. 306.1 et seq. or 31 C.F.R. 350.00 et seq. in such securities is created for the benefit of the Trustee.

    3.    <u>Legal opinion which must be delivered to the municipal entity:</u>

    a.    Repo meets guidelines under state law for legal investment of public funds.

    b.    The perfection of the security interest (or the procedures therefor) is confirmed by an Opinion of Counsel.

    L.    Any other investment approved in writing by the Majority Owner.

"Rating Agencies" shall mean any nationally recognized rating services, initially including Standard & Poor's Ratings Services, a division of McGraw-Hill Companies, Inc. or Moody's Investors Service, Inc., and such others as may be designated by the Corporation from time to time.

"Record Date" shall have the meaning set forth in Section 3.5 hereof.

"Redemption Fund" shall mean the Redemption Fund created and established by Section 5.2.

"Redemption Price" shall have the meaning attributable to such term in Article 4 of this Indenture.

"Refunding Trust Agreement" shall mean the Refunding Trust Agreement, dated as of the date hereof, by and between the Corporation and the Refunding Trust Agent.

"Refunding Trust Agent" shall mean U.S. Bank National Association, as refunding trust agent.

"Refunding Trust Fund" shall mean the Refunding Trust Fund established and held by the Refunding Trust Agent pursuant to the Refunding Trust Agreement.

"Regulatory Body" shall mean any federal, state or local government, department, agency or instrumentality and other public or private body, including accrediting organizations, having regulatory jurisdiction and authority over the Corporation or its facilities or operations.

"Representation Letter" shall mean the representation letter from the Corporation to DTC.

"Reserve Fund" shall mean the Reserve Fund created and established by Section 5.2 hereof.

"Reserve Fund Requirement" shall mean, at any date of determination in a Bond Year and as computed by the Corporation the least of (i) an amount equal to Maximum Annual Debt Service with respect to Outstanding Bonds for that or any succeeding Bond Year, (ii) an amount equal to 10% of the sales proceeds (within the meaning of section 148 of the Code) of all Bonds, or (iii) an amount equal to 125% of the average annual debt service on all Bonds then Outstanding for that and every succeeding Bond Year. The initial Reserve Fund Requirement shall be $8,829,512.50.

"Revenue Fund" shall mean the Revenue Fund created and established by Section 5.2 hereof.

"Revenues" means all receipts, revenues, income (including investment income) and other money received or receivable by or on behalf of the Corporation derived from all sources including, without limitation, the operation or ownership of the Project, and including, without limitation, disposition of assets or borrowings, and any insurance proceeds and condemnation awards, and all rights to receive the same whether in the form of accounts, accounts receivable, general intangibles, contract rights, chattel paper, instruments or other rights and the proceeds thereof, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Corporation.

"S&P" means Standard & Poor's, a division of McGraw-Hill Companies, New York, New York, or its successors.

"Securities Depositories" means The Depository Trust Company, 55 Water Street, 50th Floor, New York, New York 10041-0099, Attention: Call Notification Department, Fax (212) 855-7232; and, in accordance with then current guidelines of the Securities and Exchange Commission, such other addresses and/or such other securities depositories as the Corporation may designate in a written request of the Corporation delivered to the Trustee.

"Series 2005A Bonds" shall mean the Corporation's Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 2005A, originally issued in the principal amount of $106,380,000 authorized and issued pursuant to this Indenture.

"Significant Owner" means any Owner of at least $1,000,000 of Bonds Outstanding named on the register kept by the Trustee pursuant to Section 3.3 herein.

"Sinking Fund Installment" shall mean the amount required to be applied by the Corporation to the payment of the principal portion of the Redemption Price of the Bonds (other than at the option or election of the Corporation) on any one date as specified herein.

"State" shall mean the State of Rhode Island.

"Subordinate Bonds" shall mean the $3,520,000 Central Falls Detention Facility Corporation Detention Facility Subordinate Revenue Bonds (The Donald W. Wyatt Detention Facility) Series 2005.

"Subordinate Bonds Indenture" shall mean the Indenture of Trust, dated as of December 15, 2004, pursuant to which the Subordinate Bonds were issued.

"Supplemental Indenture" shall mean an indenture supplemental to or amendatory of this Indenture adopted by the Corporation in accordance with Articles 9 and 10.

"Surrounding Property" shall mean any real property that is located within a one-half (1/2) mile radius of the Project.

"Trustee" shall mean the bank or trust company or national banking association appointed pursuant to Section 8.1 to act as trustee hereunder, and its successor or successors and any other bank or trust company or national banking association at any time substituted in its place pursuant to this Indenture.

"Trust Estate" shall mean Revenues and other property pledged to the payment of any Bonds in the granting clauses hereof.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include corporations and associations, including public bodies, as well as natural persons.

Unless the context shall clearly indicate otherwise, the words "moneys," "funds," "amounts," "proceeds," and any other words of like import, when used in relation to any Fund or Account created or maintained under this Indenture, shall be deemed to include both cash and any investments, securities or other obligations, and the earnings thereon, held as a part of the Fund or Account to which such words relate.

Unless the context shall clearly indicate otherwise, references to Articles, Sections and other subdivisions, whether by letter, number or otherwise, are to the respective Articles, Sections and subdivisions of this Indenture.

## ARTICLE 2

## AUTHORIZATION AND ISSUANCE OF BONDS

Section 2.1 **Authorization of Bonds**

(a)     In order to provide funds for the refunding of the Prior Bonds and the Subordinate Bonds, expanding the Project, financing additional capital improvements to the Project, funding of capitalized interest on the Bonds, funding of the Reserve Fund, and paying Cost of Issuance, the Bonds are hereby authorized to be issued. There is hereby created by this Indenture, in the manner and to the extent provided herein, a continuing pledge and lien to secure the full and final payment of the principal and Redemption Price of and interest on all of the Bonds issued pursuant to this Indenture and the performance by the Corporation of all its obligations under this Indenture and the Bonds. The Bonds shall be special obligations of the Corporation payable solely from the Trust Estate.

(b)     The Series 2005A Bonds shall be dated the date of their delivery, shall bear interest at the rates set forth herein, shall be numbered in such manner as the Trustee may deem appropriate so long as each Bond receives a distinctive number and shall mature, subject to the right of prior redemption as described herein, and become payable as provided herein. Interest on the Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months, payable on January 15 and July 15 of each year, commencing January 15, 2006.

The Series 2005A Bonds shall mature on the following dates and in the amount and shall bear interest at the rates, indicated as follows:

| Maturity Date | Principal Amount | Interest Rate |
|---|---|---|
| January 15, 2009 | $1,730,000 | 6.00% |
| January 15, 2013 | 5,680,000 | 6.75 |
| July 15, 2035 | 98,970,000 | 7.25 |

45545798.12

15

Section 2.2 **Conditions Precedent to the Issuance of the Bonds**. The Bonds shall be executed on behalf of the Corporation, authenticated by the Trustee, and delivered to the purchasers thereof, but only upon and subject to the following further conditions:

(a)     A copy of this Indenture certified by an Authorized Officer;

(b)     A written order of the Corporation as to the authentication and delivery of the Bonds signed by an Authorized Officer describing the Bonds to be authenticated and delivered, designating the purchaser or purchasers to whom the Bonds are to be delivered, and stating the purchase price of the Bonds;

(c)     A Counsel's Opinion for the Bonds to the effect that this Indenture has been duly executed and delivered by the Corporation; that this Indenture is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, except as to enforcement of remedies which may be limited by bankruptcy, insolvency, fraudulent conveyance or other laws or equitable principles affecting the enforcement of creditors' rights generally; that this Indenture creates, upon receipt thereof by the Trustee, a valid and perfected lien on and pledge of the Trust Estate upon the execution, authentication and delivery thereof; and that the Bonds will be duly and validly issued and will constitute valid and binding special obligations of the Corporation.

## ARTICLE 3

## GENERAL TERMS AND PROVISIONS OF BONDS

Section 3.1 **Medium of Payment; Form and Date**. The Bonds shall be issuable only as fully registered Bonds without coupons in denominations of $5,000 or any integral multiple thereof. Unless the Corporation shall otherwise direct, the Bonds shall be numbered as determined by the Trustee.

The form of the Series 2005A Bonds, the certificate of authentication to be endorsed on the Series 2005A Bonds and the form of assignment to be endorsed on the Series 2005A Bonds are to be in substantially the form set forth in Exhibit A, attached hereto and hereby made a part of this Indenture, with necessary and appropriate variations, omissions and insertions as permitted or required by this Indenture.

Regularly scheduled interest on the Bonds shall be payable on the applicable Interest Payment Date. Each Bond will bear interest from the Interest Payment Date next preceding the date of authentication thereof to which interest has been duly paid or provided for, unless a Bond is authenticated before the first Record Date, in which case interest will accrue from the Closing Date, or unless authenticated as of a date during the period from the Record Date to and including the next Interest Payment Date, in which case it shall bear interest from such Interest Payment Date. The Trustee shall insert the date of authentication of each Bond in the place provided for such purpose in the form of certificate of authentication to be printed on each Bond. Each Bond shall bear interest on overdue principal at the rate then in effect on such Bond.

The principal of, premium, if any, and interest on the Bonds shall be payable in lawful money of the United States of America, being any coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts. Interest on each Bond shall be paid on each Interest Payment Date to the Bondowner of such Bond at the close of business on the Record Date with respect to such interest payment and shall be paid by check mailed by first class mail on such Interest Payment Date to such Bondowner at his address as it appears on the registration books of the Trustee or, upon the written request of a Bondowner of at least $1,000,000 in

45545798.12                                16

principal amount of Bonds received by the Trustee not later than fifteen days prior to the Record Date for such payment, by wire transfer to an account in the United States designated by such Bondowner, irrespective of the cancellation of such Bond upon any transfer or exchange thereof subsequent to such Record Date and prior to such Interest Payment Date, unless the Corporation shall default in the payment of interest due on such Interest Payment Date. Payment of principal and premium, if any, due on any Bond shall be paid only upon surrender of such Bond at the office designated by the Trustee in writing, or its successor in interest. In the event of any default in the payment of interest, such defaulted interest shall be payable to the Bondowner of such Bond on a special Record Date for the payment of such defaulted interest, which date shall be established by the Trustee by notice mailed by or on behalf of the Corporation to the Owners of Bonds not less than fifteen (15) days preceding such special Record Date.

Section 3.2 **Execution and Authentication; Limited Obligation**. The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of the Chairperson thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of another Authorized Officer or the Secretary of the Corporation. In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been authenticated and delivered, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed such Bonds had not ceased to hold such offices or be so employed. Any Bond may be signed on behalf of the Corporation by such persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or employment by the Corporation although at the date of the Bonds such persons may not have been so authorized or have held such office or employment.

Each of the Bonds shall bear thereon a certificate of authentication, in the forms set forth in the forms of Bonds set forth in Exhibit A hereto, executed manually by the Trustee. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under this Indenture and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under this Indenture and that the Owner thereof is entitled to the benefits of this Indenture.

Neither the State of Rhode Island nor the City nor the Corporation shall be obligated to pay the Bonds or the interest thereon except from the Revenues. Neither the faith and credit nor the taxing power of the State of Rhode Island or the City is pledged to the payment of the principal of, premium, if any, or the interest on the Bonds.

No recourse shall be had for the payment of the principal of, or premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement contained herein, against any past, present or future member of the Board of Directors of the Corporation, officer, employee or agent of the Corporation, under any rule of law or equity, or statutory or constitutional provision or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such member of the Board of Directors of the Corporation, officer, employee, agent or member as such is hereby expressly waived and released as a condition of and in consideration for the execution of this Indenture and the issuance of the Bonds.

Section 3.3 **Registration, Beneficial Owners; Significant Owner; Transfer and Exchange of Bonds; Persons Deemed Owners**.

The Trustee shall cause to be maintained and kept, at the designated office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at such office,

the Trustee shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration of transfer.

In addition, the Trustee shall, upon written request of any Significant Owner and at the expense of the Corporation, provide to the requesting Significant Owner and make publicly available to any requesting party a list of the names and addresses of all registered Owners and all parties who have filed with the Trustee a certification of beneficial ownership of Bonds Outstanding as provided in the following paragraph (provided that the Trustee may elect to omit any such certification that has subsequently been rescinded or overridden by a subsequent transfer of record ownership of the related Bond, as provided below). In providing or making available such list, the Trustee shall be entitled to include a disclaimer to the effect that such list reflects those parties purporting to be beneficial owners of Bonds, as of the particular time when the related certification was given, and the Trustee makes no representation as to the accuracy thereof (either when given or on a continuing basis) or as to the actual, current beneficial ownership of the Bonds. Nothing herein shall obligate the Trustee or the Corporation to order or obtain a DTC participant listing in connection with any such request or disclosure.

The Trustee shall also maintain a register of each party which has filed with the Trustee a certification representing and certifying that it is a beneficial owner of the Bonds, upon receipt of written certification of any such party as to its beneficial ownership, accompanied by (i) identification of the principal amount, CUSIP and certificate number of the Bonds so held, and the DTC participant through which such interest is held, (ii) a statement expressly consenting to the public disclosure of such party's identity, address and holding of the Bonds pursuant to this Section, (iii) the agreement of such party to make reasonable efforts to notify the Trustee in writing promptly upon transfer of such party's interest, in whole or in part, in the Bonds Outstanding, and (iv) such other information or terms as the Trustee may reasonably require (at its sole option). In no instance shall the Trustee be under any obligation to verify or investigate the accuracy of any such certification or to independently investigate, inquire into, verify or monitor the actual beneficial ownership of the Bonds at any time; and the Trustee shall be entitled to rely upon and assume the continuing accuracy of any certification of beneficial ownership (except as provided in the next sentence), notwithstanding any notice or demand to the contrary. Any such certificate of beneficial ownership filed with the Trustee shall be deemed to remain in effect until (x) rescinded or modified by such certifying party by written notice to the Trustee, or (y) the record transfer of registered ownership of the related Bond, whereupon all certifications of beneficial ownership previously received and purporting to hold beneficial interests in such Bond shall be deemed to have been rescinded and of no further force or effect and the new registered Owner shall be deemed to be the sole beneficial owner of such Bond, unless and until (and except to the extent) the Trustee subsequently receives certification of beneficial ownership pursuant to this paragraph in respect of such Bond.

A copy of any notice or report or report sent hereunder to registered Owners shall also be sent to those parties listed on the register of beneficial owners described in the preceding paragraph (provided that such delivery shall not be required to be sent to any such party whose certification has been rescinded or overridden as provided in the preceding paragraph) and any consent, request, direction, approval, objection or other instrument or action required or permitted by this Indenture to be executed or taken by any Owner (other than the transfer of a Bond) may be regarded by the Trustee as fully effective, and may be relied upon and acted upon by the Trustee for any purpose, if executed or taken by parties who have certified their beneficial ownership as provided in the preceding paragraph; provided that, in the event of conflicting instruments executed by the registered Owner any such beneficial owner of the related Bond, the action of the registered Owner shall govern.

For purposes of determining whether a Owner holds a certain percentage in aggregate principal amount of Bonds Outstanding for the purposes of this Indenture, ownership by Owners which are

45545798.12                                    18

affiliates shall be aggregated. An Owner is an affiliate of another if the first controls the second, is controlled by the second or is under common control with the second, or if both Owners share a common investment advisor (or affiliated investment advisors). The Trustee shall be entitled to rely upon a certificate of any Owner with respect to such matters. For the purposes of this Section, Owner shall be deemed to include beneficial owners of the Bonds listed in the register thereof maintained under this Section 3.3, as provided above.

The Trustee shall also maintain a register of each party which has filed with the Trustee a certification representing and certifying that it is an Owner of at least $1,000,000 of Bonds Outstanding along with evidence of ownership acceptable to the Trustee in its sole discretion. Each party listed on this register shall be deemed a "Significant Owner" until rescinded or modified by such certifying party by written notice to the Trustee.

Each Bond shall be transferable only upon the books of the Trustee, at the request of the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the Owner or his duly authorized attorney. Upon the transfer of any such Bond, the Trustee shall authenticate in the name of the transferee a new registered Bond or Bonds of the same series, aggregate Principal Amount and maturity as the surrendered Bond.

Bonds may be exchanged at the designated office of the Trustee for an equal aggregate Principal Amount of Bonds of the same series and maturity of other authorized denominations.

In each case in which Bonds are transferred or exchanged, the Corporation shall execute and the Trustee shall authenticate, as required, and deliver Bonds to the transferee or the Bondowner making the exchange.

The Corporation and the Trustee may deem and treat the person in whose name any outstanding Bond shall be registered upon the books of the Trustee as the absolute Owner of such Bond (except as otherwise provided herein with respect to beneficial owners), whether such Bonds shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or premium, if any, and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his written order or to his legal representative shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary.

Section 3.4 **Regulations With Respect to Exchanges and Transfers.** In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Corporation shall execute and the Trustee shall deliver Bonds in accordance with the provisions of this Indenture. All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled and destroyed by the Trustee. For every such exchange or transfer of Bonds, whether temporary or definitive, the Corporation or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge, other than one imposed by the Corporation, required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer. The cost of printing the Bonds required for any such exchange or transfer shall be paid by the Corporation subject to reimbursement from the Operational Reserve Fund.

Section 3.5 **Record Date; Special Record Date**. Interest on each Bond shall be payable to the Owner in whose name such Bond is registered at the close of business on the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the Interest Payment Date (the

45545798.12                                          19

"Record Date"), without regard to any transfer or exchange of such Bond after such day, unless the Corporation shall default in the payment of interest due on such Bond on such Interest Payment Date.

If the Corporation shall default in the payment of interest due on any Bond, such defaulted interest shall be payable to the Owner in whose name such Bond is registered at the close of business on a special record date for the payment of such defaulted interest established by notice mailed by the Trustee to the Owners of such Bonds not less than fifteen (15) days preceding such special record date. Such notice shall be mailed to the Owners in whose names such Bonds are registered at the close of business on the fifth day (whether or not a Business Day) preceding the date of mailing.

Section 3.6 **Bonds Mutilated, Destroyed, Stolen or Lost**. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and the Trustee shall authenticate and deliver, a new Bond of like maturity and Principal Amount as the Bonds so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Trustee that such Bond has been destroyed, stolen or lost and proof of ownership thereof, and upon furnishing the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and the Trustee may incur and any expenses related to any such indemnification required to be provided herein.

Section 3.7 **Temporary Bonds**. Until the definitive Bonds are prepared, the Corporation may execute, in the same manner as is provided in Section 3.2 and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for Bonds, one or more temporary Bonds which shall be registered as to principal and interest. Such temporary Bonds shall be substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or maturity amounts of $5,000 or any multiples thereof authorized by the Corporation as to the Bonds, and with such omissions, insertions and variations as may be appropriate to temporary Bonds. The installments of interest payable on such temporary Bonds shall be payable only upon presentation of such temporary Bonds for notation thereon of the payment of such interest. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds, for exchange and cancellation, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor, at the designated office of the Trustee, definitive Bonds, of the same aggregate Principal Amount and maturity as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to this Indenture.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled and destroyed by the Trustee.

Section 3.8 **Cancellation**. All Bonds surrendered for redemption, payment, replacement or exchange, if surrendered to the Trustee, shall be promptly canceled by it, and, if surrendered to any person other than the Trustee, shall be delivered to the Trustee and, if not already canceled, shall be promptly canceled by it. The Corporation may at any time deliver to the Trustee for cancellation any Bonds previously authenticated and delivered hereunder, which Bonds so delivered shall be promptly canceled by the Trustee. All canceled Bonds held by the Trustee shall be destroyed by a method selected by the Trustee. The Trustee shall execute a certificate of destruction in duplicate by the signature of one of its authorized officers describing the Bonds so destroyed and, if so requested by the Corporation, one such executed certificate shall be filed with the Corporation and the other such executed certificate shall be retained by the Trustee.

45545798.12 20

Section 3.9 **Additional Bonds**. Additional bonds may be issued upon the prior written consent of the Majority Owner. The Corporation shall provide written directions to the Trustee in connection with the issuance of additional bonds.

Section 3.10 **Book-Entry System**.

(a)    All Bonds shall be initially issued in the form of a separate single certificate fully registered Bond for each maturity of the Bonds. Upon initial issuance, the ownership of the Bonds shall be registered in the Bond Register in the name of Cede & Co., as nominee of DTC. Except as provided in Section 3.10(d) hereof, all Outstanding Bonds shall be registered in the Bond Register in the name of Cede & Co., as nominee of DTC.

(b)    With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the Corporation and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co. or any Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any Participant or any other person, other than a Owner, as shown in the Bond Register, of any notice with respect to the Bonds, including any notice of redemption, (iii) the payment to any Participant or any other person, other than an Owner, as shown in the Bond Register, of any amount with respect to principal of and interest on the Bonds, or (iv) any consent given or other action taken by DTC as Bondowner. Subject to Section 3.3 hereof, the Corporation and the Trustee may treat and consider the person in whose name each Bond is registered in the Bond Register as the holder and absolute owner of such Bond for the purpose of payment of principal of and interest on such Bond, for the purpose of giving notices of redemption and other matters with respect to such Bond, for the purpose of registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal of and interest on the Bonds only to or upon the order of the respective Owners, as shown in the Bond Register, as provided in Section 3.3 hereof, or their respective attorneys duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the Corporation's obligations with respect to payment of principal of and interest on the Bonds to the extent of the sum or sums so paid. No person other than an Owner, as shown in the Bond Register, shall receive a certificated Bond evidencing the obligation of the Corporation to make payments of principal of and interest on the Bonds, pursuant to this Indenture. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions herein with respect to record dates, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(c)    The delivery of the Representation Letter by the Corporation shall not in any way limit the provisions of Section 3.10(b) hereof or in any other way impose upon the Corporation or the Trustee any obligation whatsoever with respect to persons having interests in the Bonds other than the Owners, as shown on the Bond Register. The Trustee shall take all action necessary for all representations in the Representation Letter with respect to the Trustee to at all times be complied with.

(d)    (i) DTC may determine to discontinue providing its services with respect to the Bonds at any time by giving written notice to the Corporation and the Trustee and discharging its responsibilities with respect thereto under applicable law.

(ii)    The Corporation, in its sole discretion and without the consent of any other person, may terminate the services of DTC with respect to the Bonds if the Corporation determines that:

(A)    DTC is unable to discharge its responsibilities with respect to the Bonds, or

(B) a continuation of the requirement that all Outstanding Bonds be registered in the Bond Register in the name of Cede & Co., or any other nominee of DTC, is not in the best interest of the beneficial owners of such Bonds.

(C) Upon the termination of the services of DTC with respect to the Bonds pursuant to subsection 3.10(d)(ii)(B) hereof, or upon the discontinuance or termination of the services of DTC with respect to the Bonds pursuant to subsection 3.10(d)(i) or subsection 3.10(d)(ii)(A) hereof after which no substitute securities depository willing to undertake the functions of DTC hereunder can be found which, in the opinion of the Corporation, is willing and able to undertake such functions upon reasonable and customary terms, the Corporation is obligated to deliver Bond certificates, as described in this Indenture and the Bonds shall no longer be restricted to being registered in the Bond Register in the name of Cede & Co. as nominee of DTC, but may be registered in whatever name or names Owners transferring or exchanging Bonds shall designate to the Trustee in writing, in accordance with the provisions of this Indenture.

(e) Notwithstanding any other provisions of this Indenture to the contrary, as long as any Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of and interest on such Bond and all notices with respect to such Bond shall be made and given, respectively, in the manner provided in the Representation Letter.

## ARTICLE 4

## REDEMPTION OF BONDS

Section 4.1 **Privilege of Redemption and Redemption Prices**. Bonds subject to redemption prior to maturity pursuant to the provisions of this Section shall be redeemable, upon notice as provided in this Article 4, at such times, at such Redemption Prices and upon such terms as are specified herein.

(a) **Mandatory Sinking Fund Redemption**. The Series 2005A Bonds maturing on January 15, 2009 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on January 15, 2008, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

| Date | Sinking Fund Amount |
|---|---|
| 01/15/2008 | $570,000 |
| 07/15/2008 | 570,000 |
| 01/15/2009 (maturity) | 590,000 |

The Series 2005A Bonds maturing on January 15, 2013 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on July 15, 2009, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

45545798.12                                22

| Date | Sinking Fund Amount |
|---|---|
| 07/15/2009 | $630,000 |
| 01/15/2010 | 650,000 |
| 07/15/2010 | 675,000 |
| 01/15/2011 | 700,000 |
| 07/15/2011 | 720,000 |
| 01/15/2012 | 745,000 |
| 07/15/2012 | 765,000 |
| 01/15/2013 (maturity) | 795,000 |

The Series 2005A Bonds maturing on July 15, 2035 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on July 15, 2013, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

45545798.12

23

| Date | Sinking Fund Amount | Date | Sinking Fund Amount |
|---|---|---|---|
| 07/15/2013 | $820,000 | 01/15/2025 | 1,860,000 |
| 01/15/2014 | 850,000 | 07/15/2025 | 1,930,000 |
| 07/15/2014 | 880,000 | 01/15/2026 | 2,005,000 |
| 01/15/2015 | 910,000 | 07/15/2026 | 2,075,000 |
| 07/15/2015 | 950,000 | 01/15/2027 | 2,150,000 |
| 01/15/2016 | 980,000 | 07/15/2027 | 2,225,000 |
| 07/15/2016 | 1,015,000 | 01/15/2028 | 2,310,000 |
| 01/15/2017 | 1,055,000 | 07/15/2028 | 2,390,000 |
| 07/15/2017 | 1,090,000 | 01/15/2029 | 2,475,000 |
| 01/15/2018 | 1,130,000 | 07/15/2029 | 2,565,000 |
| 07/15/2018 | 1,175,000 | 01/15/2030 | 2,660,000 |
| 01/15/2019 | 1,215,000 | 07/15/2030 | 2,755,000 |
| 07/15/2019 | 1,260,000 | 01/15/2031 | 2,855,000 |
| 01/15/2020 | 1,305,000 | 07/15/2031 | 2,960,000 |
| 07/15/2020 | 1,350,000 | 01/15/2032 | 3,070,000 |
| 01/15/2021 | 1,400,000 | 07/15/2032 | 3,180,000 |
| 07/15/2021 | 1,450,000 | 01/15/2033 | 3,295,000 |
| 01/15/2022 | 1,505,000 | 07/15/2033 | 3,415,000 |
| 07/15/2022 | 1,560,000 | 01/15/2034 | 3,540,000 |
| 01/15/2023 | 1,615,000 | 07/15/2034 | 3,665,000 |
| 07/15/2023 | 1,670,000 | 01/15/2035 | 3,800,000 |
| 01/15/2024 | 1,735,000 | 07/15/2035 (maturity) | 13,075,000 |
| 07/15/2024 | 1,795,000 | | |

(b) **Optional Redemption**. The Series 2005A Bonds maturing after July 15, 2015 are subject to optional redemption at the option of the Corporation prior to the stated maturities thereof as may be directed by the Corporation, in whole or in part, on any date on or after July 15, 2015, at the applicable redemption price (the "Redemption Price") set forth below (expressed as a percentage of the Principal Amount of the Series 2005A Bonds to be redeemed) together with accrued interest thereon to the date fixed for redemption; provided, however, that upon an Event of Default the Series 2005A Bonds may not be redeemed in part unless approved in writing by the Majority Owner:

| Redemption Period | Redemption Price |
| --- | --- |
| July 15, 2015 through January 14, 2016 | 103.0% |
| January 15, 2016 through July 14, 2016 | 102.5 |
| July 15, 2016 through January 14, 2017 | 102.0 |
| January 15, 2017 through July 14, 2017 | 101.5 |
| July 15, 2017 through January 14, 2018 | 101.0 |
| January 15, 2018 through July 14, 2018 | 100.5 |
| July 15, 2018 and thereafter | 100.0 |

(c) **Redemption Based on the Occurrence of Certain Events**.

(i) Net Proceeds. In accordance with and for the purpose of Section 7.7 hereof, the Bonds shall be subject to redemption at the option of the Corporation on any date prior to the stated maturities thereof, in whole or in part as shall be determined by the Corporation in its sole discretion, at a Redemption Price equal to 100% of the Principal Amount of such Bonds or portions thereof to be redeemed, together with accrued interest thereon to the date of redemption, in a Principal Amount having an aggregate Redemption Price equal to the amount of moneys which are deposited in or transferred to the Redemption Fund, from any Net Proceeds in connection with a condemnation or casualty loss which results in Net Proceeds (provided that such Redemption Price in the event of a condemnation shall equal 108% of the Principal Amount, together with accrued interest to the date of redemption, if the Project continues to be used as a detention facility or any related purpose), from amounts released from the Capital Improvement Fund or the Expansion Project Account representing excess proceeds of the Series 2005A Bonds in such account and from excess amounts in the Reserve Fund resulting from a reduction in the Reserve Fund Requirement after giving effect to redemption under this subsection (c)(i). The Trustee shall apply any such amounts described above in accordance with applicable provisions hereof from time to time as directed by Officer's Certificate; provided, however, that (i) such amount to be applied to such redemption or purchase shall be rounded to the next lower authorized denomination, and (ii) unless otherwise directed by an Officer's Certificate, no such redemption of Bonds shall be effected unless the total amount to be applied to redeem Bonds on such date shall be at least $25,000.

(ii) Excess Amounts in the Operational Reserve Fund. In accordance with and for the purpose of Section 5.14 hereof, the Bonds shall be subject to redemption on any Interest Payment Date prior to the stated maturities thereof at the option of the Corporation, in whole or in part as shall be determined by the Corporation in its sole discretion, at the applicable redemption price (the "Redemption Price") set forth below (expressed as a percentage of the Principal Amount of the Bonds to be redeemed) together with accrued interest thereon to the date of redemption, from the excess amounts in the

45545798.12 25

Operational Reserve Fund; provided, however, that upon an Event of Default the Series 2005A Bonds may not be redeemed in part unless so approved in writing by the Majority Owner:

| Redemption Period | Redemption Price |
|---|---|
| January 15, 2005 through July 15, 2015 | 103.0% |
| January 15, 2016 | 102.5 |
| July 15, 2016 | 102.0 |
| January 15, 2017 | 101.5 |
| July 15, 2017 | 101.0 |
| January 15, 2018 | 100.5 |
| July 15, 2018 and thereafter | 100.0 |

Section 4.2 **Selection of Bonds to be Redeemed**. Unless otherwise specified in this Indenture, whenever a provision is made in this Indenture for the redemption of less than all of the Bonds of a maturity, the Trustee shall select the Bonds to be redeemed from all Bonds of such maturity not previously called for redemption, by lot in any manner which the Trustee in its sole discretion shall deem appropriate and fair. For purposes of such selection, all Bonds shall be deemed to be comprised of separate $5,000 Authorized Denominations and such separate Authorized Denominations shall be treated as separate Bonds which may be separately redeemed.

Section 4.3 **Redemption at the Election or Direction of the Corporation**. In the case of any redemption of Bonds other than as provided in Section 4.4, the Corporation shall give written notice to the Trustee of its election or direction so to redeem, of the redemption date, of the Principal Amounts of the Bonds of each Sinking Fund Installment to be redeemed (which Sinking Fund Installment, Principal Amounts thereof to be redeemed shall be determined by the Corporation in its sole discretion, subject to any limitation with respect thereto contained in this Indenture) and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least forty-five (45) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 4.5, such redemption shall be effective only if, on the date of redemption, the Trustee shall hold an amount in immediately available funds which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem all of the Bonds to be redeemed and to pay the accrued interest on such Bonds to the redemption date.

Section 4.4 **Redemption Other Than at the Corporation's Election or Direction**. Whenever by the terms of this Indenture the Trustee is required to redeem Bonds other than at the election or direction of the Corporation, the Trustee shall select the Bonds to be redeemed and give the notice of such redemption in accordance with the terms of this Article 4.

Section 4.5 **Notice of Redemption**. When the Trustee shall receive notice from the Corporation of its election or direction to redeem Bonds pursuant to Section 4.3, and when redemption of Bonds is required pursuant to Section 4.4, the Trustee shall give notice, which notice shall specify the Sinking Fund Installments of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable, whether such redemption is conditioned upon the availability of funds for such purpose on the redemption date (in the case of redemption pursuant to Section 4.1(b) and 4.1(c)(i)) and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the Principal Amount thereof to be redeemed. Such notice shall further

45545798.12                    26

state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the Principal Amount thereof in the case of Bonds to be redeemed in part only, together with interest accrued on such Bonds to the redemption date, and that from and after such date interest on such Bonds shall cease to accrue and be payable; provided that, if the redemption is conditioned upon funds being available therefor no later than the opening of business on the Business Day prior to the redemption date, the notice shall so state. The Trustee shall mail a copy of such notice, by first class mail, postage prepaid, not less than thirty (30) days (provided, however, in the case of special redemption as described above in Section 4.1(c)(i), such notice shall be given not less than ten (10) days) nor more than forty-five (45) days before the redemption date, to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registration book. Failure to give such notice with respect to any Bonds, or any defect therein, shall not affect the validity of the proceedings for redemption of any other Bonds.

Section 4.6 **Payment of Redeemed Bonds**. Notice having been given in the manner provided in Section 4.5 (and if said notice shall have been conditioned on the availability of funds on the redemption date, then to the extent such funds are so available), the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid on such Bonds to the redemption date, and, upon presentation and surrender thereof at the offices specified in such notice, together with, in the case of Bonds presented by other than the Owner, a written instrument of transfer duly executed by the Owner or his attorney duly authorized in writing, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid on such Bonds to the redemption date. If there shall be called for redemption less than all of a registered Bond, the Corporation shall execute and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the Principal Amount of the registered Bond so surrendered, registered Bonds of like maturity in any of the authorized denominations. If, on the redemption date, moneys for the redemption of all the Bonds or portions thereof of any like maturity to be redeemed, together with interest to the redemption date, shall be held by the Trustee and Paying Agent so as to be available therefor on said date and if notice of redemption shall have been given as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof of such maturity so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate they would have borne had they not been called for redemption.

Section 4.7 **Redeemed Bonds as Satisfaction of Sinking Fund Installments**. Upon any purchase or redemption of Bonds (other than by application of Sinking Fund Installments) an amount equal to the applicable Redemption Prices thereof (as specified below) shall be credited towards a part or all of any one or more of such Sinking Fund Installments, as directed by an Officer's Certificate or, failing such direction by January 15 or July 15 of each year, toward such Sinking Fund Installments of each series pro rata. Such applicable Redemption Prices shall be the respective Redemption Prices which would be applicable upon the redemption of such Bonds from the respective Sinking Fund Installments on the due dates thereof. The portion of any such Sinking Fund Installment remaining after the deduction of any such amounts credited toward the same (or the original amount of any such Sinking Fund Installment if no such amounts shall have been credited toward the same) shall constitute the unsatisfied balance of such Sinking Fund Installment for the purpose of the calculation of Principal Installments due on a future date.

Section 4.8 **Purchase of Bonds**. In lieu of redemption of Bonds as provided in the Indenture, amounts held by the Trustee for such redemption will, at the written request of the Corporation set forth in an Officer's Certificate received by the Trustee prior to the selection of Bonds for redemption, be applied by the Trustee to the purchase of Bonds at public or private sale as and when and at such prices (including brokerage, accrued interest and other charges) as the Corporation may in its discretion direct,

but not to exceed the redemption price which would be payable if such Bonds were redeemed. The aggregate principal amount of Bonds of the same Sinking Fund Installments purchased in lieu of redemption may not exceed the aggregate principal amount of Bonds of such Sinking Fund Installments which would otherwise be subject to such redemption. Any Bonds purchased pursuant to this Section shall be delivered to the Trustee for cancellation.

## ARTICLE 5

### PLEDGES; ESTABLISHMENT OF FUNDS
### AND ACCOUNTS AND APPLICATIONS THEREOF

Section 5.1 **Pledges.**

The Corporation hereby grants and pledges all of its right, title and interest in (i) the Revenues and (ii) all Funds and Accounts created or established by or maintained pursuant to this Indenture and any other property pledged to the payment of any Bonds in the granting clauses hereof, to secure the payment of the principal, Redemption Price, if any, and interest on the Bonds in accordance with the terms and provisions of this Indenture, and the performance by the Corporation of all of its obligations under this Indenture and the Bonds, and the Trustee is hereby granted a security interest therein, subject only to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth in this Indenture.

Section 5.2 **Establishment of Other Funds.**

The Corporation hereby establishes and creates with the Trustee a series of special trust funds to be held as hereinafter set forth in this Article 5, but subject to Section 11.3, and designated as follows:

    (1)    Revenue Fund;

    (2)    Operation and Maintenance Fund (So long as there is no Event of Default hereunder, upon the written direction of the Corporation to the Trustee, the Operation and Maintenance Fund may be held and maintained by the Corporation. Upon the happening and continuance of any Event of Default hereunder, the Operation and Maintenance Fund shall be held and maintained by the Trustee.);

    (3)    Debt Service Fund;

    (4)    Reserve Fund;

    (5)    Redemption Fund;

    (6)    Capital Improvement Fund, and within the Capital Improvement Fund, the Expansion Project Account;

    (7)    Project Operator Per Diem Fund;

    (8)    Contingency Reserve Fund;

    (9)    Operational Reserve Fund; and

    (10)    Cost of Issuance Fund.

Section 5.3 **Deposit of Bond Proceeds and Other Moneys**. The proceeds of the sale of the Series 2005A Bonds in the amount of $106,380,000 (representing par amount of the Bonds) shall be deposited with the Trustee on the Closing Date. The proceeds of the Series 2005A Bonds so deposited with the Trustee shall be disbursed as follows:

(a)     to the Refunding Trust Agent $31,688,910.70 to be deposited in the Refunding Trust Fund held under the Refunding Trust Agreement;

(b)     to the Reserve Fund $8,829,512.50, the amount equal to the Reserve Fund Requirement;

(c)     to the Cost of Issuance Fund $3,453,450.00;

(d)     to the Expansion Project Account of the Capital Improvement Fund $45,935,000.00, to be disbursed in accordance with Section 5.12 hereof;

(e)     to the Capital Improvement Fund $3,578,456.23, to be disbursed in accordance with Section 5.12 hereof;

(f)     to the trustee for the Subordinate Bonds $3,197,361.28 to be used to refund the Subordinate Bonds on July 3, 2005; and

(g)     to the Debt Service Fund $9,697,309.29, representing capitalized interest on a portion of the Bonds through July 15, 2007.

Furthermore, the following amounts released from the Prior Bonds Indenture and the Subordinate Bonds Indenture and received by the Trustee shall be disbursed as follows:

(a)     to the Capital Improvement Fund $677,568.49 transferred from the Capital Improvement Fund held under the Subordinate Bonds Indenture;

(b)     to the Capital Improvement Fund $33,307.23 transferred from the Costs of Issuance Fund held under the Subordinate Bonds Indenture;

(c)     to the Operational Reserve Fund, all amounts transferred from the Operational Reserve Fund and the Revenue Fund held under the Prior Bonds Indenture.

Section 5.4 **Cost of Issuance Fund**. Moneys in the Cost of Issuance Fund shall be applied to the payment of Costs of Issuance, upon receipt of an Officer's Certificate stating the person to whom and the purpose for which each payment is to be made, and the amount of such payment. Upon receipt of an Officer's Certificate stating that the Costs of Issuance have been fully paid and in any event within six months of the Closing Date, the Trustee shall transfer any remaining balance to the Capital Improvement Fund and such Cost of Issuance Fund shall be closed.

Section 5.5 **Deposits; Monthly Payment of Fees**.

The Corporation shall collect and deposit or cause to be collected and deposited with the Trustee, on the date of receipt, so far as practicable, all Revenues, and to forward promptly to the Trustee statements of each amount deposited. The Trustee shall be accountable only for moneys actually so deposited or held. All Revenues (excluding insurance proceeds, other than business interruption insurance proceeds, and condemnation awards, which are to be applied pursuant to Section 7.7 hereof) shall be deposited for credit to the Revenue Fund to be held by the Trustee.

Section 5.6 **Revenue Fund**. The Revenue Fund shall be held by the Trustee in trust for the benefit of the Bondowners.

All interest and other income from time to time received from the deposit of moneys in the Revenue Fund shall be retained in such fund and applied pursuant to this Section.

On or before each January 15 and July 15, commencing January 15, 2006, the Trustee shall provide a written notice to the Corporation as to the amount deposited in the Revenue Fund, the Operation and Maintenance Fund and the Debt Service Fund and the deposit requirements for each of the Funds set forth in this Section. In the event that the amount deposited in the Revenue Fund shall be insufficient to satisfy the required deposit in the Debt Service Fund on such Interest Payment Date, the Trustee shall include such fact in its notice to the Corporation and shall also state the balances as of the date of such notice in the Contingency Reserve Fund and the Operational Reserve Fund.

On or before fifth (5th) calendar day of each month (each, a "Deposit Date"), the Trustee shall withdraw from the Revenue Fund and transfer to the following funds or make the following payments in the amounts indicated in the following tabulation, in the following order of priority, or so much thereof as remains after first making all prior transfers or payments:

(a)     into the Operation and Maintenance Fund, the amount budgeted for such month by the Corporation as set forth in the Corporation Budget for Operation and Maintenance Costs (less, unless approved by the Majority Owner, the Project Operator Per Diem and Local Impact Fees) (the initial deposit shall be in the amount of 110% of the budgeted amount);

(b)     into the Debt Service Fund, an amount, taking into consideration amounts deposited therein pursuant to Section 5.3(g) and available for debt service pursuant to Section 5.8, equal to one-sixth of the amount of interest due and payable on the Bonds on the next Interest Payment Date, plus an amount equal to any shortfall in the amount previously required to be deposited in such Fund pursuant to this subsection (b) to the extent of such shortfall;

(c)     into the Debt Service Fund, an amount equal to one-sixth of the Principal Amount of the Bonds due and payable on the next Principal Payment Date (except the first monthly payment shall begin six months prior to the first Principal Payment Date), including Sinking Fund Installments, plus an amount equal to any shortfall in the amount previously required to be deposited in such Fund pursuant to this subsection (c) to the extent of such shortfall; and

(d)     into the Reserve Fund, the amount, if any, needed to increase the balance therein to the Reserve Fund Requirement.

In addition to the foregoing deposits, on the Deposit Date in each February and August, the Trustee shall withdraw from the Revenue Fund and transfer to the following funds or make the following payments in the amounts indicated in the following tabulation, in the following order of priority, or so much thereof as remains after first making all prior transfers or payments:

(e)     into the Project Operator Per Diem Fund, the amount payable to the Project Operator on each February 1 and August 1 as directed by the Corporation;

(f)     into the Contingency Reserve Fund, fifty percent of amounts remaining in the Revenue Fund, after the foregoing deposits, and only until the Contingency Reserve Fund Requirement is met; and

(g)     all remaining amounts into the Operational Reserve Fund.

45545798.12                                30

Section 5.7 **Operation and Maintenance Fund**.

The Operation and Maintenance Fund shall be held by the Trustee. So long as there is no Event of Default hereunder, upon the written direction of the Corporation to the Trustee, the Operation and Maintenance Fund may be held and maintained by the Corporation. Upon the happening and continuance of any Event of Default hereunder, the Operation and Maintenance Fund shall be held and maintained by the Trustee. Upon receipt of written direction from the Treasurer or other authorized official of the Corporation with respect to disbursements for Operation and Maintenance Costs, including a bill or statement of account, if any, for each obligation, the Trustee (or the Corporation pursuant to Section 5.2(2)) shall make the payments as authorized by such direction from the Operation and Maintenance Fund directly to the payee entitled thereto as named in such written direction.

All interest and other income from time to time received from the deposit and investment of moneys in the Operation and Maintenance Fund shall be retained in the Operation and Maintenance Fund.

Section 5.8 **Debt Service Fund**.

(a)  The Debt Service Fund shall be held by the Trustee in trust for the benefit of the Bondowners. The Trustee shall withdraw from the Debt Service Fund, on or prior to each Interest Payment Date, an amount equal to the unpaid interest due on the Bonds on that date and shall cause it to be applied to the payment of such interest when due. The monies deposited in the Debt Service Fund pursuant to Section 5.3(f) herein along with interest earnings thereon and interest earnings from the Reserve Fund transferred into the Debt Service Fund shall be used to pay interest on a portion of the Bonds on the dates and in the amounts set forth in Exhibit C attached hereto.

(b)  If the withdrawals required under subsection (a) of this Section on the same and every prior Interest Payment Date have been made, the Trustee shall withdraw from the Debt Service Fund, on or prior to each Principal Payment Date, an amount equal to the principal amount of Bonds maturing on such Principal Payment Date or the Sinking Fund Installment, if any, due on that date and shall cause it to be applied to the payment of the principal of or the Sinking Fund Installments on the Bonds when due.

(c)  Each withdrawal from the Debt Service Fund under subsections (a) and (b) of this Section shall be made on or immediately prior to the Interest Payment Date or Principal Payment Date to which it relates, and the amount so withdrawn shall be deemed to be part of the Debt Service Fund until such Interest Payment Date or Principal Payment Date.

(d)  The Trustee shall apply money in the Debt Service Fund to the purchase or the redemption of the Bonds in the manner provided in this Section and Article 4, provided that no such Bonds shall be so purchased in lieu of redemption during the period of 45 days next preceding each Sinking Fund Installment due date established for such Bonds. The price paid by the Trustee (including any brokerage and other charges) for any Bond purchased pursuant to this subsection (d) shall not exceed the Redemption Price applicable on the next date on which such Bond could be redeemed in accordance with its terms as part of a Sinking Fund Installment. Subject to the limitations set forth and referred to in this Section, the Trustee shall purchase Bonds at such times, for such prices, in such manner (whether after advertisement for tenders or otherwise) as the Trustee shall be directed by an Officer's Certificate and as may be possible with the amount of money available in the Debt Service Fund therefor.

(e)  As soon as practicable after the 45th day but not later than the 30th day prior to the due date of any Sinking Fund Installment, the Trustee shall proceed pursuant to Section 4.5 to call for redemption on that date a Principal Amount of Bonds subject to such Sinking Fund Installment in such amount as shall be necessary to complete the retirement of the Principal Amount of the Bonds of such

45545798.12                                        31

maturity specified for such Sinking Fund Installment. The Trustee shall withdraw from the Debt Service Fund, on or prior to the due date of the next Sinking Fund Installment, an amount equal to the Principal Amount of the Bonds called for redemption on such date pursuant to this subsection; and shall cause it to be applied to the payment of the Redemption Price thereof on such date. If on any date there shall be moneys on deposit in such Sinking Fund Installment Account and no Bonds subject to redemption therefrom shall then be Outstanding, such moneys shall be transferred to the Revenue Fund.

If, by application of moneys in the Debt Service Fund, the Trustee shall purchase in any Bond Year Bonds subject to redemption from moneys in the Debt Service Fund in excess of the aggregate Sinking Fund Installment in respect of such Bonds for such Bond Year, the Trustee shall file with the Corporation not later than the 20th day preceding the close of such Bond Year, a statement identifying such Bonds purchased and called for redemption during such Bond Year. The Corporation shall thereafter cause an Officer's Certificate to be filed with the Trustee not later than the 10th day preceding the close of such Bond Year setting forth with respect to the amount of such excess the years in which Sinking Fund Installments are to be reduced and the respective amounts by which such Sinking Fund Installments are to be reduced.

Upon the retirement of any Bonds by purchase or redemption pursuant to this Section, the Trustee shall file with the Corporation a statement identifying such Bonds and setting forth the date of their purchase or redemption, the amount of the purchase price or the Redemption Price of such Bonds and the amount paid as interest thereon.

(f)      All interest and other income from time to time received from the deposit and investment of moneys in the Debt Service Fund shall be retained in the Debt Service Fund.

(g)      No amount shall be withdrawn or transferred from or paid out of the Debt Service Fund except as provided in this Section.

Section 5.9 **Reserve Fund**.

(a)      The Reserve Fund shall be held by the Trustee for the benefit of the Bondowners. If available moneys in the Debt Service Fund shall be insufficient to pay in full the interest on and principal of any Bonds becoming due on any Interest Payment Date, Principal Payment Date or any date on which Bonds have been called for redemption, and to the extent no moneys are available in the Operational Reserve Fund and the Contingency Reserve Fund, the Trustee shall transfer the deficiency from the Reserve Fund to the Debt Service Fund for such purpose unless the Corporation shall, by an Officer's Certificate delivered to the Trustee prior to the Interest Payment Date, designate one or more Funds or Accounts from which an amount equal to the deficiency in the Debt Service Fund is required to be transferred to the Debt Service Fund.

(b)      All interest and other income from time to time received from the deposit and investment of moneys in the Reserve Fund shall be transferred upon receipt to the Debt Service Fund.

(c)      If, at any time, the amount in the Reserve Fund exceeds the Reserve Fund Requirement, the Trustee shall withdraw any amount therein in excess of the Reserve Fund Requirement and transfer such amount to the Debt Service Fund.

(d)      Whenever the Corporation shall receive Net Proceeds, or excess amounts exist in the Capital Improvement Fund, and shall transfer the Net Proceeds or such excess amounts to the Redemption Fund, which in any such case would result in the reduction of the Reserve Fund Requirement upon application of the moneys so transferred to the purchase or redemption of Bonds, the Trustee shall,

immediately prior to and in connection with each such purchase or redemption, withdraw from the Reserve Fund and deposit in the Redemption Fund an amount of moneys equal to the reduction of the Reserve Fund Requirement which would result upon the purchase or redemption of such Bonds (including the purchase or redemption of such Bonds utilizing the moneys being transferred from the Reserve Fund and deposited in the Redemption Fund pursuant to the provisions of this paragraph), but only to the extent that any such withdrawal would not reduce the amount of the Reserve Fund below the Reserve Fund Requirement. The amount of moneys to be withdrawn from the Reserve Fund in each instance pursuant to the provisions of this paragraph shall be as determined by an Officer's Certificate.

Section 5.10 **Redemption Fund.**

(a)    The Redemption Fund shall be held by the Trustee in trust for the benefit of the Bondowners. The Trustee shall deposit into the Redemption Fund any Net Proceeds or any excess funds transferred to the Redemption Fund from the Capital Improvement Fund pursuant to Section 5.12. Any moneys on deposit in the Redemption Fund shall be used and applied, as soon as practicable following the receipt thereof, but not later than twelve months after such receipt, for either or both of the following purposes:

(1)    to the redemption of Bonds as may be designated in an Officer's Certificate; or

(2)    to the purchase of Bonds at the price specified in writing by the Corporation, but only upon receipt of an Officer's Certificate stating the Principal Amounts and maturities of the Bonds to be purchased; provided that no such purchase shall be made at a price in excess of the Redemption Price applicable on the next ensuing redemption date, and that no such purchase shall be made during the period of 45 days next preceding a redemption date from moneys to be applied pursuant to paragraph (1) above to the redemption of Bonds on such date.

(b)    Accrued interest on purchased Bonds shall be paid from the Debt Service Fund.

(c)    All interest and other income from time to time received from the deposit and investment of moneys in the Redemption Fund shall be transferred upon receipt to the Revenue Fund.

(d)    No amount shall be withdrawn or transferred from or paid out of the Redemption Fund except as provided in this Section.

Section 5.11 **Project Operator Per Diem Fund.** The Trustee shall establish and hold a special trust fund designated as the Project Operator Per Diem Fund. The Trustee shall pay the semiannual payment to the Project Operator on each February 1 and August 1; provided, however, that no payment shall be made from the Project Operator Per Diem Fund in the Event of Default unless approved by the Majority Owner.

Section 5.12 **Capital Improvement Fund.**

(a)    The Trustee shall establish and hold a special trust fund designated as the Capital Improvement Fund, and within the Capital Improvement Fund, the Expansion Project Account. Except as set forth below in this Section, amounts in the Capital Improvement Fund shall be expended and applied only for capital improvements to the Project other than those contemplated under the Construction Contract; provided, however, the Corporation may transfer moneys in the Capital Improvement Fund to the Expansion Project Account. On or after the Closing Date, the Trustee shall pay out moneys in the Capital Improvement Fund only upon receipt by the Trustee of a written requisition of the Corporation signed by an Authorized Officer certifying with respect to each disbursement: (i) the requisition number;

(ii) the name and address of the person, firm or corporation to whom payment will be made; (iii) the amount to be disbursed; (iv) that each obligation mentioned in the requisition is a proper charge against the Capital Improvement Fund and has not previously been disbursed by the Trustee from amounts in the Capital Improvement Fund; and (v) in reasonable detail the nature of the obligation; and shall be accompanied by a bill or statement of account (if any) for each obligation.

(b)     Except as set forth below in this Section, amounts in the Expansion Project Account shall be expended and applied only for costs contemplated under the Construction Contract. The Trustee shall not pay out any retainages (which, notwithstanding anything in the Construction Contract to the contrary, shall not be reduced by the Corporation without the consent of the Majority Owner) from the Expansion Project Account except as set forth herein; provided, however, that so long as it is acting in good faith the Trustee shall be entitled to rely conclusively on the Corporation's certifications in the related requisition and shall not be under a duty independently to examine or evaluate the accompanying deliverables as described herein. On or after the Closing Date, the Trustee shall pay out moneys in the Expansion Project Account only upon receipt by the Trustee of a written requisition of the Corporation signed by an Authorized Officer numbered consecutively upward from 1 and certifying with respect to each disbursement: (i) the name and address of the person to whom the payment is to be made; (ii) the amount to be paid (net of retainages to be withheld in accordance with the Construction Contract); (iii) the obligation on account of which the payment is to be made, showing the total obligation, any amount previously paid, and the unpaid balance; (iv) that the obligation was properly incurred and is a proper charge against the Expansion Project Account; (v) that the amount requisitioned is due and unpaid; (vi) that with respect to items covered in the requisition, there are no vendors', mechanics', or other liens, which should be satisfied or discharged before the payments as requisitioned therein are made, or which will not be discharged before the payments requisitioned therein are made, or which will not be discharged by such payment; provided, however, other than for the final payment, this requirement shall only apply to contractors, subcontractors, workmen and suppliers who have contracts with the contractor in excess of $100,000 as provided for under the Construction Contract, (vii) that the amount remaining in the Expansion Project Account after the payment of the requisition will be sufficient to pay all remaining costs of the project contemplated under the Construction Contract, (viii) that the work can be completed within the time shown on the schedule, (ix) that the work performed or materials supplied is satisfactory to the Corporation, and (x) that such requisition is accompanied by delivery of all of the requirements of, and in compliance with, this Section 5.12(b).

Such requisition shall be accompanied by (i) copies of vendor's or contractors' requisitions, acknowledgments of payment and, as provided for under the Construction Contract, waivers of lien from all persons supplying labor or materials for all lienable work done and materials delivered through the date of the previous requisition and bills of sale or equivalent documentation for any personal property included in the requisition, and (ii) if the requisition includes any payment for foundation work or site work, a certificate of the contractor certifying that all foundations and site work have been constructed in the location shown on the plans and specifications.

Other than the initial requisition on the Closing Date, such requisition shall also be accompanied by a certificate of the Construction Monitor (unless the Majority Owner shall have waived the requirement of a Construction Monitor) certifying (i) his approval of the requisition; (ii) that the obligation was properly incurred; (iii) that the amount requisitioned is due and unpaid; (iv) that, insofar as the payment is to be made for work, materials, supplies or equipment, the work has been performed and the materials, supplies or equipment have been installed in the capital improvement or have been delivered at the site or designated off-site location and are covered by the builders' risk insurance; (v) that all work, materials, supplies and equipment for which payment is to be made are, in the signer's opinion, in accordance with the plans and specifications or duly approved change orders; (vi) that the amount remaining in the Expansion Project Account after the payment of the requisition will be sufficient to pay

all remaining costs contemplated under the Construction Contract; (vii) that the construction work can be completed within the time shown on the schedule; and (viii) that the related requisition is in compliance with, and the deliverables accompanying the same are in compliance with, the requirements of this Section 5.12(b).

Upon substantial completion of the project contemplated under the Construction Contract, the Corporation shall furnish the Trustee with its certificate which may be given in reliance upon appropriate certifications of an architect, showing such substantial completion and the date thereof and certifying that all required insurance has been obtained, that all construction has been substantially completed in accordance with the approved plans and specifications and approved changes if any, and that all costs of the capital improvement (other than the retainages) have been paid or stating the amounts to be reserved for the payment of any unpaid costs and certifying that such amounts are more than sufficient. Any such certificate must be approved in writing by the Construction Monitor unless waived by the Majority Owner. The Trustee may then release the retainages from the Expansion Project Account to the appropriate parties (as directed in the related requisition) upon delivery of (i) a requisition and certificates meeting the provisions of this Section 5.12(b) except for the provision therein requiring a retainage from each requisition; (ii) acknowledgments of payment and waivers of lien for all lienable work done and materials delivered from all contractors, subcontractors and material suppliers who performed services or provided materials with respect to the capital improvement; (iii) if the capital improvement involved construction, a final title insurance policy or endorsement insuring the lien of the Mortgage with respect to the Project and any real property in which an interest was obtained in connection with the capital improvement, subject only to permitted encumbrances; (iv) if applicable, a certificate of occupancy; (v) the execution and filing of the contractor's completion certificate; (vi) the execution and filing of the Corporation's completion certificate; (vii) certification to the Trustee by an Authorized Officer of compliance with the conditions stated in clauses (ii) through (iv) above and clause (viii) hereafter; and (viii) if the capital improvement involved new foundation or site work, a final certificate of the contractor certifying that all foundations and site work have been constructed in the location shown on the plans and specifications. So long as it is acting in good faith the Trustee shall be entitled to rely conclusively on the Corporation's certifications in or accompanying any related requisition (and any certificate of the Construction monitor that may be applicable) and shall not be under a duty independently to examine or evaluate the accompanying deliverables (described in the preceding sentence of this paragraph or the preceding paragraphs of this Section).

(c)      To the extent of any unexpended monies in the Capital Improvement Fund or the Expansion Project Account after receipt of the certificate required in this Section, the Trustee shall transfer such excess funds to the Redemption Fund and shall apply such excess funds to the redemption of the Bonds as provided in Section 4.1(c)(i) hereof.

(d)      In the case of capital improvements to be funded from the proceeds of insurance or condemnation proceeds deposited into the Capital Improvement Fund pursuant to Section 7.7 hereof, it shall be a further condition to any disbursements of funds from the Capital Improvement Fund that the Corporation shall have satisfied each of the requirements which are specified in Section 7.7 hereof. In addition, in connection with the disbursement of title insurance proceeds from the Capital Improvement Fund with respect to the cure of a title defect, no such disbursement shall be made until after the title defect has been cured.

(e)      Anything in this Section 5.12 to the contrary notwithstanding, the Trustee, at the written request of the Corporation, shall make necessary payments of Rebate Amounts pursuant to Section 7.10 from the Capital Improvement Fund as instructed in writing by the Corporation.

(f)      The Trustee shall, upon written request of the Corporation or any Significant Owner, provide the Corporation or such Significant Owner with a copy of all requisitions and/or a statement of all disbursements made from the Capital Improvement Fund or the Expansion Project Account.

(g)      The foregoing provisions of this Section notwithstanding, if there shall occur an Event of Default, unless otherwise directed in writing by the Majority Owner, the Trustee shall withdraw all amounts then on deposit in the Capital Improvement Fund or the Expansion Project Account and apply them as provided in Section 11.3 hereof.

(h)      All interest and other income from time to time received from the deposit and investment of moneys in the Capital Improvement Fund and the Expansion Project Account shall be retained in the Capital Improvement Fund or transferred to the Capital Improvement Fund in the case of the Expansion Project Account.

Section 5.13  **Contingency Reserve Fund**.

(a)      The Contingency Reserve Fund shall be held by the Trustee.  If at any time there is a deficiency in the Debt Service Fund and no amounts are available in the Operational Reserve Fund, the Trustee shall withdraw from the Contingency Reserve Fund and deposit in the Debt Service Fund the amount necessary to remedy such deficiency, and shall give written notice to the Corporation of such withdrawal.  Amounts in the Contingency Reserve Fund may also be used to finance capital expenditures and to fund Operation and Maintenance Costs.  Amounts in the Contingency Reserve Fund shall not be used to pay Local Impact Fees.  If at any time the amount held in the Contingency Reserve Fund exceeds the Contingency Reserve Fund Requirement, any surplus shall be transferred to the Operational Reserve Fund.

(b)      All interest and other income from time to time received from the deposit and investment of moneys in the Contingency Reserve Fund, so long as the Contingency Reserve Fund Requirement is met, shall be credited to the Revenue Fund.

Section 5.14  **Operational Reserve Fund**.

(a)      Moneys in the Operational Reserve Fund shall be applied by the Trustee at any time, at the direction of the Corporation, to fund any deficiency in the Debt Service Fund, to finance capital expenditures and to fund Operation and Maintenance Costs and Local Impact Fees.  Furthermore, amounts in excess of $2,000,000 held in the Operational Reserve Fund may be applied by the Trustee, at the written direction of the Corporation, to redeem Outstanding Bonds as provided in Section 4.1(c)(ii).

(b)      All interest and other income from time to time received from the deposit and investment of moneys in the Operational Reserve Fund shall be credited to the Revenue Fund.

**ARTICLE 6**

**SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS**

Section 6.1  **Security for Deposits**.  All moneys held hereunder by any Fiduciary shall be held in trust and continuously and fully secured for the benefit of the Corporation and the Owners of the Bonds in the manner required by this Article; provided, however, that it shall not be necessary for any Fiduciary to give security for the deposit of any moneys with them held in trust for the payment of the principal or Redemption Price of or interest on the Bonds, or for the Fiduciaries to give security for any moneys

which shall be represented by obligations purchased under the provisions of this Indenture as an investment of such moneys.

Section 6.2 **Investment and Deposit of Funds**.

(a)    The Trustee shall keep all money held by it, as continuously as reasonably possible, invested and reinvested in Qualified Investments maturing at the times and in the amounts specified below for the Fund or Account to which it pertains, all as instructed in writing by an Authorized Officer. In determining the appropriate Qualified Investments, the Authorized Officer shall review and comply with the following investment restrictions with respect to each Fund:

(1)    for the Revenue Fund, including the accounts therein, at the times and in the amounts necessary to provide funds for the disbursements therefrom pursuant to an Officer's Certificate;

(2)    for the Debt Service Fund, at the times and in the amounts necessary to provide funds for payment when due of Interest and Principal Installments on the Bonds pursuant to an Officer's Certificate;

(3)    for the Redemption Fund, at the times and in the amounts necessary to provide funds for the purposes described in Section 5.10 pursuant to an Officer's Certificate;

(4)    for the Reserve Fund, at the times and in the amounts necessary to provide funds for the disbursements therefrom pursuant to an Officer's Certificate, provided that such Qualified Investments shall mature, or shall be subject to redemption by the holder thereof at the option of such holder, not later than three (3) years from date of purchase; provided, however, if the Reserve Fund is invested in an investment agreement (as defined in clause G of the definition of Qualified Investments) or a repurchase agreement (as defined in clause K of such definition) such agreement may have a maturity longer than five (5) years if the Trustee is authorized by the provision of such agreement to draw the full amount thereof, without penalty, if required for the purpose of paying principal of and interest on the Bonds or for any other purpose required or permitted under this Indenture;

(5)    for the Contingency Reserve Fund, at the times and in the manner specified and in the amounts necessary to provide funds for the purposes described in Section 5.13, pursuant to an Officer's Certificate;

(6)    for the Operational Reserve Fund, at the times and in the manner specified and in the amounts necessary to provide funds for the purposes described in Section 5.14, pursuant to an Officer's Certificate; and

(7)    for the Cost of Issuance Fund, at the times and in the manner specified in an Officer's Certificate.

In the event that written instructions of an Authorized Officer are not received by the Trustee in a timely manner, the Trustee shall invest the amounts deposited in the Funds and Accounts in those investments defined in clause (D) of the definition of "Qualified Investments."

(b)    Moneys in any Fund or Account created and established by, or maintained pursuant to, this Indenture and held by a Fiduciary may be invested in common with moneys held in any other such

45545798.12                                37

Fund or Account; provided, however, that the common investments with such other moneys constitute Qualified Investments.

(c)    Obligations purchased as an investment of moneys in any Fund or Account held by a Fiduciary hereunder shall be deemed at all times to be a part of such Fund or Account and the income or interest earned by, or incremented to, any such Fund or Account due to the investment and reinvestment thereof shall be retained in such Fund or Account as part thereof, except as otherwise provided in this Indenture and subject to the required transfer thereof from such Fund or Account pursuant to this Section. A Fiduciary shall sell in any commercially reasonable manner, or present for redemption, any obligation purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund or Account for which such investment was made; provided, however, that in lieu of liquidating any such investment obligations and transferring the proceeds thereof, the Trustee may transfer investment obligations which will mature and the proceeds of which will be available on or before the date such proceeds are required for the purposes of this Indenture. The Corporation acknowledges that to the extent that regulations of the Comptroller of the Currency or other applicable regulatory Corporation grant the Corporation the right to receive brokerage confirmations of security transactions, the Corporation waives receipt of such confirmations. The Trustee shall furnish to the Corporation periodic statements which include detail of all investment transactions made by the Trustee. The Trustee shall advise the Corporation in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all investments held for the credit of each Account in its custody under the provisions of this Indenture as of the end of the preceding month. The Trustee may act as principal or agent in the acquisition or disposition of investments and purchase and sell investments through its investment department or that of its affiliates.

(d)    In computing the amount in any Fund or Account held by the Trustee under the provisions of this Indenture, investments and the accrued interest paid on the purchase thereof shall be deemed a part of such Fund or Account. Investments in each such Fund or Account pursuant to this Article VI shall be valued at the lower of amortized cost or fair market value thereof on a semi-annual basis.

Section 6.3 **Liability of the Fiduciaries for Investments**. No Fiduciary shall be liable or responsible for making or failing to make any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or failure to so make, except for its own gross negligence. The Trustee may deem investments directed by an Authorized Officer as Qualified Investments without independent investigation thereof.

## ARTICLE 7

## COVENANTS OF THE CORPORATION

The Corporation covenants and agrees with the Owners of the Bonds as follows:

Section 7.1 **Payment of Bonds**. The Corporation shall duly and punctually pay or cause to be paid, but solely from the Trust Estate, the principal or Redemption Price, if any, of every Bond and the interest thereon, at the dates and places and in the manner provided in the Bonds according to the true intent and meaning thereof.

Section 7.2 **Offices for Payment and Registration of Bonds**. The Corporation may designate an additional Paying Agent located within or without the State where Bonds may be presented for payment.

Section 7.3 **Further Assurances; Amendment to Mortgage**. At any and all times the Corporation shall, so far as it may be authorized or permitted by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolution, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning, confirming and effecting all and singular the proceeds, moneys, rights, interests and collections hereby pledged or assigned or intended so to be, or which the Corporation may hereafter become bound to pledge or assign. Upon the completion of any land acquisition and/or capital improvements constituting a portion of the Project, the Corporation shall cause an amendment to the Mortgage to include such land and/or capital improvements.

Section 7.4 **Power to Issue Bonds and Make Pledges**. The Corporation is duly authorized pursuant to law to authorize and issue the Bonds and to adopt this Indenture and to pledge the Trust Estate in the manner and to the extent provided in this Indenture and to grant a mortgage lien on the Mortgaged Property pursuant to the Mortgage. The Trust Estate is and will remain free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto prior to, or of equal rank with, the pledge created by Section 5.1 hereof. The Bonds and the provisions of this Indenture are and will be the valid and legally enforceable obligations of the Corporation in accordance with their terms and the terms of this Indenture. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Trust Estate and the mortgage lien granted by the Mortgage and all the rights of the Bondowners under this Indenture and the Mortgage against all claims and demands of all persons whomsoever.

Section 7.5 **Use of Proceeds**.

The Corporation shall use and apply the proceeds of Bonds, to the extent not otherwise required by this Indenture, for the purposes specified in the Act, and shall do all such acts and things necessary to receive and collect when due all Revenues, and shall diligently enforce, and take all steps, actions and proceedings reasonably necessary in the judgment of the Corporation for the enforcement of all terms, covenants and conditions of this Indenture.

Section 7.6 **Fees and Charges**. The Corporation shall review, approve and pay such fees and charges as shall be required by the Act or as it shall deem appropriate to pay each Fiduciary acting in connection with this Indenture and the Bonds.

Section 7.7 **Disposition of Net Proceeds**.

(a) Net Proceeds constituting proceeds of a condemnation award, sale of land, or casualty insurance claim with respect to the Project shall be deposited in a special restoration account to be established and held by the Trustee within the Capital Improvement Fund for the Project and the Trustee, upon receipt of Net Proceeds, shall give written notice to the Corporation of such event. Such amounts shall either be applied to the redemption of Bonds or the repair, replacement, restoration or rebuilding of the Project or part thereof as determined in accordance with this Section. Prior to the receipt of Net Proceeds by the Trustee, the Trustee shall first receive a written direction from the Corporation as to whether such proceeds shall be used to redeem the Bonds or to rebuild the Project. Upon receipt of such written direction from the Corporation that such Net Proceeds will be used to redeem the Bonds, the Corporation shall cause the Net Proceeds to be paid to the Trustee no more than 30 days from the date that such Net Proceeds will be used to redeem the Bonds.

The Corporation shall use best efforts, in accordance with applicable laws, to apply any Net Proceeds constituting casualty insurance claim with respect to the Project to the repair, replacement,

45545798.12    39

restoration or rebuilding of the Project or part thereof. The appropriateness of any disposition of Net Proceeds shall be supported by a certificate of an independent consultant or architect.

(b)     Repair or Replacement.     Amounts in the special restoration account described in (a) above shall be applied to the repair, replacement, restoration or rebuilding of the Project if the Corporation shall deliver or cause to be delivered to the Trustee within ninety (90) days of the event giving rise to the Net Proceeds written notice of its determination that such proceeds may be applied to the repair, replacement, restoration or rebuilding of the Project or part thereof in an economical manner, and that such proceeds shall be sufficient, together with any other moneys deposited into such special restoration account for such purpose together with a report of a management consultant to the effect that following such repair or restoration, the Coverage Ratio Requirement will be met. Upon compliance with these conditions, the Trustee shall disburse the moneys so deposited for such repair, replacement, restoration or rebuilding, but not in an aggregate amount exceeding the cost thereof, upon receipt of an Officer's Certificate stating (i) the amount to be paid, (ii) the name of the person to which payment is to be made, and (iii) that such amount, together with all prior payments from such account, do not exceed the cost of such repair, replacement, restoration or rebuilding; provided that prior to making any such payments, the Trustee shall first have received an Officer's Certificate stating (i) the estimated cost of such repair, replacement, restoration or rebuilding, (ii) that such repair, replacement, restoration or rebuilding is, in the signer's opinion, economically practicable with the proceeds of such condemnation award, sale of land or hazard insurance claim, and other moneys, if any, deposited in such account, and (iii) that the plans and specifications, if any, prepared for such repair, replacement, restoration and rebuilding have been approved by the Corporation. All disbursements made by the Trustee pursuant to such Officer's Certificates shall be presumed to be made properly, and the Trustee shall not be required to see to the application of any payments so made or inquire into the purposes for which such disbursements are made.

(c)     Redemption.     If the Corporation shall not have determined to repair, replace, restore or build the Project or portion thereof, the Trustee shall promptly transfer the Net Proceeds on deposit in the special restoration account to the Redemption Fund and apply such proceeds to the special redemption of the Bonds pursuant to the provisions of Section 4.1(c). Such transfer shall take place upon the occurrence of the earlier of the following events:

(1)     Receipt by the Trustee of a written notice by an Authorized Officer that the Corporation has determined that the repair, replacement, restoration or rebuilding of the Project or portion thereof is not economically feasible; or

(2)     One year from the date of receipt of the Net Proceeds.

Any amounts remaining in a special restoration account and not required for the repair, replacement, restoration or rebuilding of the Project for which such special restoration account was established and all other Net Proceeds, less the cost and expenses of the Corporation incurred in collecting the same and in effecting the purchase or redemption of the Bonds to be purchased or redeemed, shall be deposited in the Redemption Fund, and shall be applied to the purchase, payment, retirement or redemption of Bonds in accordance with the provisions of this Indenture, provided, however, that any portion of such Net Proceeds which represents due and unpaid principal of, or interest on, or fees and charges in each case as determined by the Corporation in an Officer's Certificate delivered to the Trustee, shall be deposited in the Revenue Fund in such amount, if any, as shall be set forth in such Certificate.

45545798.12                                    40

Section 7.8 **Accounts and Reports**. The Corporation shall cause the Trustee to keep proper books of record and account in which complete and correct entries shall be made of its transactions and all Funds and Accounts established by or maintained pursuant to this Indenture, which shall at all times during normal business hours be subject to inspection by the Corporation and the Owners of an aggregate of not less than twenty-five percent (25%) in Principal Amount of the Bonds then Outstanding or their agents or representatives duly authorized in writing.

Section 7.9 **Creation of Liens**. The Corporation shall not issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of the proceeds, moneys, rights, interests and collections pledged or held aside by the Corporation or by a Fiduciary under this Indenture and, except as expressly provided in this Indenture and as may be otherwise provided in a Supplemental Indenture with respect to any supplemental security, shall not create or cause to be created any lien or charge on proceeds, moneys, rights, interests and collections or such moneys on a subordinate, parity or senior basis to the lien created by Section 5.1 for the benefit of the Bonds or allow any lien to exist with respect to the Property, other than liens existing on the date of delivery of the Bonds; provided, however, that nothing in this Indenture shall prevent the Corporation from leasing a portion of the Property for expansion of the Improvements so long as such action is expected to result in an increase in Revenues, will not adversely affect the operation of the Project and will not cause the interest on any Series 2005A Bonds to become includable in the gross income, as defined in section 61 of the Code, of the owners thereof for federal income tax purposes, and further provided, however, that nothing in this Indenture shall prevent the Corporation from issuing evidences of indebtedness secured by a pledge of such proceeds, moneys, rights, interests and collections to be derived on and after such date as the Trust Estate shall be discharged and satisfied as provided in Section 13.1, or from issuing notes or bonds of the Corporation secured by assets and revenues of the Corporation other than the Trust Estate and the Mortgaged Property.

Section 7.10 **Covenants to Maintain Tax-Exempt Status of the Series 2005A Bonds**. The Corporation covenants as follows in this Section.

(a) Definitions. When used in this Section, the following terms have the following meanings:

*"Bonds"*, when referred to in this Section 7.10, shall mean the Series 2005A Bonds.

*"Computation Date"*, with respect to the Bonds, has the meaning set forth in section 1.148-1(b) of the Tax Regulations.

*"Gross Proceeds"*, with respect to the Bonds, means any proceeds as defined in section 1.148-1(b) of the Tax Regulations (referring to sales, investment and transferred proceeds), and any replacement proceeds as defined in section 1.148-1(c) of the Tax Regulations, of the Bonds.

*"Investment"* has the meaning set forth in section 1.148-1(b) of the Tax Regulations.

*"Nonpurpose Investment"* means any investment property, as defined in section 148(b) of the Code, in which Gross Proceeds of the Bonds are invested and is not acquired to carry out the governmental purposes of the Bonds.

*"Rebate Amount"* has the meaning set forth in section 1.148-1(b) of the Tax Regulations.

*"Tax Regulations"* means the United States Treasury Regulations promulgated pursuant to sections 103 and 141 through 150 of the Code.

45545798.12

41

*"Yield"* of

(1) any Investment has the meaning set forth in section 1.148-5 of the Tax Regulations; and

(2) the Bonds has the meaning set forth in section 1.148-4 of the Tax Regulations.

(b) <u>Not to Cause Interest to Become Taxable</u>. The Corporation shall not use, permit the use of, or omit to use Gross Proceeds or any other amounts (or any property the acquisition, construction or improvement of which is to be financed or refinanced directly or indirectly with Gross Proceeds) in a manner that if made or omitted, respectively, might cause the interest on the Bonds to fail to be excluded pursuant to section 103(a) of the Code from the gross income of the owner thereof for federal income tax purposes. Without limiting the generality of the foregoing, unless and until the Corporation receives a written opinion of Bond Counsel to the effect that failure to comply with such covenant will not adversely affect the exemption from federal income tax of the interest on any Bond, the Corporation shall comply with each of the specific covenants in this Section.

(c) <u>No Private Use or Private Payments</u>. Except as would not cause any Bonds to become "private activity bonds" within the meaning of section 141 of the Code and the Tax Regulations and rulings thereunder, the Corporation shall at all times prior to the final maturity of the Bonds:

(1) exclusively own, operate and possess all property the acquisition, construction or improvement of which is to be financed or refinanced directly or indirectly with Gross Proceeds of the Bonds, and not use or permit the use of such Gross Proceeds (including all contractual arrangements with terms different than those applicable to the general public) or any property acquired, constructed or improved with such Gross Proceeds in any activity carried on by any person or entity (including the United States or any agency, department and instrumentality thereof) other than a state or local government, unless such use is solely as a member of the general public; and

(2) not directly or indirectly impose or accept any charge or other payment by any person or entity who is treated as using Gross Proceeds of the Bonds or any property the acquisition, construction or improvement of which is to be financed or refinanced directly or indirectly with such Gross Proceeds, other than taxes of general application within the jurisdiction of any of the Project Participants or interest earned on investments acquired with such Gross Proceeds pending application for their intended purposes.

Without limitation of the foregoing, the Corporation expressly covenants that, unless it first shall have delivered to the Trustee a written opinion of Bond Counsel to the effect that such arrangement will not cause interest on the Bonds to fail to be excluded pursuant to section 103(a) of the Code from the gross income of the owners thereof for federal income tax purposes: (i) the Corporation shall not enter into any arrangement for the operation or management of any property or facility financed or refinanced in whole or in part with Gross Proceeds of the Bonds unless such arrangement is described in Revenue Procedure 97-13, as supplemented by Revenue Procedure 2002-39, or subsequent guidance provided by the Internal Revenue Service for management arrangements that do not result in "private business use" within the meaning of section 141(b)(1) of the Code; and (ii) the Corporation will not enter into any arrangement with the United States or any agency or instrumentality thereof for the provision of detention services utilizing the capacity of the property or facility financed or refinanced in whole or in part with Gross Proceeds of the Bonds, under which the Corporation obligates itself directly or indirectly to make available any minimum capacity or volume of services or the vendee is obligated, directly or indirectly, to purchase any minimum volume of services or make any minimum payment.

45545798.12                                          42

(d)     No Private Loan.  Except as would not cause any Bond to become "private activity bonds" within the meaning of section 141 of the Code and the Tax Regulations and rulings thereunder, the Corporation shall not use Gross Proceeds of the Bonds to make, finance or refinance loans to any person or entity other than a state or local government.  For purposes of the foregoing covenant, monies are considered to be "loaned" to a person or entity if: (1) property acquired, constructed or improved with such monies is sold or leased to such person or entity in a transaction which creates a debt for federal income tax purposes; (2) capacity in or service from such property is committed to such person or entity under a take-or-pay, output or similar contract or arrangement; or (3) indirect benefits of such monies, or burdens and benefits of ownership of any property acquired, constructed or improved with such monies, are otherwise transferred in a transaction which is the economic equivalent of a loan.

(e)     Not to Invest at Higher Yield.  Except as would not cause the Bonds to become "arbitrage bonds" within the meaning of section 148 of the Code and the Tax Regulations and rulings thereunder, the Corporation shall not at any time prior to the final maturity of the Bonds directly or indirectly invest Gross Proceeds in any Investment, if as a result of such investment the Yield of any Investment acquired with Gross Proceeds, whether then held or previously disposed of, would materially exceeds the Yield of the Bonds within the meaning of said section 148.

(f)     Not Federally Guaranteed.  Except to the extent permitted by section 149(b) of the Code and the Tax Regulations and rulings thereunder, the Corporation shall not take or omit to take any action that if taken or omitted, respectively, would cause any Bonds to be "federally guaranteed" within the meaning of section 149(b) of the Code and the Tax Regulations and rulings thereunder.

(g)     Information Report.  The Corporation shall timely file or cause to be filed any information required by section 149(e) of the Code with respect to the Bonds with the Secretary of the Treasury on Form 8038-G or such other form and in such place as the Secretary may prescribe.

(h)     Rebate of Arbitrage Profits.  Except to the extent otherwise provided in section 148(f) of the Code and the Tax Regulations and rulings thereunder:

(1)     The Corporation shall account for all Gross Proceeds (including all receipts, expenditures and investments thereof) on its books of account separately and apart from all other funds (and receipts, expenditures and investments thereof) and shall retain all records of accounting for at least six years after the day on which the last Bond is discharged.  However, to the extent permitted by law, the Corporation may commingle Gross Proceeds of Bonds with other money of the Corporation, provided that the Corporation separately accounts for each receipt and expenditure of Gross Proceeds and the obligations acquired therewith.

(2)     Not less frequently than each Computation Date, the Corporation shall calculate the Rebate Amount in accordance with rules set forth in section 148(f) of the Code and the Tax Regulations and rulings thereunder.  The Corporation shall maintain a copy of the calculation with its official transcript of proceedings relating to the issuance of the Bonds until six years after the final Computation Date.

(3)     In order to insure the excludability of the interest on the Bonds from the gross income of the owners thereof for federal income tax purposes, the Corporation shall pay or cause to be paid to the United States the amount that when added to the future value of previous rebate payments made for the Bonds equals (i) in the case of a Final Computation Date as defined in section 1.148-3(e)(2) of the Tax Regulations, one hundred percent (100%) of the Rebate Amount on such date; and (ii) in the case of any other Computation Date, ninety percent (90%) of the Rebate Amount on such date.  In all cases, such rebate payments shall be made by the

Corporation at the times and in the amounts as are or may be required by section 148(f) of the Code and the Tax Regulations and rulings thereunder, and shall be accompanied by Form 8038-T or such other forms and information as is or may be required by section 148(f) of the Code and the Tax Regulations and rulings thereunder for execution and filing by the Corporation.

(4)     The Corporation shall exercise reasonable diligence to assure that no errors are made in the calculations and payments required by paragraphs (2) and (3), and if an error is made, to discover and promptly correct such error within a reasonable amount of time thereafter (and in all events within one hundred eighty (180) days after discovery of the error), including payment to the United States of any additional Rebate Amount owed to it, interest thereon, and any penalty imposed under section 1.148-3(h) of the Tax Regulations.

(i)     Not to Divert Arbitrage Profits. Except to the extent permitted by section 148 of the Code and the Tax Regulations and rulings thereunder, the Corporation shall not, at any time prior to the final maturity of the Bonds, enter into any transaction that reduces the amount required to be paid to the United States pursuant to paragraph (h) of this Section because such transaction results in a smaller profit or a larger loss than would have resulted if the transaction had been at arm's length and had the Yield of the Bonds not been relevant to either party.

(j)     Bonds Not Hedge Bonds.

(1)     The Corporation represents that neither the Prior Bonds, the Subordinate Bonds nor any Bonds are or will become a "hedge bonds" within the meaning of section 149(g) of the Code.

(2)     Without limitation of clause (1) above, (I)(a) on the date of issuance of the Prior Bonds and the Subordinate Bonds, the Corporation reasonably expected that at least 85% of the spendable proceeds of the Prior Bonds and the Subordinate Bonds would be expended within the three-year period commencing on such date of issuance, and (b) no more than 50% of the proceeds of the 1992 Bonds were or will be invested in "nonpurpose investments" (within the meaning of section 1.148-1 of the Tax Regulations) having a substantially guaranteed yield for a period of four years or more; and (II),with respect to that portion of the Bonds that is not allocable to the refunding of the Prior Bonds and the Subordinate Bonds, (a) on the date of issuance of the Bonds, the Corporation will reasonably expect that at least 85% of the spendable proceeds of such portion of the Bonds will be expended within the three-year period commencing on such date of issuance, and (b) no more than 50% of the proceeds of such portion of the Bonds will be invested in "nonpurpose investments" having a substantially guaranteed yield for a period of four years or more.

(k)     Elections. The Corporation hereby directs and authorizes any Authorized Officer to make elections permitted or required pursuant to the provisions of the Code or the Tax Regulations, as such Authorized Officer (after consultation with Bond Counsel) deems necessary or appropriate in connection with the Bonds, in the Certificate as to Tax Exemption or similar or other appropriate certificate, form or document.

(l)     Closing Certificate. The Corporation agrees to execute and deliver in connection with the issuance of the Bonds a *Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986*, or similar document containing additional representations and covenants pertaining to the exclusion of interest on the Bonds from the gross income of the owners thereof for federal income tax purposes, which representations and covenants are incorporated as though expressly set forth herein.

45545798.12                                    44

Section 7.11 **Preparation of Annual Budget, Periodic Financial Statements and Other Reports.** (a) At least 30 days prior to the beginning of each Fiscal Year of the Corporation, the Corporation shall prepare or cause to be prepared an annual budget, by month, which may be amended from time to time by the Corporation. The Corporation shall cause a copy of such budget to be delivered to the Trustee. In the event that a budget is not adopted by the first day of any Fiscal Year, the budget for the preceding Fiscal Year shall be applicable to the subsequent Fiscal Year until the date of adoption of a budget for such Fiscal Year.

(b)　Furthermore, the Corporation shall prepare or cause to be prepared quarterly financial statements within forty-five (45) days of the end of each quarter and annual financial statements within one hundred fifty (150) days of the end of the Fiscal Year. The Corporation shall also prepare or cause to be prepared monthly average daily population statistical information with respect to the Project. The Corporation shall also prepare or cause to be prepared within forty-five (45) days of end of each Fiscal Year, a summary of the prior Fiscal Year's marketing efforts with respect to marketing the Project to state and local jurisdictions. Such quarterly and annual financial statements along with the monthly average daily population statistical information and annual marketing efforts summary shall be delivered to the Trustee and the Underwriter promptly upon their preparation, and shall be delivered to an Owner of at least $1,000,000 in principal amount of the Bonds upon request. Upon request, the Corporation shall provide to each Significant Owner any report prepared by the Construction Monitor received by the Corporation.

(c)　Upon written request, the Trustee shall provide to each Significant Owner a statement of activity and fund balances (i) on a monthly basis for all funds and accounts until such time as the Trustee shall receive the notice of the Corporation stating that no further amounts will be expended from the Capital Improvement Fund pursuant to Section 5.12 herein, (ii) on an annual basis for all funds and accounts thereafter.

(d)　From time to time the Corporation shall prepare or cause to be prepared such reports and information concerning the condition of the Project or compliance with the Bond Documents as the Trustee or any Significant Owner may reasonably request in writing, including but not limited to, the following reports:

(i)　Promptly upon its receipt by the Corporation, copies of any correspondence from the Internal Revenue Service as to an audit or potential audit with respect to the Bonds; and

(ii)　Prompt written notice of any litigation or proceeding in which the Corporation is a party if such litigation, if decided against the Corporation, would materially and adversely affect the Corporation or the operations, financial conditions, property or business of the Corporation, and, to the extent feasible, the status of the Corporation's defense of such claim; and

(iii)　Prompt written notice of: (i) any Event of Default, and (ii) the occurrence or nonoccurrence any event that would cause any of the representations and warranties contained in Article VII hereof to be incorrect if made at such time of such event.

(e)　The Trustee and any Significant Owner by their respective duly authorized representatives, at reasonable times and upon reasonable notice, may (i) discuss the financial affairs of the Corporation with a designee of senior management and of the Contract Administrator with a designee or such party's senior management, the Corporation's Accountant reporting on its audited financial statements and any Independent Consultant retained by the Corporation to analyze its operations or financial affairs as a result of a failure to meet any financial covenants or as a result of any Event of Default, and (ii) at such party's own expense (subject to the Trustee's right to be indemnified for such

45545798.12　　　　　　　　　　　　　　　　　45

expenses prior to taking such action; and in any case unless an Event of Default shall have occurred and be continuing, in which case at the Corporation's expense) examine and inspect the property which is subject to the Mortgage and the books and records of the Corporation and any collateral for the Bonds.

(f)     At the expense of the Corporation, a copy of the information required to be provided pursuant to this Section shall be furnished to each Owner, Significant Owner and to any other registered or beneficial owner filing a written request therefor.

Section 7.12 **Operation of the Project**.    The operation of the Project in the manner contemplated on the Closing Date does not conflict with any zoning, water or air pollution or other ordinance, order, law or regulation applicable thereto; the Corporation will cause the Project to be operated in accordance with all applicable federal, state and local laws or ordinances (including rules and regulations) relating to zoning, building, safety, and environmental quality and will obtain and maintain in effect any licenses, permits, franchises or other governmental authorizations necessary for the operation of the Project.

The Corporation shall continue to use its best efforts to market the Project to jurisdictions other than the Federal government; provided, however, failure to house inmates from non-Federal government jurisdictions despite efforts to market the Project to such jurisdictions shall not constitute an Event of Default under this Indenture.

Section 7.13 **Continuing Disclosure**. The Corporation hereby covenants and agrees that it will comply with and carry out all of the provisions of the Continuing Disclosure Agreement. Notwithstanding any other provision of this Agreement, failure of the Corporation to comply with the Continuing Disclosure Agreement shall not be considered an Event of Default under this Indenture; however, the Trustee may (and, at the request of any Participating Underwriter (as defined in the Continuing Disclosure Agreement), or the holders of at least 25% in aggregate principal amount of Outstanding Bonds, subject to payment of its fees and expenses, including reasonable attorneys' fees, shall) or any Bondowner may, take such actions as may be necessary and appropriate, including seeking specific performance by court order, to cause the Corporation to comply with its obligations under this Section.

Section 7.14 **Minimum Fees and Charges; Coverage Ratio Requirement.** The Corporation shall, at all times while any of the Bonds remain Outstanding, fix, prescribe and collect fees and charges in connection with the Project and conduct its operations so as to yield, to the extent permitted by applicable law and/or administrative regulations or procedures, Net Operating Revenues, including any earnings on the Reserve Fund, the Contingency Reserve Fund and Operational Reserve Fund, in each case as estimated for the immediately following 12-month period, and any Capitalized Interest funded from the proceeds of the Bonds or additional bonds allocable to such period, equal to not less than the Coverage Ratio Requirement.

If the requirements of this Section conflict with any applicable law and/or administrative regulations or procedures, the Corporation's failure to comply with the requirements of this Section shall not be deemed an Event of Default hereunder and the Corporation shall be obligated to comply with the provisions of this Section only to the extent permitted by law and/or administrative regulations or procedures.

The Corporation shall file with the Trustee on May 15 of each year thereafter, an Accountant's Certificate evidencing that the Coverage Ratio Requirement for the preceding Fiscal Year has been met and a Corporation's certificate as to whether or not the Coverage Ratio Requirement for the current twelve (12) month period is expected to be met.

45545798.12                                       46

The Corporation shall maintain for each Fiscal Year (commencing with the Fiscal Year ending December 31, 2008) the Coverage Ratio Requirement. On or before the report date for each Fiscal Year, the Corporation shall furnish a calculation by the Independent accountant of whether the Coverage Ratio Requirement was met for the preceding Fiscal Year. If the Coverage Ratio Requirement, as calculated at the end of any Fiscal Year, was not met, the Corporation shall employ (unless waived by the Majority Owner) within thirty (30) days after the applicable report date, at the Corporation's expense, an Independent Consultant to submit a written report and recommendations with respect to the fees, charges, operations and management relating to the Project and with respect to improvements or changes in the operations and management of or the services rendered by the Project Operator and the Corporation so as to permit the Corporation to comply with the Coverage Ratio Requirement, which report shall state the extent to which prior recommendations (if any) of the Independent Consultant may not have been complied with by the Corporation. The recommendations of the Independent Consultant may include a recommendation as to whether the existing Project Operator should continue to be retained. A copy of such report shall be submitted to the Trustee and to each Significant Owner as soon as practicable but in no event later than seventy-five (75) days after the applicable report date. Within seven (7) months after the submission of its initial report, the Independent Consultant shall submit to the Trustee and each Significant Owner a follow-up report indicating whether or not the recommendations contained in its initial report are being complied with. The Corporation shall revise or cause to be revised such fees, charges, operations and management in conformity with any recommendation of the Independent Consultant and otherwise follow the recommendations of the Independent Consultant, unless such compliance would violate legal or contractual obligations of the Corporation or such compliance would compromise the safety and/or security of the Project as determined by the Corporation in its sole discretion. In such event, the Corporation will not be required to follow the recommendations of the Independent Consultant. Subject to the limitation in the preceding sentence, if the Corporation continuously complies with the recommendations of the Independent Consultant, this Section shall be deemed to have been complied with even if the Coverage Ratio Requirement for such Fiscal Year was not met.

Section 7.15 **Public Liabilities and Workers' Compensation Insurance**.

(a) <u>Public Liability Insurance</u>. The Corporation shall maintain or cause to be maintained so long as Bonds are Outstanding under this Indenture, a commercial general liability coverage, including products, completed operations, contractual, bodily injury, personal injury, and property damage in the amount of at least Two Million Dollars ($2,000,000) combined single limits, naming the Corporation and its officers, officials, employees, volunteers, agents, and representatives as named insured. All such insurance (i) shall be primary insurance and not contributory with any other insurance with the Corporation or its officers, officials, employees, volunteers, agents, or representatives may have; (ii) shall contain no special limitations on the scope of protection afforded to the Corporation and its officers, officials, employees, volunteers, agents, and representatives; (iii) shall be "per occurrence" rather than "claims made" insurance; provided, however, in the event the Corporation is unable to obtain such policy, or believes that such policy's premium is not reasonable, the Corporation may obtain a "claims made" policy for this Project; (iv) shall apply separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the insurer's liability; (v) shall provide that the policy will not be canceled or limited in scope by the insurer unless there is a minimum of thirty (30) days prior written notice by certified mail, return receipt requested to the Trustee; (vi) shall be written by a Rhode Island licensed insurer with a Best rating of not less than B+, Class X or shall be the Rhode Island Interlocal Risk Management Trust; and (vii) shall be endorsed to state that any failure to comply with the reporting provisions of the policies shall not affect coverage provided.

Such insurance may be maintained as part of or in conjunction with any other insurance coverage carried by the Corporation, and may be maintained in whole or in part in the form of self-insurance by the

Corporation, subject to the provisions of Section 7.18. The Net Proceeds of such liability insurance shall be applied by the Corporation toward extinguishment or satisfaction of the liability with respect to which the Net Proceeds of such insurance shall have been paid.

(b) Workers' Compensation Insurance. To the extent required by State law, the Corporation shall maintain or cause to be maintained so long as Bonds are Outstanding under this Indenture, workers' compensation insurance, including Employer's Liability Coverage, with limits not less than $1,000,000 per accident, issued by a responsible carrier authorized under the laws of the State to insure employers against liability for compensation under the Labor Code of the State, or any act enacted as an amendment or supplement thereto or in lieu thereof, such workers' compensation insurance to cover all persons (if any) employed by the Corporation in connection with the Project and to cover full liability for compensation under such act. Such insurance shall be endorsed to include a waiver of subrogation rights against the Corporation and its officers, officials, employees, volunteers, agents and representatives, and notice of cancellation as described in (v) under Section 7.15(a) above. Such insurance shall be underwritten by Rhode Island licensed insurers with Best ratings of not less than B+, Class X or shall be the Rhode Island Interlocal Risk Management Trust. Such insurance may be maintained as part of or in conjunction with any other insurance coverage carried by the Corporation, and may be maintained in whole or in part in the form of self-insurance by the Corporation, subject to the provisions of Section 7.19.

Section 7.16 **Casualty Insurance**. The Corporation shall procure and maintain, or cause to be procured and maintained, so long as Bonds are Outstanding under the Indenture, all risk casualty insurance against loss or damage to the Improvements located on the Project, in an amount at least equal to one hundred percent (100%) of the replacement value of the insured Improvements. Such insurance shall, as nearly as practicable, cover loss or damage by explosion, windstorm, riot, aircraft, vehicle damage, smoke, fire and such other hazards (excluding earthquake and flood coverage) as are normally covered by such insurance. Such insurance shall be subject to such deductibles as are customarily maintained by municipalities with respect to works and properties of like character, but in any case shall not exceed $100,000. Such insurance may be maintained as part of or in conjunction with any other insurance coverage carried by the Corporation. The Corporation shall not self insure for casualty insurance except for the deductible provided above. The Net Proceeds of such insurance shall be applied as provided in Section 7.7 of the Indenture.

Section 7.17 **Business Interruption Insurance**. The Corporation shall procure and maintain, or cause to be procured and maintained, so long as Bonds are Outstanding under this Indenture, business interruption or use and occupancy insurance (including extra expense insurance) to cover the Corporation's loss, total or partial, of payments for the Bonds resulting from the loss, total or partial, of the use of the Improvements located on the Project as a result of any of the hazards covered in the insurance required by Section 7.16, in an amount at least equal to the debt service on the Bonds for the current Fiscal Year. Such insurance may be maintained as part of or in conjunction with any other insurance coverage carried by the Corporation, and may be maintained in whole or in part in the form of self-insurance by the Corporation, subject to the provisions of Section 7.18. The Net Proceeds of such insurance, if any, shall be paid to the Trustee and deposited in the Debt Service Fund, and shall be credited towards the payment of the Bonds as the same become due and payable.

Section 7.18 **Insurance Net Proceeds; Form of Policies**. Each policy of insurance maintained pursuant to Sections 7.15, 7.16 and 7.17 shall name the Trustee as loss payee so as to provide that all proceeds thereunder shall be payable to the Trustee. The Corporation shall pay or cause to be paid when due the premiums for all insurance policies required by this Indenture. Except as specifically provided elsewhere in this Indenture, all such policies must be provided by carriers the long-term debt of which is rated at least "A-" by S&P or shall be the Rhode Island Interlocal Risk Management Trust. All such

policies shall provide that the Trustee shall be given thirty (30) days' prior notice of each expiration, and intended cancellation thereof or reduction of the coverage provided thereby. The Trustee shall not be responsible for the sufficiency, adequacy or amount of any insurance herein required and shall be fully protected in accepting payment on account of such insurance or any adjustment, compromise or settlement of any loss. In the event that any insurance required pursuant to Sections 7.15, 7.16 or 7.17 shall be provided in the form of self-insurance, the Corporation shall file with the Trustee annually, within ninety (90) days following the close of each Fiscal Year, a statement of an Independent actuarial consultant identifying the extent of such self-insurance and stating the determination that the Corporation maintains sufficient reserves with respect thereto. In the event that any such insurance shall be provided in the form of self-insurance by the Corporation, the Corporation shall not be obligated to make any payment with respect to any insured event except from Revenues or such reserves. The Corporation shall cause to be delivered to the Trustee annually, no later than January 15 each year, a certificate stating that all of the insurance policies required by this Indenture are in full force and effect and that the Trustee has been named as loss payee in all policies required to be maintained under Sections 7.15(a), 7.16 and 7.17. Failure to comply with the above requirements shall constitute an Event of Default hereunder.

The insurance required to be maintained pursuant to Sections 7.15, 7.16 and 7.17 shall be subject to the annual review of the insurance consultant (such as the Rhode Island Interlocal Insurance Trust), and the Corporation agrees that it will follow any recommendations of the insurance consultant. In order to establish compliance with the requirements of Sections 7.15, 7.16 and 7.17, the Corporation agrees that it will deliver to the Trustee at or prior to the Closing and then every two (2) years thereafter within three months after the end of the applicable Fiscal Year, (i) a report of the insurance consultant setting forth a description of the insurance maintained, or caused to be maintained pursuant to Sections 7.15, 7.16 and 7.17 of this Indenture and then in effect and stating whether, in the opinion of the insurance consultant, such insurance, the manner of providing such insurance and any reductions or eliminations of the amount of any insurance coverage during the Fiscal Year covered by such report comply with the requirements of the Sections 7.15, 7.16 and 7.17 of this Indenture and adequately protect the Project and the Corporation's operations, and (ii) a letter from the insurance consultant evidencing compliance with its recommendations.

Section 7.19 **Engaging In Businesses Other Than Detention Facilities**. The Corporation shall not engage in business activities other than activities conducted in the normal course of business of the operation of detention facilities including, but not limited to, providing security, training and inmate transportation services.

Section 7.20 **Additional Indebtedness.** Except as otherwise permitted in the Indenture, or to refund all Outstanding Bonds, the Corporation shall not incur any additional debt not in existence on the date of issuance of the Bonds unless approved in writing by the Majority Owner.

Section 7.21 **Subordination Provisions Applicable to Subordinated Debt**.

(a)    The indebtedness evidenced by subordinated debt and any renewals or extensions thereof, shall at all times be wholly subordinate and junior in right of payment to any and all indebtedness of the Corporation under the Indenture or the Bonds, in the manner and with the force and effect hereinafter set forth:

(1)    In the event of any liquidation, dissolution or winding up of the Corporation, or of any execution, sale, receivership, insolvency, bankruptcy, liquidation, readjustment, reorganization, or other similar proceeding relative to the Corporation or its property, all principal and interest owing on all the Bonds shall first be paid in full before any payment is made upon the indebtedness evidenced by the subordinated debt, provided, however, that, except for Revenues,

this sentence shall not apply to payments made on such subordinated indebtedness from the proceeds of collateral specifically securing such subordinated debt; and in any such event any payment or distribution of any kind or character from sources other than the proceeds of collateral specifically securing the subordinated debt, except for Revenues, whether in cash, property or securities (other than in securities, including equity securities, or other evidences of indebtedness, the payment of which is subordinated to the payment of all of the Bonds which may at the time be outstanding) which shall be made upon or in respect of the subordinated debt shall be paid over to the holders of such Bonds, pro rata, for application in payment thereof unless and until such Bonds shall have been paid or satisfied in full;

(2)    In the event that the subordinated debt is declared or become due and payable because of the occurrence of any event of default (or under the Indenture, as appropriate) or otherwise than at the option of the Corporation, under circumstances when the foregoing clause (1) shall not be applicable, the holders of the subordinated debt shall be entitled to payments only after there shall first have been paid in full all Bonds outstanding at the time the subordinated debt so become due and payable because of any such event, or payment shall have been provided for in a manner satisfactory to the holders of the Bonds, provided, however, that, except for Revenues, this sentence shall not apply to payments made on such subordinated indebtedness from the proceeds of collateral specifically securing such subordinated debt; and

(3)    During the continuance of any default in the payment of either principal or interest on the Bonds, no payment of principal, premium or interest shall be made on the subordinated debt if either (i) notice of such default in writing or by telegram has been given to the Corporation by any holder or holders of any Bond, provided that judicial proceedings shall be commenced with respect to such default within one hundred twenty (120) days thereafter, or (ii) judicial proceedings shall be pending in respect of such default, provided, however, that, except for Revenues, this sentence shall not apply to payments made on such subordinated indebtedness from the proceeds of collateral specifically securing such subordinated notes.

(b)    The holder of subordinated debt undertakes and agrees for the benefit of each holder of the Bonds to execute, verify, deliver and file any proofs of claim which any holder of the Bonds may at any time require in order to prove and realize upon any rights or claims pertaining to the subordinated notes and to effectuate the full benefit of the subordination contained herein; and upon failure of the holder of any subordinated debt so to do, any such holder of the Bonds shall be deemed to be irrevocably appointed the agent and attorney-in-fact of the holder of such note to execute, verify, delivery and file any such proofs of claim.

(c)    No right of any holder of any Bonds to enforce subordination as herein provided shall at any time or in any way be affected or impaired by any failure to act on the part of the Corporation or the holders of the Bonds, or by any non-compliance by the Corporation with any of the terms, provisions and covenants of the subordinated debt or the agreement under which it is issued, regardless of any knowledge thereof that any such holder of Bonds may have or be otherwise charged with.

(d)    The Corporation agrees, for the benefit of the holders of the Bonds, that in the event that any subordinated debt is declared due and payable before its expressed maturity because of the occurrence of a default hereunder, (i) the Corporation will give prompt notice in writing of such happening to the holders of the Bonds and (ii) all Bonds shall forthwith become immediately due and payable upon demand regardless of the expressed maturity thereof.

(e)    The foregoing provisions are solely for the purpose of defining the relative rights of the holders of Bonds on the one hand, and the holders of the subordinated debt on the other hand, and nothing

45545798.12                                          50

herein shall impair, as between the Corporation and the holders of the subordinated debt, the obligation of the Corporation which is unconditional and absolute, to pay the principal, premium, if any, and interest on the subordinated debt in accordance with their terms, nor shall anything herein prevent the holders of the subordinated debt from exercising all remedies otherwise permitted by applicable law or hereunder upon default hereunder, including, without limitation, all rights to foreclose or otherwise realize upon any collateral specifically securing the subordinated notes, subject to the rights of the holders of Bonds as provided herein.

(f)     Any default in the covenants contained in this section shall be an immediate Event of Default without regard to any "grace period" otherwise contained in the Indenture.

(g)     If the holder of the subordinated indebtedness is a commercial bank, savings bank, savings and loan association or other financial institution which is authorized by law to accept and hold deposits of money or issue certificates of deposit, such holder must agree to waive any common law or statutory right of setoff with respect to any deposits of the Corporation maintained with or held by such holder.

Section 7.22 **Disposition of Assets**. The Corporation covenants that the Project, or any portion thereof including tangible and intangible personal property or fixtures thereof, shall not be sold, leased or disposed of as a whole or substantially as a whole if such sale, lease or disposal would impair the ability of the Corporation to comply with Section 7.14 hereof. Nothing in this Section shall impact the Corporation's covenants under Section 7.33 hereof.

Section 7.23 **Preservation of Project.** The Corporation shall at all times preserve and keep the Project in good repair, working order and safe condition, and from time to time will make, or will cause to be made, all needed and proper repairs, renewals, replacements, betterments and improvements thereto including those required after a casualty loss. The Corporation shall pay all operating costs, utility charges and other costs and expenses arising out of ownership, possession, use or operation of the Project.

Section 7.24 **Concerning the Project - Operation and Compliance with Laws.**

(a)     The Corporation shall (i) use its best efforts to maintain the accreditation of the Project from the American Correction Association, (ii) maintain good standing under all applicable state and federal correction facility guidelines to the extent necessary to continue operating as a detention facility, and (iii) maintain any licenses required by the appropriate Regulatory Bodies.

(b)     The Corporation covenants and agrees that it will comply in good faith with all laws, ordinances and regulations, including without limitation all licensure, building, zoning, safety and environmental laws, ordinances and regulations of any Regulatory Body which hereafter in any manner may affect the Project or the use or operation thereof. The Corporation shall have the right in good faith to contest or appeal from such laws, ordinances and regulations any decision adverse to the Corporation based thereon by appropriate proceedings diligently conducted, but all costs, fees and expenses incurred in connection with such proceedings shall be borne by the Corporation and provided that during such contest or appeal the Corporation complies therewith unless enforcement is stayed.

(c)     The Corporation covenants that, as long as the Indenture remains in force and effect, it shall not:

(1)     other than in the ordinary course of its business, generate, store, transport, utilize, dispose of, manage, release or locate, or permit the generation, storage, transportation, utilization, disposal, management, release or threat of release, or location of any Hazardous Substances on,

45545798.12                                             51

under or from the Project, except for de minimis releases typically associated with the use of certain portions of the Project for driving and parking motor vehicles; or

(2) permit any lien arising under or related to any of the Environmental Laws to attach to the Project.

In addition to all other covenants contained herein, the Corporation agrees that the Project shall be maintained in compliance with the Environmental Laws.

(d) The Corporation shall provide the Trustee with written notice of any of the following events promptly upon the Corporation becoming aware thereof: (a) the presence of, any release or any threat of release of any Hazardous Substances on, under or from the Project (whether or not caused by the Corporation), (b) any environmental enforcement action instituted or threatened, (c) any enforcement, assessment, monitoring, clean-up, containment, removal, remediation, restoration or other action or order instituted, threatened, required or completed by any Governmental Authority pursuant to any of the Environmental Laws with respect to any Surrounding Property, (d) any condition or occurrence on any Surrounding Property that may constitute a violation of any of the Environmental Laws and (e) the receipt by the Corporation of any notice relating to the Project or any Hazardous Substance allegedly originating on, under or from the Project or any Surrounding Property, from any Governmental Authority pursuant to any of the Environmental Laws.

(e) Upon the Corporation becoming aware of the presence of, any release, or any threat of release of any Hazardous Substances on, under or from the Project or any Surrounding Property (whether or not caused by the Corporation), the Corporation shall immediately take all such actions to arrange for the assessment, monitoring, clean-up, containment, removal, remediation or restoration of the Project and the Surrounding Property, to the extent that the presence of any Hazardous Substances on the Surrounding Property originated on, under or from the Project as (i) are required pursuant to any of the Environmental Laws or by any Governmental Authority and (ii) may otherwise be advisable and requested by the Trustee or the Majority Owner.

(f) The Corporation shall provide the Trustee, within thirty (30) days after a demand by the Trustee or the Majority Owner, with a bond, letter of credit or other similar financial assurance, in form and substance satisfactory to the Majority Owner evidencing to the satisfaction of the Majority Owner that the necessary financial resources are available to pay all costs associated with the aforementioned actions, the release of any lien against the Project, the release or other satisfaction of the liability, if any, of the Corporation arising under or related to any of the Environmental Laws and the satisfaction of any applicable environmental enforcement actions. The Trustee shall not be under any obligation to make such demand unless instructed in writing by to the Majority Owner.

(g) Upon request, the Corporation shall provide a copy of any notice required to be given under this Section 7.24 to the Trustee to each Significant Owner.

Section 7.25 **Payment of Taxes and Other Charges.**

(a) The Corporation shall, prior to the date on which any interest or penalties shall commence to accrue thereon, cause to be paid and discharged all taxes (including but not limited to *ad valorem* taxes), assessments, water and sewer rents and charges and all license or permit fees, levies, and governmental charges, payments in lieu of any of the foregoing, general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind and nature whatsoever, which are or may have been, or may hereafter be, charged, assessed, levied, or imposed upon or against the Project, or any part thereof, by any lawful authority. The Corporation shall not suffer, and shall promptly cause to be paid and

45545798.12                                                     52

discharged, any lien or charge whatsoever which by any present or future law may be or become superior, or on a parity with or junior to, either in lien or in distribution out of the proceeds of any judicial sale, the lien of the Mortgage. The Corporation will cause to be paid, when due, all charges for utilities whether public or private.

(b)     Notwithstanding the foregoing, the Corporation may in good faith contest, by proper legal proceedings, the validity or amount of any such tax or charge, and may permit such tax or charge to remain unpaid during the period of such contest, provided (i) no Event of Default, or event or condition which, with the giving of notice or the passage of time or both, would constitute an Event of Default, has occurred and is continuing; (ii) the Corporation maintains and prosecutes with diligence such contest; (iii) the Corporation shall pay such contested tax or charge and all costs and penalties, if any, and shall deliver to the Trustee a certificate signed by an Authorized Officer certifying that such amounts have been paid in full and accompanied by evidence of such payment promptly if such contest is terminated or determined adversely to the Corporation, and in any event prior to the date any portion of the Project may be sold or otherwise transferred because of non-payment of the tax or charge; and (iv) the Corporation shall deposit with the Trustee during such contest cash or a surety bond in the amount of such tax or unpaid charge plus interest and penalties anticipated to accrue thereon through the date reasonably estimated by the Corporation in good faith as the date by which resolution of such contest is expected, accompanied by the Corporation's certification that such amount is in compliance with the requirements hereof and expressly acknowledging that such amounts may be used by the Trustee at the written direction of the Majority Owner (given at their discretion at any time). Notwithstanding any provision hereof to the contrary, at the written direction of the Majority Owner, which may be given at their election and discretion at any time, the Trustee shall use such cash or surety bond to pay the same, as so directed, prior to the date any of the Project may be sold or otherwise transferred because of non-payment of the tax or charge. The Trustee shall not be under any obligation to invest (or pay interest on) any such funds so deposited.

Section 7.26 **Advances by Trustee.** If the Corporation fails to take out or maintain the full insurance coverage required by this Indenture, fails to pay the taxes and other charges required to be paid hereunder at or prior to the time they are required to be paid or fails to keep the Project in good order and repair and in safe condition or fails to perform any other obligation under this Indenture, the Trustee, upon prior written notice to the Corporation, except that such notice shall not be required if the Trustee determines in its sole discretion that delay will be materially prejudicial to its interests herein, may (but shall not be obligated to) take out the required policies of insurance and pay the premiums on the same, pay such taxes or other charges or make such repairs, renewals and replacements as may be necessary to maintain the Project in good order and repair and in safe condition, and pay such other amounts as are necessary to perform or cause to be performed the Corporation's other obligations. All amounts so advanced therefor by the Trustee (at its sole election), together with interest at four percentage points over the rate of interest on the Bonds or at the highest rate permitted by law, whichever is less, shall become an additional obligation of the Corporation to the Trustee, which amounts the Corporation hereby agrees to pay (and which shall be deemed to be obligations described in Section 8.5 herein).

Section 7.27     **Restrictions on Encumbrance, Sale and Lease of Property.**

(a)     The Corporation shall not, without the written consent of the Majority Owner, (i) encumber its title to any Property to secure indebtedness, (ii) sell, lease to others, loan or otherwise dispose of all or any portion of any Property or any interest therein; permit others to occupy any Property, (iii) or create or suffer to be created or permit the existence of any lien upon any Property, that would have a materially adverse affect on the operation of the Project.

(b)     The Corporation may dispose of equipment, furnishings and fixtures which have become obsolete, worn out or unnecessary for the operation of the Corporation provided replacements are made if needed to comply with Section 7.23 hereof.

(c)     The Corporation may transfer cash (other than amounts held in funds under the Indenture) in exchange for property or services in connection with its normal operations, except as otherwise limited by this Indenture.

Section 7.28 **Corporate Existence; Consolidation, Merger, Sale or Conveyance.**

(a)     The Corporation hereby covenants to preserve its corporate existence and all its rights and licenses to the extent necessary or desirable in the operation of its business and affairs and be qualified to do business in each jurisdiction where its ownership of property or the conduct of its business requires such qualifications.

(b)     The Corporation covenants that it will not merge or consolidate with any other corporation, partnership, joint venture, business trust or other entity or sell or convey all or substantially all of its assets to any Person or take any actions that will affect the procedures by which the Corporation's governing body is selected without the prior written consent of the Majority Owner.

Section 7.29    **Project Operator.** The Corporation shall at all times retain a Project Operator for the Project unless it determines to operate the Project itself. Any company or other entity retained as Project Operator shall be qualified and have significant experience in the operation of similar facilities and services or comparable operational experience. If the Corporation fails to retain an acceptable Project Operator as set forth in the preceding sentence, and the Corporation has not determined to operate the Project itself, the Majority Owner shall have the right to require the Corporation at the Corporation's expense to immediately retain a Project Operator pursuant to its statutorily required competitive bidding process utilizing a "request for proposal" acceptable to the Majority Owner. If the Net Operating Revenues, plus any earnings on moneys on deposit in the Reserve Fund, in each case for any Fiscal Year, is less than 100% of principal (including Sinking Fund Installments) and interest payment on the Bonds during such Fiscal Year, and the independent management consultant employed pursuant to Section 7.14 recommends that the Project Operator be replaced, the Majority Owner shall have the right to require the Corporation to replace the Project Operator at the Corporation's expense pursuant to its statutorily required competitive bidding process utilizing a "request for proposal" acceptable to the Majority Owner, subject to the Corporation's contractual obligations with such Project Operator. If the Corporation enters into a new Operator's Agreement or extends the terms of an Operator's Agreement by amendment thereof or exercise of any renewal options therein, the Corporation shall include in such Operator's Agreement provisions incorporating the termination provisions required by this Section; provided that in connection with the Operator's Agreement in effect on the Closing Date, the Corporation shall be required to use best efforts to include, upon exercise of the renewal option therein, provisions incorporating the termination required by this Section.

Section 7.30    **Engineering Reports.** On or before June 30 of every five-year period, commencing June 30, 2010, the Corporation shall provide to the Trustee and, upon request, to each Significant Owner an engineering report on the physical condition of the Project performed by an engineer satisfactory to the Majority Owner. The Corporation shall use its best efforts to implement any recommendations contained in the engineer's report.

Section 7.31 **Covenant to be Bound by the Bond Documents.** The Corporation agrees that it shall faithfully and timely perform all of its obligations under each Bond Document and agrees to be bound by the provisions of the Bond Documents. The Corporation will in all respects promptly and

45545798.12                                   54

faithfully keep, perform and comply with all the terms, provisions, covenants and conditions of this Indenture and all other Bond Documents. It will not do or permit anything to be done, omit or refrain from doing anything where such action or non-action would be a ground for declaring a forfeiture or termination of this Indenture or any other Bond Document.

Section 7.32 **Compliance with Leases.** The Corporation agrees that it shall faithfully and timely perform all of its obligations under any lease to which it is a party.

Section 7.33 **Additional Negative Covenants.**

(a)  Remove Collateral.. Other than in the ordinary course of its business, the Corporation will not remove or suffer the removal of any books or records relating to accounts receivable from the Project or remove from the facilities any part of the Trust Estate until after delivery to the Trustee of an opinion of Corporation counsel addressed to the Trustee stating that all actions have been taken and all necessary documentation has been executed, delivered and filed, as applicable, as is necessary to maintain, perfect and confirm the first priority security interests granted herein.

(b)  Enter into sale/leaseback. The Corporation will not enter into any sale leaseback transaction with respect to the Project.

(c)  Restriction on Certain Investments. The Corporation shall not enter into any Hedge Contracts, reverse repurchase agreement or invest in any so called "inverse floaters" or enter into any other arrangement having the effect of leveraging its investments in securities. The Corporation shall not directly or indirectly invest in collateralized mortgage obligations or in any other investments the principal of or interest on which is defined through an ownership interest in an underlying pool of financial obligations that is not strictly ratable to all of the cash flows of the underlying pool.

## ARTICLE 8
## FIDUCIARIES

Section 8.1 **Trustee Acceptance of Duties.** The Trustee hereby accepts and agrees to execute the trusts specifically imposed upon it by this Indenture, but only upon the additional terms set forth in this Article 8, and no implied covenants or obligations whatsoever shall be read into this Indenture against the Trustee. Prior to the occurrence of an Event of Default and after the cure or waiver of any such Event of Default, the Trustee shall undertake to perform such duties and only such duties as are expressly and specifically set forth in this Indenture. Upon an Event of Default which has not been cured or waived, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would use under similar circumstances in the conduct of his or her own affairs. The Trustee shall be a bank or trust company organized under the laws of any state of the United States or a national banking association, having (together with any affiliates) capital and surplus aggregating at least Fifty Million Dollars ($50,000,000) and authorized by law to perform all the duties imposed upon it by this Indenture.

Section 8.2 **Paying Agents; Appointment and Acceptance of Duties**. The Corporation shall, subject to the requirements of Section 7.2, appoint one or more Paying Agents for the Bonds. The Trustee may be appointed to act as Paying Agent notwithstanding that it may then be acting in the capacity of the Trustee.

Each Paying Agent, immediately upon such appointment, shall signify its acceptance of the duties and obligations imposed upon it by this Indenture by written instrument of acceptance deposited with the Corporation and the Trustee.

45545798.12                                          55

The Corporation will cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent will:

(a)　hold all sums held by it for the payment of principal of (and premium, if any) or interest on the Bonds in trust for the benefit of the persons entitled thereto until such sums shall be paid to such persons or otherwise disposed of as herein expressly provided; and

(b)　at any time during the continuance of any default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The designated trust office of the Paying Agent is hereby designated as the respective agencies of the Corporation for the payment of the principal or Redemption Price of and interest on the Bonds. Except in the event the Trustee shall be the Paying Agent hereunder, the Trustee shall not be responsible for the use or application of any money received by any Paying Agent.

Section 8.3　**Responsibilities of the Fiduciaries**. The recitals of fact herein and in the Bonds and the statements and information in any disclosure provided pursuant to sale of the Bonds shall be taken as the statements of the Corporation, the Corporation or other applicable party and no Fiduciary assumes or shall in any respect is deemed to have assumed any responsibility or liability for the accuracy, completeness or correctness of the same. No Fiduciary shall be deemed to make any representations as to the validity or sufficiency of this Indenture or of any Bonds issued hereunder or in respect of the security afforded by this Indenture, and no Fiduciary shall incur any responsibility in respect thereof. No Fiduciary shall have any responsibility or duty with respect to the issuance of the Bonds or the application of the proceeds thereof or the application of any moneys paid to the Corporation. Except with respect to actions required to be taken by the Trustee pursuant to Section 11.10 upon the occurrence of an Event of Default (as defined in Section 11.1), no Fiduciary shall be under any obligation or duty to perform any act which would cause the Fiduciary to incur or be subject to any expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys. No Fiduciary shall be liable in connection with the performance of its duties hereunder except for its own gross negligence or willful misconduct. No Fiduciary shall be under any responsibility or duty with respect to the application of any moneys paid to any one of the others. The permissive right of a Fiduciary to do things enumerated in this Indenture shall not be construed as a duty.

The Trustee makes no representation of warranty, express or implied, as to the title, value, design, compliance with specifications or legal requirements, quality, durability, operation, condition, merchantability for any particular purpose for the use contemplated by the Corporation of the Project. In no event shall a Fiduciary be liable for incidental, indirect, special or consequential damages in connection with or arising from this Indenture for the existence, furnishing or use of the Project.

The Trustee (i) is hereby authorized and directed to execute and deliver that certain Recognition, Attornment and Assent to Leasehold Mortgage Agreement dated as of June 30, 2005 by and among the Corporation, as Tenant, Sanford Fink and Francine Fink as Landlord, and the Trustee, that certain Recognition, Attornment and Assent to Leasehold Mortgage Agreement dated as of June 30, 2005 among the Corporation, National Railroad Passenger Corporation and the Trustee, that certain Assignment of Construction Contract dated June 30, 2005 among the Corporation, O. Ahlborg & Sons, Inc. and the Trustee and that certain Subordination Agreement dated as of June 1, 2005 among the Corporation, the Trustee and Cornell Corrections of Rhode Island, Inc., each of which has been provided to it by the Corporation, and (ii) is hereby authorized to execute and deliver any further documents and take such actions from time to time pursuant to the terms of such documents as it may deem necessary or

45545798.12　　　　　　　　　　　　　　56

appropriate and consistent with the terms of this Indenture. The Trustee has no responsibility for the validity or sufficiency of the terms of such documents.

Section 8.4 **Evidence on Which Fiduciaries May Act**. The Trustee and any Paying Agent shall be protected in acting upon any Officer's Certificate, notice, resolution, request, consent, order, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. Any Fiduciary may consult with counsel, who may or may not be counsel to the Corporation, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it under this resolution in good faith and in accordance herewith.

Whenever any Fiduciary shall deem it necessary or desirable that a matter be proved or established prior to taking, suffering or omitting any action under this Indenture, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Officer's Certificate, and such certificate shall be full warrant for any action taken, suffered or omitted in good faith under the provisions of this Indenture upon the faith thereof, but in its discretion such Fiduciary may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Except as otherwise expressly provided in this Indenture, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to any Fiduciary shall be sufficiently executed if executed in the name of the Corporation by an Authorized Officer.

The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Bondowners pursuant to this Indenture, unless such Bondowners shall have offered to the Trustee compensations, reimbursement of its reasonable attorneys' fees and costs, and security or indemnity satisfactory to it against further costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Corporation, personally or by agent or attorney.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys or receivers and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

The Trustee shall not be deemed to have knowledge of an Event of Default unless it has actual knowledge thereof at its office where the funds and accounts established under this Indenture are administered.

The Trustee shall have no responsibility with respect to any information, statement, or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds.

Anything to the contrary notwithstanding, the Trustee shall not be required to enter, take possession of, or take any other action whatsoever with respect to the Project unless the Trustee is satisfied that the Trustee will not be subject to any liability under any local, state or federal environmental laws or regulations of any kind whatsoever or from any circumstances present at the Project relating to the presence, use, management, disposal of, or contamination by any environmentally hazardous materials or substances of any kind whatsoever.

Section 8.5 **Compensation**. The Corporation shall pay to the Trustee and each Paying Agent from time to time compensation for all services rendered under this Indenture, and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents and employees, incurred in and about the performance of their powers and duties under this Indenture. In addition, the Corporation shall pay the Trustee's reasonable compensation and reimburse its reasonable expenses, including attorneys' and agent's fees, for any extraordinary services performed in the exercise of its powers and duties under this Indenture. The Corporation further agrees to indemnify and save the Trustee and each Paying Agent harmless against any claims, liabilities, costs or expenses, including fees and expenses of its attorneys which any of them may incur in the exercise and performance of its powers and duties hereunder, and which are not due to the gross negligence or willful misconduct of such Fiduciary. The Corporation's obligations shall survive the termination or discharge of this Indenture. To secure the payment or reimbursement to the Trustee provided for in this Section, the Trustee shall have a senior claim, to which the liens securing the bonds are made subordinate, on all money or property held or collected by the Trustee, except that held under Section 13.1, held in the Reserve Fund or otherwise held in trust to pay principal of and interest on particular Bonds.

Section 8.6 **Permitted Acts and Functions**. The Trustee and any Paying Agent may buy, own, hold and sell (including acting as an underwriter in respect of) any bonds, coupons or notes of the Corporation, whether heretofore or hereafter issued or created; and may engage or be interested in any financial or other transaction with the Corporation, with like effect and with the same rights it would have if it were not such Fiduciary. Any Fiduciary may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or this Indenture, whether or not any such committee shall represent the Owners of a majority in Principal Amount of the Bonds then Outstanding.

Section 8.7 **Replacement of Trustee**. The Trustee may resign by notifying the Corporation in writing at least 60 days prior to the proposed effective date of the resignation. The Owners of a majority in aggregate Principal Amount of the Bonds then Outstanding may remove the Trustee upon 30 days' prior written notice to the Trustee and the Corporation, and may appoint a successor Trustee with the Corporation's consent; provided, however, if an Event of Default has been declared under Section 11.1, then the Corporation's consent shall not be required. The Corporation may remove the Trustee at any time with or without cause by notice in writing delivered to the Trustee 60 days prior to the proposed removal date; provided, however, that the Corporation shall have no right to remove the Trustee during any time when an Event of Default has occurred and is continuing. Notwithstanding the foregoing, the Trustee shall not be substituted without a written confirmation from each Rating Agency maintaining a rating on the Bonds (if any) at the request of the Corporation to the effect that such substitution will not cause the withdrawal or reduction of such rating.

No resignation or removal of the Trustee under this Section shall be effective until a new Trustee has taken office.

If the Trustee resigns or is removed or for any reason is unable or unwilling to perform its duties under this Indenture, the Corporation shall promptly appoint a successor Trustee (unless an Event of

Default has occurred and is continuing, in which case the Majority Owner shall promptly appoint a successor Trustee).

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Owners of 25% in aggregate principal amount of Bonds Outstanding may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with the last sentence of the foregoing Section 8.1, the Owners of 25% in aggregate principal amount of Bonds Outstanding may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Corporation. Immediately thereafter, the retiring Trustee shall transfer, in strict compliance with the terms thereof, all property held by it as Trustee to the successor Trustee and the resignation or removal of the retiring Trustee shall then (but only then) become effective and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.

If a Trustee is not performing its duties hereunder and a successor Trustee does not take office within 60 days after the retiring Trustee delivers notice of resignation or the Corporation delivers notice of removal, the retiring Trustee, the Corporation or the Owners of a majority in Principal Amount of the Bonds may petition any court of competent jurisdiction for the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee, the Corporation's obligations under Section 8.5 shall continue for the benefit of the retiring Trustee.

Section 8.8 **Successor Trustee or Agent by Merger**. If the Trustee or any Paying Agent consolidates with, merges or converts into, or transfers all or substantially all its assets (or, in the case of a national association bank or trust company, its corporate trust assets) to, another corporation, bank, or national association, the resulting, surviving or transferee corporation, bank, or national association without any further act shall be the successor Trustee or Paying Agent.

Section 8.9 **Several Capacities**. Anything in this Indenture to the contrary notwithstanding, the same entity may serve hereunder as the Trustee, the Paying Agent and any other agent as appointed to perform duties or obligations under this Indenture, under a Supplemental Indenture, or in any combination of such capacities, to the extent permitted by law.

Section 8.10 **Resignation or Removal of Paying Agents and Appointment of Successors**. Any Paying Agent may at any time resign and be discharged of the duties and obligations created by this Indenture by giving at least sixty (60) days' written notice to the Corporation and the Trustee. Any Paying Agent may be removed at any time by an instrument filed with such Fiduciary and the Trustee and signed by an Authorized Officer. Any initial or successor Paying Agent acceptable to the Majority Owner shall be appointed by the Corporation and shall be a bank or trust company organized under the laws of any state of the United States or a national banking association, having capital and surplus aggregating at least Five Million Dollars ($5,000,000), and willing and able to accept the office of Paying Agent on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by this Indenture.

In the event of the resignation or removal of any Paying Agent, such Paying Agent shall pay over, assign and deliver any moneys held by it to its successor, or if there be no successor then appointed, to the Trustee until such successor be appointed.

Notwithstanding the replacement of the Paying Agent, the Corporation's obligations under Section 8.5 shall continue for the benefit of the retiring Paying Agent.

Section 8.11 **Co-Trustees**. It is the purpose of this Indenture that there shall be no violation of any law of any jurisdiction (including particularly the law of the State) denying or restricting the right of banking corporations or associations to transact business as Trustee in such jurisdiction. It is recognized that in case of litigation under this Indenture, and in particular in case of the enforcement thereof on default, or in the case the Trustee deems that by reason of any present or future law of any jurisdiction it may not exercise any of the powers, rights or remedies herein granted to the Trustee or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Trustee appoint an additional individual or institution as a separate or co-trustee. The following provisions of this Section shall govern the appointment of separate or co-trustees.

The Trustee may, in its discretion, appoint one or more additional individuals or institutions as separate or co-trustees by written instrument. The Trustee may from time to time, in writing, prescribe the powers, duties and rights of each separate or co-trustee and may remove any such separate or co-trustee. Each and every remedy, power, right, claim, demand, cause of action, immunity, estate, title, interest and lien expressed or intended by this Indenture to be exercised by or vested in or conveyed to the Trustee with respect thereto shall, to the extent provided by the Trustee, be exercisable by and vest in such separate or co-trustee but only to the extent necessary to enable the separate or co-trustee to exercise the powers, rights and duties so provided by the Trustee, and every covenant and obligation necessary to the exercise thereof by such separate or co-trustee shall run to and be enforceable by either the Trustee or such separate or co-trustee.

Should any deed, conveyance or other instrument from the Corporation be required by the separate trustee or co-trustee so appointed by the Trustee for more fully and certainly vesting in and confirming to him or it such properties, rights, owners, trusts, duties and obligations, any and all such deeds, conveyances and other instruments shall on request, be executed, acknowledged and delivered by the Corporation. In case any separate trustee or co-trustee, or successor to either, shall die, become incapable of acting, resign or be separate trustee or co-trustee, so far as permitted by law, shall vest in and be exercised by the Trustee until the appointment of a new trustee or successor to such separate trustee or co-trustee.

Section 8.12 **Continuing Disclosure**. The Corporation has undertaken all responsibility for compliance with continuing disclosure requirements. The Trustee hereby covenants and agrees that it will comply with and carry out all of the provisions of the Continuing Disclosure Agreement applicable to it as Trustee. Notwithstanding any other provision of this Indenture, failure of the Corporation or the Trustee to comply with the Continuing Disclosure Agreement shall not be considered an Event of Default nor, with respect to the Trustee, any breach of its duties; however, the Trustee may (and, at the request of any Participating Underwriter or the Owners of at least 25% in aggregate principal amount of Outstanding Bonds, upon receipt of compensation and payment of its fees and expenses, including attorneys' fees, shall) or any Bondowner may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Corporation to comply with its obligations.

Section 8.13 **Availability of Records**. The Trustee shall provide copies at the expense of the Corporation to any Owner (or any beneficial owner) of the Bonds, upon written request from such Owner or beneficial owner (accompanied by such evidence or proof of beneficial ownership as the Trustee may require), of all records and documents in the Trustee's possession maintained or received by it in connection with this Indenture and the Bonds; provided, however, that if and to the extent the Trustee receives multiple or repeated requests from a particular Owner or beneficial owner (whether for multiple copies of the same materials or repeated requests on a frequent or excessive basis, in the Trustee's

reasonable judgment), the Trustee may, in lieu of providing such copies, make such requested records and documents available for inspection and copying (at the Corporation's expense) by such requesting Owner or beneficial owner at the offices of the Trustee (and such availability shall be deemed to satisfy requirements of this Section); and provided further, however, that the Trustee shall not be obligated to provide copies of or access to records of funds and accounts except to the extent provided in Section 7.11(c). The Trustee may elect to provide such copies or access on an electronic basis, in satisfaction of the requirements of this section. Notwithstanding any term hereof to the contrary, nothing herein shall obligate the Trustee to disclose or deliver any information or material that it determines, based on the advice of counsel, to be confidential in nature and as to which such disclosure or delivery would be in violation of applicable contractual or legal restrictions; provided that the information required to be provided by the Corporation pursuant to the terms hereof or the Continuing Disclosure Agreement shall not be considered confidential information. The Trustee shall, upon written request of any Significant Owner, and at the Corporation's expense, cause a copy of any information provided by the Corporation pursuant to the express requirements of this Indenture to be posted on the Nationally Recognized Municipal Information Repositories through the "Central Post Office" established in connection with Rule 15c2-12.

## ARTICLE 9

### SUPPLEMENTAL INDENTURE

Section 9.1 **Supplemental Indentures Effective Without Consent of Bondowners**. The Corporation may adopt, without the consent of or notice to Bondowners, at any time or from time to time Supplemental Indentures for any one or more of the following purposes, and any such Indenture or Supplemental Indenture shall become effective in accordance with its terms upon the filing with the Trustee of a copy thereof certified by an Authorized Officer:

(a)     To add additional covenants and agreements of the Corporation for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Corporation contained in this Indenture;

(b)     To prescribe further limitations and restrictions upon the issuance of Bonds and the incurring of indebtedness by the Corporation;

(c)     To surrender any right, power or privilege reserved to or conferred upon the Corporation by the terms of this Indenture, provided that no such surrender is contrary to or inconsistent with the covenants and agreements of the Corporation contained in this Indenture;

(d)     To confirm as further assurance any pledge under, and the subjection to any lien, claim or pledge created or to be created by, the provisions of this Indenture;

(e)     To modify any of the provisions of this Indenture or any previously adopted Supplemental Indenture in any other respects, provided that such modifications shall not be effective until after all Bonds Outstanding as of the date of adoption of such Indenture or Supplemental Indenture shall cease to be Outstanding, and all Bonds issued after the date of adoption of such Indenture shall contain a specific reference to the modifications contained in such Indenture;

(f)     To amend this Indenture to add such provisions as may be necessary or advisable in connection with the substitution of any supplemental security; provided that any such modification does not materially adversely affect interests of any Bondowners; or

45545798.12

61

(g)     With the consent of the Trustee, which shall be given or withheld in its sole discretion, to cure any ambiguity or defect or inconsistent provision in this Indenture or to insert such provisions clarifying matters or questions arising under this Indenture as are necessary or desirable; provided that any such modifications do not materially adversely affect the interests of any Bondowners and provided that 45 days' notices of such modifications have been given to the Bondowners.

Section 9.2 **Supplemental Indenture Effective with Consent of Bondowners**. The provisions of this Indenture may be modified at any time or from time to time supplemented by a Supplemental Indenture, subject to the consent of Bondowners in accordance with and subject to the provisions of Article 10 hereof.

Section 9.3 **General Provisions Relating to Indenture and Supplemental Indentures**. This Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article 9 and Article 10. Nothing contained in this Article 9 or Article 10 shall affect or limit the right or obligations of the Corporation to adopt, make, do, execute or deliver any resolution, act or other instrument pursuant to the provision of Section 7.3 hereof or the right or obligation of the Corporation to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere in this Indenture provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Indenture and Supplemental Indenture adopted by the Corporation when filed with the Trustee shall be accompanied by a Counsel's Opinion addressed to the Trustee and the Corporation stating that such Indenture or Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture and is valid and binding upon the Corporation and enforceable in accordance with its terms, except as to enforcement of remedies which may be limited by bankruptcy, insolvency or other laws or equitable principles affecting the enforcement of creditors' rights generally, and, if applicable, is not materially adverse to the interests of any Bondowners.

The Trustee is hereby authorized to accept delivery of a certified copy of any Supplemental Indenture permitted or authorized pursuant to the provisions of this Indenture and to make all further agreements and stipulations which may be contained therein, and, in taking such action, the Trustee shall be fully protected in relying on Counsel's Opinion that such Supplemental Indenture is authorized or permitted by the provisions of this Indenture.

No Indenture or Supplemental Indenture changing, amending or modifying any of the rights or obligations of the Trustee or any Paying Agent may be adopted by the Corporation without the written consent of such Fiduciary affected thereby.

# ARTICLE 10

## AMENDMENTS OF INDENTURE

Section 10.1 **Powers of Amendment**. Any modification or amendments of this Indenture and of the rights and obligations of the Corporation and of the Owners of the Bonds in any particular, may be made by a Supplemental Indenture, with, except as provided in Section 9.1 hereof, the written consent given as hereinafter provided in Section 10.2, of the Owners of at least a majority in aggregate Principal Amount of the Bonds outstanding at the time such consent is given; provided, however, that if any such modification or amendment will, by its terms, not take effect so long as any Bonds remain Outstanding, the consent of the Owners of the Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of the Principal Amount of Outstanding Bonds under this Section. In the event that the Supplemental Indenture shall contain provisions which affect the rights and

interests of less than all series of Bonds Outstanding, then the Owners of not less than a majority of the aggregate Principal Amount of the series of Bonds which are affected by such changes shall have the right from time to time to consent to and approve the execution by the Corporation of any Supplemental Indenture deemed necessary or desirable by the Corporation for the purposes of modifying, altering, amending, supplementing or rescinding, in any particular, any of the terms or provisions contained in the Indenture and affecting only the Bonds of such series; provided, however, unless approved by the Owners of all the Bonds of all the affected series then Outstanding adversely affected by such change, nothing herein shall permit or be construed as permitting such items as further provided in Section 10.1 hereof. No such modification or amendment shall (i) permit a change in the terms of redemption or maturity of the principal of any Outstanding Bond or of any installment of interest thereon, (ii) a reduction in the Principal Amount or the Redemption Price thereof or in the rate of interest thereon, (iii) effect a privilege or priority of any Bond or Bonds over any other Bond or Bonds, (iv) reduce the percentage of the principal amount of the Bonds required for consent to such amendment or supplement, or (v) create a lien ranking prior to or on a parity with the lien of this Indenture on the property described in the Granting Clauses of this Indenture (other than for parity indebtedness as provided herein) without the consent of all Owners that are adversely affected. The Trustee may in its discretion determine whether or not in accordance with the foregoing provisions Bonds of any particular maturity would be affected by any modification or amendment of this Indenture and any such determination shall be binding and conclusive on the Corporation and all Owners of Bonds. The Trustee may receive an opinion of counsel, including Counsel's Opinion, as conclusive evidence as to whether Bonds of any particular maturity of such series would be so affected by any such modification or amendment of this Indenture.

Section 10.2 **Consent of Bondowners**. The Corporation may at any time adopt a Supplemental Indenture making a modification or amendment permitted by the provisions of Section 10.1 to take effect when and as provided in this Section. A copy of such Supplemental Indenture (or brief summary thereof) together with a request to Bondowners for their consent thereto (in form satisfactory to the Trustee) by the Corporation to Bondowners, shall be mailed by the Corporation, or the Trustee on its behalf, by first class mail, postage prepaid to the Owners of all Outstanding Bonds. Such Supplemental Indenture shall not be effective unless and until (a) there have been filed with the Trustee (i) the written consents of Owners of the percentages of Outstanding Bonds specified in Section 10.1 and (ii) a Counsel's Opinion stating that such Supplemental Indenture has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (b) a notice shall have been given as hereinafter provided in this Section. Any consent or other instrument required by this Indenture to be signed by an Owner may be in any number of concurrent documents and may be signed by an Owner, by the Owner's agent appointed in writing or by the beneficial owner of such Bonds. Proof of the execution of such instrument or of the instrument appointing an agent and of the ownership of Bonds, if made in the following manner, shall be conclusive for any purposes of this Indenture with regard to any action taken by the Trustee under the instrument:

(a)      The fact and date of a person's signing an instrument may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments within that jurisdiction that the person signing the writing acknowledged before the officer the execution of the writing, or by an affidavit of any witness to the signing.

(b)      The fact of ownership of Bonds, the amount or amounts, numbers and other identification of such Bonds and the date of holding shall be proved by the registration books kept pursuant to this Indenture.

45545798.12                                63

(c)    The fact of beneficial ownership of the Bonds, the amount or amounts, numbers and other identification of such Bonds and the date of holding will be proved by the certificates delivered to the Trustee pursuant to this Indenture.

At any time thereafter notice, stating in substance that the Supplemental Indenture (which may be referred to as a Supplemental Indenture adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentages of Bonds and will be effective as provided in this Section, may be given to Bondowners by the Corporation by mailing such notice to Bondowners (but failure to make such notice shall not prevent such Supplemental Indenture from becoming effective and binding as in this Section provided) not more than ninety (90) days after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Indenture and the written statement of the Corporation hereinabove provided for is filed. The Corporation shall file with the Trustee proof of the mailing of such notice. A transcript, consisting of the papers required or permitted by this Section to be filed with the Trustee, shall be proof of the matters therein stated. Such Supplemental Indenture making such amendment or modification shall be deemed conclusively binding upon the Corporation, each Fiduciary and the Owners of all Bonds at the expiration of thirty (30) days after the filing with the Trustee of the proof of the mailing of such last mentioned notice, except in the event of a final decree of a court of competent jurisdiction setting aside such Supplemental Indenture in a legal action or equitable proceeding for such purpose commenced within such thirty (30) day period; provided, however, that the Corporation during such thirty (30) day period and any such further period during which any such action or proceeding may be pending shall be entitled in their absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Indenture as they may deem expedient.

Section 10.3 **Modifications by Unanimous Consent**. The terms and provisions of this Indenture and the rights and obligations of the Corporation and of the Owners of the Bonds thereunder may be modified or amended in any respect upon the adoption and filing by the Corporation of a supplemental Indenture and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.2, except that no notice to Bondowners shall be required.

Section 10.4 **Mailing**. Any provision in this Article for the mailing of a notice or other document to Bondowners shall be fully complied with if such notice or document is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his or her address, appearing upon the registration books held by the Trustee and (ii) to the Trustee.

Section 10.5 **Exclusion of Bonds**. Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of the Principal Amount of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such Bonds to give any consent or take any other action provided for taken under this Article. The Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

Section 10.6 **Notation on Bonds**. Bonds delivered after the effective date of any action taken as in Article 9 or this Article provided may, and if the Corporation so determines shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and upon presentation of his Bond for the purpose at the designated office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action. If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared and delivered, and upon demand of the Owner of any Bond then Outstanding shall be exchanged, upon surrender of such Bonds.

## ARTICLE 11

## DEFAULTS AND REMEDIES

Section 11.1 **Events of Default**.

Each of the following events is hereby declared an " Event of Default", that is to say; if

(i)      the Corporation shall fail to make payment of the principal or Redemption Price of, or Sinking Fund Installment on, any Bond from the Trust Estate after the same shall become due, whether at maturity or upon call for redemption, or otherwise; or

(ii)      the Corporation shall fail to make payment of interest on any Bond from the Trust Estate when and as the same shall become due; or

(iii)      the Corporation shall fail or refuse to comply with the provisions of the Act or shall default in the performance or observance of any other of the covenants, agreements or conditions on its part in this Indenture, any Supplemental Indenture, the Mortgage or in the Bonds contained, and such default shall continue for a period of ninety (90) days after written notice thereof by the Trustee or the Owners of not less than twenty-five percent (25%) in Principal Amount of the Outstanding Bonds; or

(iv)      if any event of default occurs under the Mortgage; or

(v)      if the Corporation shall have applied for or consented to the appointment of a receiver, trustee, or liquidator of all or a substantial part of its assets; admitted in writing the inability to pay its debts as they mature; made a general assignment for the benefit of creditors; been the subject of an order for relief under the Federal Bankruptcy Code, or been adjudicated a bankrupt, or filed a petition or an answer seeking reorganization, liquidation or any arrangement with creditors or taken advantage of any insolvency law, or submitted an answer admitting the material allegations of a petition in bankruptcy, reorganization, liquidation or insolvency proceedings; or an order, judgment or decree shall have been entered, without the application, approval or consent of the Corporation by any court of competent jurisdiction approving a petition seeking reorganization of the Corporation or appointing a receiver, trustee or liquidator of a substantial part of its assets and such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) consecutive days; or filed a voluntary petition in bankruptcy or failed to remove an involuntary petition in bankruptcy filed against it within sixty (60) days of the filing thereof; or

(vi)      if a final judgment for an amount in excess of $150,000 shall be outstanding against the Corporation for any period of sixty (60) days or more from the date of its entry and shall not have discharged in full or stayed pending appeal; or

(vii)      if the Corporation is without casualty insurance as required by Section 7.16 herein; provided, however, immediately upon obtaining the coverage required by such Section 7.16, the Corporation shall no longer be declared to be in default hereunder; or

(viii)      a draw is made from the Reserve Fund the Reserve Fund is not replenished to the Reserve Fund Requirement within sixty (60) days after the date of the draw.

Section 11.2 **Remedies**.

(a)     Upon the happening and continuance of any Event of Default specified in Section 11.1, then, and in each such case, the Trustee may proceed, and upon the written request of the Owners of not less than twenty-five percent (25%) in Principal Amount of the Outstanding Bonds shall, subject to Section 8.4 hereof, proceed in its own name, to protect and enforce its rights and the rights of the Bondowners by such of the following remedies as the Trustee shall deem most effectual to protect and enforce such rights:

(i)     by suit, action or proceeding, enforce all rights of the Bondowners hereunder, or at law or in equity, including the right to require the Corporation to receive and collect Revenues adequate to carry out the covenants and agreements as to, and pledge of, such Revenues, and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)     by bringing suit upon the Bonds;

(iii)     by action or suit, require the Corporation to account as if the Corporation were the trustee of an express trust for the Owners of the Bonds hereunder;

(iv)     by action or suit, enjoin any acts or things which may be unlawful or in violation of the rights of the Owners of the Bonds; and

(v)     by enforcement of any remedy provided by the Mortgage.

(b)     Upon the happening and continuance of any Event of Default specified in clause (i) or (ii) of Section 11.1, then, and in each such case, the Trustee may, and upon the written request of the Owners of not less than twenty-five percent (25%) in Principal Amount of the Outstanding Bonds, shall declare all Bonds due and payable, and if all defaults shall be made good, then, with the written consent of the Owners of not less than twenty-five (25%) in Principal Amount of the Outstanding Bonds, annul such declaration and its consequences.

(c)     Upon the happening and continuance of any Event of Default specified in clause (i) or (ii) of Section 11.1, then, and in each such case, the Trustee, upon the written request of the Owners of not less than a majority in Principal Amount of the Outstanding Bonds, shall exercise its rights and remedies under the Mortgage including foreclosure, and if all defaults shall be made good, then, with the written consent of the Owners of not less than a majority in Principal Amount of the Outstanding Bonds, terminate foreclosure proceedings.  The Trustee shall cooperate with the Corporation prior to and in the event it exercises its rights and remedies under the Mortgage to ensure the maximum amount of revenues for the Project.

(d)     In the enforcement of any remedy under this Indenture, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise, under any provision of this Indenture or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds, including reasonable attorneys' fees, without prejudice to any other right to remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect from any moneys available for such purpose, in any manner provided by law, the moneys adjudged or decreed to be payable.

45545798.12                                            66

Section 11.3 **Priority of Payments after an Event of Default**. In the event that the funds held by the Trustee and Paying Agents shall be insufficient for the payment of principal or Redemption Price of and interest then due on the Bonds, such funds (other than funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee acting pursuant to the Act and this Article 11, after making provision for the payment of any expenses necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds, and for the payment of the fees, charges and expenses and liabilities incurred and advances made by the Trustee in the performance of its duties under this Indenture, including reasonable attorneys' fees, shall be applied as follows:

(a) Unless the principal of all the Bonds shall not have become or have been declared due and payable,

First: To the payment to the persons entitled thereto of all installments of interest then due on the Bonds in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

Second: To the payment to the persons entitled thereto of the unpaid Principal Amounts or Redemption Price of any Bonds which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amounts available shall not be sufficient to pay in full all the Bonds due on any date, then to the payment thereof ratably, according to the amounts of Principal Amounts or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

(b) If the principal of all of the Bonds shall have become or have been declared due and payable, to the payment of the principal of and interest then due and unpaid upon the Bonds without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Bond over any other Bond, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Bonds.

Whenever moneys are to be applied by the Trustee pursuant to the provisions of this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional money becoming available for such application in the future; the deposit of such moneys with the Paying Agents, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner or to any other person for any delay in applying any such moneys, so long as the Trustee acts with reasonable diligence, having due regard for the circumstances, and ultimately applies the same in accordance with such provisions of this Indenture as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any unpaid Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

45545798.12

67

Section 11.4 **Termination of Proceedings**.  In the case any proceeding taken by the Trustee on account of any Event of Default shall have been discontinued or abandoned for any reason, then in every case the Corporation, the Trustee and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken.

Section 11.5 **Bondowners' Direction of Proceedings**.   Anything in this Indenture to the contrary notwithstanding, the Owners of a majority in Principal Amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Indenture and that the Trustee shall have the right to decline to follow any direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

Section 11.6 **Limitations on Rights of Bondowners**.  No Owner of any Bond shall have any right to institute any suit, action or other proceedings hereunder, or for the protection or enforcement of any right under this Indenture or any right under law, unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which suit, action or proceeding is to be taken, and unless the Owners of not less than twenty-five percent (25%) in Principal Amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case at the option of the Trustee to be conditions precedent to the execution of the powers under this Indenture or for any other remedy hereunder or under law and no direction inconsistent with such written request has been given to the Trustee within such period of time by the Owners of twenty-five percent (25%) of the principal amount of the Bonds then Outstanding.  It is understood and intended that no one or more Owners of the Bonds hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder or under law with respect to the Bonds or this Indenture, except in the manner herein provided, and that all proceedings shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds.  Not withstanding the foregoing provisions of this Section or any other provisions of this Article 11, the obligation of the Corporation shall be absolute and unconditional to pay the principal and Redemption Price of and interest on the Bonds to the respective Owners thereof at the respective due dates thereof, and nothing herein shall affect or impair the right of action, which is absolute and unconditional, of such Owners to enforce such payment.

Anything to the contrary contained in this Section or any other provision of this Indenture notwithstanding, each Owner of any Bond by his acceptance thereof shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Indenture or any Supplemental Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing of any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner, or group of Bondowners, holding at least twenty-five percent (25%) in Principal Amount of the Bonds Outstanding,

or to any suit instituted by any Bondowner for the enforcement of the payment of the principal or Redemption Price of or interest on any Bond on or after the respective date thereof expressed in such Bond.

Section 11.7 **Possession of Bonds by Trustee Not Required**. All rights of action under this Indenture or under any of the Bonds, enforceable by the Trustee, may be enforced by it without possession of any of the Bonds or the production thereof in the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Indenture. The Trustee is hereby appointed the agent and attorney-in-fact of the Bondowners hereunder for the purpose of filing any claims related to the Bonds, including but not limited to, tort claims and proofs of claims regarding bankruptcy matters.

Section 11.8 **Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

Section 11.9 **No Waiver of Default**. No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right of power accruing upon any default shall impair any such right of power or shall be construed to be a waiver of any such default or an acquiescence therein; and every power and remedy given by this Indenture to the Trustee and the Owners of the Bonds, respectively, may be exercised from time to time and as often as may be deemed expedient.

Section 11.10 **Notice of Event of Default**. The Trustee shall give to the Bondowners and the Corporation notice of each Event of Default hereunder known to the Trustee within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; provided that, except in the case of (i) default in any payment of the principal or Redemption Price of, or interest on any of the Bonds, or (ii) in the making of any payment required to be made into the Debt Service Fund or the Debt Service Reserve Fund, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Bondowners. Each such notice of Event of Default shall be given by mailing written notice thereof to all registered Owners of Bonds, as the names and address of such Owners appear upon the books of registration as kept by the Trustee.

## ARTICLE 12

### EXECUTION OF INSTRUMENTS BY BONDOWNERS
### AND PROOF OF OWNERSHIP OF BONDS

Section 12.1 **Evidence of Signatures of Bondowners and Ownership of Bonds**. Any request, direction, consent, revocation of consent, or other instrument in writing required or permitted by this Indenture to be signed or executed by Bondowners may be in any number of concurrent instruments of similar tenor, and may be signed or executed by such Bondowners in person or by their attorneys or agents appointed by an instrument in writing for that purpose. Proof of the execution of any such instrument, or of any instrument appointing any such attorney or agent, and of the holding and ownership of Bonds shall be sufficient for any purpose of this Indenture (except as otherwise herein provided), if made in the following manner: The fact and date of the execution by any Bondowner or his attorney or agent of any such instrument and of any instrument appointing any such attorney or agent, may be proved by delivery of a certificate, which need not be acknowledged or verified, of an officer of any bank, trust

45545798.12                                              69

company, or investment banking firm or of any notary public, or other officer authorized to take acknowledgments. Where any such instrument is executed by an officer of a corporation or association or a member of a partnership on behalf of such corporation, association or partnership, such certificate shall also constitute sufficient proof of his authority.

Nothing contained in this Article shall be construed as limiting the Trustee to such proof, it being intended that the Trustee may accept any other evidence of the matters herein stated which may seem sufficient. Any request or consent of the Owner of any Bond shall bind every future Owner of the same Bond in respect of anything done or suffered to be done by the Corporation, the Trustee or any Paying Agent pursuant to such request or consent. The ownership of the Bonds shall be proved by the Bond Register.

## ARTICLE 13

## DEFEASANCE

Section 13.1 **Defeasance**.

(a)    If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all of the Bonds then Outstanding, the principal of and interest on and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Indenture, then and in that event the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, the Trustee shall, upon request of the Corporation, execute and deliver to the Corporation all such instruments as may be reasonably requested by the Corporation to evidence such release and discharge and the Trustee and the Paying Agents shall pay over to deliver to the Corporation all moneys or securities held by them pursuant to the Indenture which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment of any amounts owed to the Trustee or for the payment or redemption.

(b)    If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of the Bonds then Outstanding, the principal of and interest on and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in this Indenture, then and in that event such Bonds shall cease to be entitled to any lien, benefit or security under this Indenture and the covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall be discharged and satisfied, except for the Corporation's obligations under Section 8.5 hereof, to the extent of any amounts owed to the Trustee.

(c)    Any Bonds or interest installments for the payment or redemption of which moneys shall then be held by the Trustee or the Paying Agents (through deposit by the Corporation of funds for such payment or redemption or otherwise), whether at or prior to the maturity or the redemption date of such Bonds, shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section. Any Bonds shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if (i) the Trustee receives an opinion of Bond Counsel to the effect that, in such counsel's opinion (x) the deposit with respect to such series of Bonds will not adversely affect the exclusion from gross income for Federal income tax purposes of the interest on any Bonds and (y) the conditions of this Article XIII have been satisfied with respect to the Bonds which are deemed to be paid, (ii) in case such Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give notice or redemption as provided in Article 4 of this Indenture on said date of such Bonds, (iii) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or noncallable Government Obligations the principal of and

45545798.12                                    70

interest on which when due will provide moneys which, together with the moneys, if any, deposited with the Trustee at the same time, shall be sufficient, as verified by an Accountant's Certificate to pay when due the principal or Redemption Price, if applicable, of such Bonds and interest due and to become due on such Bonds on and prior to the Principal Payment Date or Dates or redemption date or dates thereof, as the case may be, (iv) all compensation and expenses of the Trustee pertaining to such series of Bonds in respect of which such deposit is made have been paid or provided for to the Trustee's satisfaction, and all other obligations of the Corporation under the Bond Documents have been fully performed, (v) in the event such Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Corporation shall have given the Trustee in form satisfactory to it irrevocable instruction to give notice by mail, as soon as practicable, to the Owners of such Bonds that the deposit required by (iii) above has been made with the Trustee and that such Bonds are deemed to have been paid in accordance with paragraph (a) of this Section and stating such Principal Payment Date or Dates or redemption date or dates upon which moneys are to be available for the payment of the principal of Redemption Price, if applicable, on such Bonds, (vi) written evidence that such Bonds will, upon the deposit under (iii) above, be rated "AAA" by S&P and "Aaa" by Moody's, (vii) the escrow agreement pursuant to which the deposit requirement by (iii) above will be held provides that the Corporation will not exercise any optional redemption under Section 4.1(b) hereof not expressly required to be exercised under such escrow agreement and will not exercise any other redemption with respect to the Bonds deemed to be paid other than mandatory sinking fund redemption, and (viii) if the noncallable Government Obligations deposited pursuant to (iii) above are direct obligations of the United States Treasury then such obligations may not be substituted with Government Obligations that are not direct obligations of the United States Treasury without the prior written consent of a majority in aggregate principal amount of Bonds secured by such escrow agreement. Neither Government Obligations nor moneys deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Government Obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Government Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested in Government Obligations maturing at times and in Principal Amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such Principal Payment Date or Dates or redemption date or dates thereof, as the case may be, all as further provided in an escrow agreement relating to the defeasance of the Bonds.

(d)     Subject to the limitations set forth in the preceding paragraph, other Government Obligations may be substituted for those originally deposited with the Trustee pursuant to paragraph (c) of this Section; provided that there shall have been furnished to the Trustee a Counsel's Opinion to the effect that such substitution will not adversely affect the exclusion from federal gross income of interest on any Bonds and an Accountant's Certificate verifying the sufficiency of the moneys and Government Obligations to pay or redeem any Bonds deemed to have been paid pursuant to paragraph (c) of this Section.

(e)     Anything in this Indenture to the contrary notwithstanding, any moneys held by the Trustee or Paying Agents in trust for the payment and discharge of any of the Bonds which remain unclaimed for two years after the date when such Bonds have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such moneys were held by the Trustee or Paying Agents at such date, or for two years after the date of deposit of such moneys if deposited with the Trustee or Paying Agents after the said date when such Bonds became due and payable, shall be repaid by the Trustee or Paying Agents to the Corporation and become its absolute property, free from trust, and the Trustee or Paying Agents shall thereupon be released and discharged with respect thereto and the Bondowners thereafter shall look only to the Corporation for the payment of such Bonds.

## ARTICLE 14

## MISCELLANEOUS

Section 14.1 **Preservation and Inspection of Documents**.  All documents received by the Trustee or any Paying Agent under the provisions of this Indenture shall be retained in its possession and shall be subject to all reasonable times to the inspection of the Corporation, the Trustee or any Paying Agent, and, upon written request of not less than five percent (5%) in Principal Amount of the Owners of the Outstanding Bonds, such Owners and their agents and representatives, any of whom may make copies thereof.

Section 14.2 **Parties in Interest**.  Nothing in this Indenture adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give any person or party other than the Corporation, the Fiduciaries and the Owners of the Bonds pertaining thereto any rights, remedies or claims under or by reason of this Indenture or any covenant, condition, stipulation, promise, agreement or obligation thereof; and all covenants, conditions, stipulations, promises, agreements and obligations contained in this Indenture by or on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Fiduciaries and the Owners from time to time of the Bonds.

Section 14.3 **Limited Liability**.  Neither the State of Rhode Island, the City of Central Falls or the Corporation shall be obligated, except from Revenues, to pay the principal of the Bonds nor the interest thereon, nor are the faith and credit of the State, the Corporation or any other public body pledged to the payment of the principal of or interest on the Bonds.  The Bonds shall not directly or indirectly or contingently obligate the State or any other political subdivision to levy or pledge any form of taxation whatever therefor or to make any appropriation for their payment, and the Bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction.

Anything to the contrary herein notwithstanding, the Corporation shall be under no obligation to expend any of its own funds in connection with its duties hereunder, its liability therefor being solely limited to Revenues provided hereunder for such purpose.

Section 14.4 **No Recourse Under Indenture or on Bonds**.  All covenants, stipulations, promises, agreements and obligations of the Corporation continued in this Indenture shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Corporation and not of any member, officer or employee of the Corporation in his individual capacity, and no recourse shall be had for the payment of the principal or Redemption Price of or interest on the Bonds or for any claim based thereon or on this Indenture against any member, officers or employee of the Corporation or any person executing the Bonds.

Section 14.5 **Severability**.  If any one or more of the covenants, conditions, stipulations, promises, agreements or obligations provided in this Indenture on part of the Corporation or any Fiduciary to be performed should be determined by a court of competent jurisdiction to be contrary to law, then such covenant or covenants, condition or conditions, stipulation or stipulations, promise or promises, agreement or agreements, obligation or obligations shall be deemed and construed to be severable from the remaining covenants, conditions, stipulations, promises, agreements, and obligations herein contained and shall in no way affect the validity of the other provisions of this Indenture.

Section 14.6 **Headings**.  Any heading preceding the texts of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for the

convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect.

Section 14.7 **Conflict**. All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

Section 14.8 **Notices**. All notices, certificates or other communications shall be in writing and shall be sufficiently given and shall be deemed given on the second day following the date on which the same have been personally delivered or mailed by certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Corporation:    AVCORR Consultants
33 College Hill Road, Suite 15-A
Warwick, Rhode Island 02886
Attention: President

and

Central Falls Detention Facility Corporation
c/o Donald W. Wyatt Detention Facility
950 High Street
Central Falls, Rhode Island 02863
Attention: Chairperson and Treasurer

and

Ruggiero, Orton & Brochu
Twenty Centerville Road
Warwick, Rhode Island 02886
Attention: Chris Orton, Esq.

To the Trustee:    U.S. Bank National Association
One Federal Street, 3rd Floor
Boston, Massachusetts 02110
Attention: Corporate Trust Services

A duplicate copy of each notice, certificate or other communication given hereunder shall also be given to each of the above. All other documents required to be submitted to any of the foregoing parties shall also be submitted to such party at its address set forth above. Any of the foregoing parties may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates, documents or other communications shall be sent.

Section 14.9 **All Obligations Due on Business Days**. If the date for making any payment, performing any act, or exercising of any right, as provided in this Indenture, is a day which is not a Business Day, such payment may be made, act performed, or right exercised on the next succeeding Business Day with the same force and effect as if done on the nominal date provided under this Indenture.

Section 14.10 **Governing Law**. This Indenture shall be governed by, and interpreted in accordance with, the laws of the State of Rhode Island.

45545798.12      73

Section 14.11 **Pledge of State of Rhode Island**. Pursuant to the Act, the State of Rhode Island pledges to and agrees with the holders of any Bonds that the State of Rhode Island will not limit or alter the rights vested in the Corporation to fulfill the terms of any agreements made with the holders until the Bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of the holders, are fully met and discharged.

IN WITNESS WHEREOF, the Central Falls Detention Facility Corporation, has caused these presents to be signed in its name and on its behalf by its Chairperson, and, to evidence its acceptance of the trusts hereby created, the Trustee has caused these presents to be signed in its name and on its behalf by one of its duly authorized officers all as of the date first above written.

CENTRAL FALLS DETENTION FACILITY CORPORATION

By: _Albert M. Romanowiz_
Its: Chairperson

ATTEST:

_Casey Andrade_
Secretary

U.S. BANK NATIONAL ASSOCIATION

By: _Sam H. Cal_
Its: Authorized Signatory

45545798.12

## EXHIBIT A

## FORM OF SERIES 2005A BOND

**UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AS DEFINED IN THE INDENTURE OF TRUST) TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

R-__                                                                    $_____

## CENTRAL FALLS DETENTION FACILITY CORPORATION
## DETENTION FACILITY REVENUE REFUNDING BONDS
## (THE DONALD W. WYATT DETENTION FACILITY)
## SERIES 2005A

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| ____% | [January/July] 15, _____ | June 30, 2005 | |

REGISTERED OWNER:  CEDE & CO.

PRINCIPAL SUM:

Central Falls Detention Facility Corporation (the "Corporation"), a public corporation and an instrumentality and agency of the City of Central Falls, Rhode Island, organized and existing under the laws of the State of Rhode Island, for value received, hereby promises to pay, solely from the sources hereinafter described, to the Registered Owner named above or registered assigns or legal representative, on the Maturity Date specified above, upon the presentation and surrender hereof, the Principal Sum specified above and to pay by check mailed to the person in whose name this Bond is registered at the close of business on the fifteenth day (whether or not a business day) of the calendar month next preceding each interest payment date, solely from the same sources, interest on said sum from the date hereof at the Interest Rate per annum specified above, payable on January 15 and July 15 of each year, commencing January 15, 2006, until said Principal Sum is paid. Principal and any redemption premium and interest with respect to this Bond are payable at the designated office of U.S. Bank National Association, as Trustee, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

Capitalized terms used herein and not defined shall have the meanings given to such terms in the Indenture.

**THIS BOND IS A SPECIAL OBLIGATION OF THE CORPORATION, PAYABLE SOLELY FROM THE REVENUES, PREPAYMENTS AND NET PROCEEDS (AS DEFINED IN**

45545798.12                                          A-1

THE INDENTURE HEREINAFTER DESCRIBED) AND MONEYS, FUNDS AND ACCOUNTS PLEDGED BY THE INDENTURE. NEITHER THE STATE OF RHODE ISLAND NOR THE CITY NOR THE CORPORATION SHALL BE OBLIGATED TO PAY THE BONDS OR THE INTEREST THEREON EXCEPT FROM THE REVENUES. NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF RHODE ISLAND OR THE CITY IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS.

This Bond and the issue of which it forms a part is a limited obligation of the Corporation, giving rise to no pecuniary liability of the Corporation, the State of Rhode Island or any political subdivision thereof, nor any charge against its general credit, is payable solely from, and a valid claim of the Registered Owner hereof only against the Trust Estate. This Bond does not constitute an indebtedness or a loan of the credit of the Corporation or the State of Rhode Island or any political subdivision thereof within the meaning of any constitutional or statutory provisions. Neither the faith and credit nor the taxing power of the Corporation or the State of Rhode Island or any political subdivision thereof is pledged to the payment of principal of or interest on this Bond.

This Bond is one of a duly authorized issue of bonds of the Corporation designated as "Central Falls Detention Facility Corporation, Detention Facility Revenue Refunding Bonds (The Donald W. Wyatt Detention Facility) Series 2005A" (the "Bonds"), in the aggregate principal amount of One Hundred Six Million Three Hundred Eighty Thousand Dollars ($106,380,000), issued pursuant to Title 45, Chapter 54, Sections 1 et seq. of the General Laws of Rhode Island, as amended and supplemented (the "Act"), and under and pursuant to an Indenture of Trust dated as of June 1, 2005 (the "Indenture"), by and between the Corporation and U.S. Bank National Association, as trustee (the "Trustee"), for the purpose of refunding certain prior obligations of the Corporation and financing the cost of land acquisition and construction of a training center thereon.

The owner of this Bond should make reference to the Indenture and any and all supplements thereto and modifications and amendments thereof and to the Act for a description of the pledge and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledge, the rights and remedies of the registered owners of the Bonds with respect thereto and the terms and conditions upon which the Bonds are issued. Capitalized terms used herein shall have the meanings ascribed thereto in the Indenture unless otherwise indicated. Copies of the Indenture are on file at the office of the Corporation and at the designated office of the Trustee, Boston, Massachusetts, or its successor as trustee.

To the extent and in the manner permitted by the Indenture, the provisions of the Indenture or any Indenture amendatory thereof or supplemental thereto, may be amended by the Corporation. Certain amendments may be made without the consent of the owners of the Bonds and certain other amendments may be made only with the written consent of the owners of at least two-thirds in principal amount of the Bonds of the series then outstanding to which the amendment applies. No such amendment shall permit a change in the terms of redemption or maturity of the principal of any outstanding Bond or any installment of interest thereon or a reduction in the principal amount or redemption price thereof or in the rate of interest thereon without the consent of the owner of such Bond, or shall reduce the percentages of principal amount of Bonds the consent of the owners of which is required to effect any such amendment, or shall change or modify any of the rights or obligations of the Trustee or of any paying agent without its written consent thereto.

The Bonds are issuable only as fully registered bonds without coupons, in denominations of $5,000 or any integral multiple thereof. Bonds may be exchanged for an equal aggregate principal amount of Bonds and maturity, of other authorized denominations and bearing interest at the same rate at

the principal corporate trust office of the Trustee, in the manner and subject to the limitations and conditions provided in the Indenture and without cost except for any tax or other governmental charge.

The Bonds maturing on January 15, 2009 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on January 15, 2008, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

| Date | Sinking Fund Amount |
|------|---------------------|
| 01/15/2008 | $570,000 |
| 07/15/2008 | 570,000 |
| 01/15/2009 (maturity) | 590,000 |

The Bonds maturing on January 15, 2013 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on July 15, 2009, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

| Date | Sinking Fund Amount |
|------|---------------------|
| 07/15/2009 | $630,000 |
| 01/15/2010 | 650,000 |
| 07/15/2010 | 675,000 |
| 01/15/2011 | 700,000 |
| 07/15/2011 | 720,000 |
| 01/15/2012 | 745,000 |
| 07/15/2012 | 765,000 |
| 01/15/2013 (maturity) | 795,000 |

The Bonds maturing on July 15, 2035 are subject to mandatory sinking fund redemption by application of the Sinking Fund Installments as provided herein on each January 15 and July 15, commencing on July 15, 2013, at a Redemption Price equal to the Principal amount of each Bond or portion thereof to be redeemed, plus accrued interest to the date of redemption thereof, without premium, on the respective dates and in the amounts set forth in the following table:

| Date | Sinking Fund Amount | Date | Sinking Fund Amount |
|---|---|---|---|
| 07/15/2013 | $820,000 | 01/15/2025 | 1,860,000 |
| 01/15/2014 | 850,000 | 07/15/2025 | 1,930,000 |
| 07/15/2014 | 880,000 | 01/15/2026 | 2,005,000 |
| 01/15/2015 | 910,000 | 07/15/2026 | 2,075,000 |
| 07/15/2015 | 950,000 | 01/15/2027 | 2,150,000 |
| 01/15/2016 | 980,000 | 07/15/2027 | 2,225,000 |
| 07/15/2016 | 1,015,000 | 01/15/2028 | 2,310,000 |
| 01/15/2017 | 1,055,000 | 07/15/2028 | 2,390,000 |
| 07/15/2017 | 1,090,000 | 01/15/2029 | 2,475,000 |
| 01/15/2018 | 1,130,000 | 07/15/2029 | 2,565,000 |
| 07/15/2018 | 1,175,000 | 01/15/2030 | 2,660,000 |
| 01/15/2019 | 1,215,000 | 07/15/2030 | 2,755,000 |
| 07/15/2019 | 1,260,000 | 01/15/2031 | 2,855,000 |
| 01/15/2020 | 1,305,000 | 07/15/2031 | 2,960,000 |
| 07/15/2020 | 1,350,000 | 01/15/2032 | 3,070,000 |
| 01/15/2021 | 1,400,000 | 07/15/2032 | 3,180,000 |
| 07/15/2021 | 1,450,000 | 01/15/2033 | 3,295,000 |
| 01/15/2022 | 1,505,000 | 07/15/2033 | 3,415,000 |
| 07/15/2022 | 1,560,000 | 01/15/2034 | 3,540,000 |
| 01/15/2023 | 1,615,000 | 07/15/2034 | 3,665,000 |
| 07/15/2023 | 1,670,000 | 01/15/2035 | 3,800,000 |
| 01/15/2024 | 1,735,000 | 07/15/2035 (maturity) | 13,075,000 |
| 07/15/2024 | 1,795,000 | | |

The Bonds maturing after July 15, 2015 are subject to optional redemption at the option of the Corporation prior to the stated maturities thereof as may be directed by the Corporation, in whole or in part, on any date on or after July 15, 2015, at the applicable redemption price (the "Redemption Price") set forth below (expressed as a percentage of the Principal Amount of the Series 2005A Bonds to be redeemed) together with accrued interest thereon to the date fixed for redemption; provided, however, that upon an Event of Default the Series 2005A Bonds may not be redeemed in part unless approved in writing by the Majority Owner:

| Redemption Period | Redemption Price |
|---|---|
| July 15, 2015 through January 14, 2016 | 103.0% |
| January 15, 2016 through July 14, 2016 | 102.5 |
| July 15, 2016 through January 14, 2017 | 102.0 |
| January 15, 2017 through July 14, 2017 | 101.5 |
| July 15, 2017 through January 14, 2018 | 101.0 |
| January 15, 2018 through July 14, 2018 | 100.5 |
| July 15, 2018 and thereafter | 100.0 |

The Bonds shall be subject to redemption at the option of the Corporation on any date prior to the stated maturities thereof, in whole or in part as shall be determined by the Corporation in its sole discretion, at a Redemption Price equal to 100% of the Principal Amount of such Bonds or portions thereof to be redeemed, together with accrued interest thereon to the date of redemption, in a Principal Amount having an aggregate Redemption Price equal to the amount of moneys which are deposited in or transferred to the Redemption Fund, from any Net Proceeds in connection with a condemnation or casualty loss which results in Net Proceeds (provided that such Redemption Price in the event of a condemnation shall equal 108% of the Principal Amount, together with accrued interest to the date of redemption, if the Project continues to be used as a detention facility or any related purpose), from amounts released from the Capital Improvement Fund or the Expansion Project Account representing excess proceeds of the Series 2005A Bonds in such account and from excess amounts in the Reserve Fund resulting from a reduction in the Reserve Fund Requirement after giving effect to redemption under this subsection (c)(i). The Trustee shall apply any such amounts described above in accordance with applicable provisions hereof from time to time as directed by Officer's Certificate; provided, however, that (i) such amount to be applied to such redemption or purchase shall be rounded to the next lower authorized denomination, and (ii) unless otherwise directed by an Officer's Certificate, no such redemption of Bonds shall be effected unless the total amount to be applied to redeem Bonds on such date shall be at least $25,000.

The Bonds shall be subject to redemption on any Interest Payment Date prior to the stated maturities thereof at the option of the Corporation, in whole or in part as shall be determined by the Corporation in its sole discretion, at the applicable redemption price (the "Redemption Price") set forth below (expressed as a percentage of the Principal Amount of the Bonds to be redeemed) together with accrued interest thereon to the date of redemption, from the excess amounts in the Operational Reserve Fund; provided, however, that upon an Event of Default the Bonds may not be redeemed in part unless so approved in writing by the Majority Owner:

45545798.12                                              A-5

| Redemption Period | Redemption Price |
|---|---|
| January 15, 2005 through July 15, 2015 | 103.0% |
| January 15, 2016 | 102.5 |
| July 15, 2016 | 102.0 |
| January 15, 2017 | 101.5 |
| July 15, 2017 | 101.0 |
| January 15, 2018 | 100.5 |
| July 15, 2018 and thereafter | 100.0 |

If any or all of the Bonds are to be redeemed prior to maturity, the Trustee shall give notice, which notice shall specify the maturities of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable, whether such redemption is conditioned upon the availability of funds for such purpose on the redemption date and, if less than all of the Bonds of any maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only, such notice shall also specify the respective portions of the Principal Amount thereof to be redeemed. Such notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the Principal Amount thereof in the case of Bonds to be redeemed in part only, together with interest accrued on such Bonds to the redemption date, and that from and after such date interest on such Bonds shall cease to accrue and be payable; provided that, if the redemption is conditioned upon funds being available therefor no later than the opening of business on the redemption date, the notice shall so state. The Trustee shall mail a copy of such notice, by first class mail, postage prepaid, not less than thirty (30) days (provided, however, in the case of special redemption as described above, such notice shall be given not less than ten (10) days) nor more than forty-five (45) days before the redemption date, to the Owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registration book. Failure to give such notice with respect to any Bonds, or any defect therein, shall not affect the validity of the proceedings for redemption of any other Bonds.

With respect to any optional redemption of Bonds, if at the time of mailing such notice of redemption, the Corporation shall not have deposited with the Trustee moneys sufficient to redeem all the Bonds called for redemption, such notice may state that it is conditional, that is, subject to the deposit of the redemption moneys with the Trustee not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited.

Pursuant to the Act, the State of Rhode Island pledges to and agrees with the holders of any Bonds that the State of Rhode Island will not limit or alter the rights vested in the Corporation to fulfill the terms of any agreements made with the holders until the Bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of the holders, are fully met and discharged.

The transfer of this Bond is registrable by the Registered Owner hereof in person or by his attorney or legal representative at the principal corporate trust office of the Trustee but only in the manner and subject to the limitations and conditions provided in the Indenture and upon surrender and cancellation of this Bond. Upon any such registration of transfer the Corporation shall execute and the Trustee shall authenticate and deliver in exchange for this Bond a new registered Bond or Bonds without

45545798.12                              A-6

coupons, registered in the name of the transferee, of authorized denominations, in an aggregate principal amount equal to the principal amount of this Bond, of the same series and maturity and bearing interest at the same rate.

It is hereby certified and recited that all conditions, acts and things required by law and the Indenture to exist, to have happened and to have been performed precedent to and in the issuance of this Bond, exist, have happened and have been performed and that the issue of the Bonds, of which this is one, together with all other indebtedness of the Corporation is within every debt and other limit prescribed by the laws of the State of Rhode Island.

This Bond shall not be entitled to any benefit under the Indenture or be valid or become obligatory for any purpose until this Bond shall have been authenticated by the execution by the Trustee of the Certificate of Authentication attached hereto.

IN WITNESS WHEREOF, the Corporation has caused this Bond to be signed in its name and on its behalf by the facsimile signature of the Chairperson and attested to by the facsimile signature of the Secretary of the Corporation, and has caused this Bond to be dated as of June 1, 2005.

CENTRAL FALLS DETENTION FACILITY CORPORATION

By:_____
　　　　　　　　　　Chairperson

ATTEST:

_____
Secretary

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds of the issue described in the within-mentioned Indenture.

Date of Authentication: _____, 2005

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
　　　　　　　Authorized Signatory

45545798.12

A-8

## ASSIGNMENT

For value received the undersigned hereby sells, assigns and transfers unto

_____

_____

(Name, Address and Tax Identification or Social Security Number)

the within-mentioned Bond and hereby irrevocably constitute(s) and appoint(s)

_____ attorney, to transfer the same on the registration books of the Trustee with full power of substitution in the premises.

Dated: _____

Signature Guaranteed:

_____

Note: Signature(s) must be guaranteed by a qualified guarantor.

Note: The signature(s) on this Assignment must correspond with the name(s) as written on the face of the within Bond in every particular without alteration or enlargement or any change whatsoever.

45545798.12

A-9

## EXHIBIT B

## [RESERVED]

## EXHIBIT C

## CAPITALIZED INTEREST PAYMENT SCHEDULE

| Interest Payment Date | Principal Draw from GIC | 3.73% Interest on GIC | Total Amount Available for Bond Interest Payment |
|---|---|---|---|
| 1/15/2006 | 2,764,751 | 195,926 | 2,960,677 |
| 7/15/2006 | 2,268,286 | 129,292 | 2,397,578 |
| 1/15/2007 | 2,310,590 | 86,989 | 2,397,579 |
| 7/15/2007 | 2,353,682 | 43,896 | 2,397,578 |

45545798.12

C-1

**Exhibit D**

| Wyatt Detention Facility<br>Cash Flow Projection Model<br>*as of 07/09/2026* | 1<br>Projection<br>7/18/2026 | 2<br>Projection<br>7/25/2026 | 3<br>Projection<br>8/1/2026 | 4<br>Projection<br>8/8/2026 | 5<br>Projection<br>8/15/2026 | 6<br>Projection<br>8/22/2026 | 7<br>Projection<br>8/29/2026 | 8<br>Projection<br>9/5/2026 | 9<br>Projection<br>9/12/2026 | 10<br>Projection<br>9/19/2026 | 11<br>Projection<br>9/26/2026 | 12<br>Projection<br>10/3/2026 | 13<br>Projection<br>10/10/2026 | 14<br>Projection<br>10/17/2026 | 15<br>Projection<br>10/24/2026 | 16<br>Projection<br>10/31/2026 | 7/18/2026<br>10/31/2026<br>BK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *CONFIDENTIAL - FOR PROFESSIONAL EYES ONLY* | | | | | | | | | | | | | | | | | |
| **BEGINNING CASH BALANCE** | 12,187,692 | 11,390,187 | 10,486,002 | 12,832,752 | 11,210,490 | 10,449,446 | 9,500,631 | 11,882,753 | 11,741,045 | 11,008,900 | 10,003,645 | 8,463,309 | 11,386,321 | 10,654,064 | 9,717,749 | 8,626,383 | 12,187,692 |
| **CASH COLLECTIONS** | 335 | 87,876 | 3,079,614 | 603,354 | - | 52,783 | 3,114,519 | 603,960 | - | 52,783 | 74,970 | 3,668,577 | - | 47,314 | 5,469 | 3,722,759 | **15,114,311** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | | | | | |
| Payroll Disbursements | 562,677 | 569,346 | 562,677 | 575,958 | 562,677 | 569,346 | 562,677 | 575,958 | 562,677 | 643,746 | 562,677 | 575,958 | 562,677 | 569,346 | 637,685 | 575,958 | 9,232,037 |
| Operating Disbursements | 160,163 | 395,715 | 170,187 | 1,649,659 | 168,867 | 395,252 | 169,721 | 169,709 | 169,469 | 395,292 | 169,629 | 169,607 | 169,581 | 395,282 | 169,607 | 169,601 | 5,087,340 |
| Total Operational Disbursements | 722,840 | 965,061 | 732,864 | 2,225,617 | 731,543 | 964,598 | 732,397 | 745,667 | 732,145 | 1,039,038 | 732,306 | 745,564 | 732,258 | 964,628 | 807,292 | 745,559 | 14,319,376 |
| **Operational Change in Cash** | (722,505) | (877,185) | 2,346,750 | (1,622,263) | (731,543) | (911,815) | 2,382,121 | (141,707) | (732,145) | (986,255) | (657,336) | 2,923,012 | (732,258) | (917,315) | (801,822) | 2,977,200 | 794,935 |
| *Ch 11. Related Disbursements* | | | | | | | | | | | | | | | | | |
| Ch 11. Professionals | - | 12,000 | - | - | 17,500 | - | - | - | - | 7,000 | 792,000 | - | - | 7,000 | 113,000 | - | 948,500 |
| Account Trustee (UMB / Indenture) | - | - | - | - | 12,000 | - | - | - | - | 12,000 | - | - | - | 12,000 | - | - | 36,000 |
| Ordinary Course Professionals | - | 15,000 | - | - | - | 37,000 | - | - | - | - | 91,000 | - | - | - | 63,000 | - | 206,000 |
| United States Trustee Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 113,544 | - | 113,544 |
| Other | 75,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 75,000 |
| Total Ch 11. Disbursements | 75,000 | 27,000 | - | - | 29,500 | 37,000 | - | - | - | 19,000 | 883,000 | - | - | 19,000 | 289,544 | - | 1,379,044 |
| **CHANGE IN CASH** | (797,505) | (904,185) | 2,346,750 | (1,622,263) | (761,043) | (948,815) | 2,382,121 | (141,707) | (732,145) | (1,005,255) | (1,540,336) | 2,923,012 | (732,258) | (936,315) | (1,091,366) | 2,977,200 | (584,109) |
| **ENDING OPERATIONAL CASH BALANCE** | 11,390,187 | 10,486,002 | 12,832,752 | 11,210,490 | 10,449,446 | 9,500,631 | 11,882,753 | 11,741,045 | 11,008,900 | 10,003,645 | 8,463,309 | 11,386,321 | 10,654,064 | 9,717,749 | 8,626,383 | 11,603,583 | $ 11,603,583 |